**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VANDA PHARMACEUTICALS, INC.,<br>2200 Pennsylvania Avenue, N.W.<br>Suite 300E<br>Washington, DC 20037,<br><br>DECEMBER GUZMAN<br>3806 S. Bonniewood Drive<br>West Valley City, UT 84119,<br><br>CATHY HARTWIG, and<br>10541 S. 161st West Ave.<br>Sapulpa, OK 74066,<br><br>LOUISA JENNESS<br>135 Sumner Rd.<br>Brookline, MA 02445<br><br>                            Plaintiffs,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION,<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993,<br><br>NORMAN E. SHARPLESS, M.D., in his official<br>capacity as Acting Commissioner of Food and Drugs<br>Food and Drug Administration<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993,<br><br>and | Civ. No. 1:19-cv-00301-JDB<br><br>Hon. John D. Bates |

ALEX M. AZAR II, in his official capacity as
Secretary of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201,

                                        Defendants.

## FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

Introduction ................................................................................................................... 1

Preliminary Allegations ................................................................................................ 4

    A.    Gastroparesis is a severe, life-altering condition, and new treatments are needed. ................................................................................................................ 4

    B.    Tradipitant has been extensively studied in animals and humans. ................. 7

    C.    Parties. ............................................................................................................ 9

Jurisdiction and Venue ............................................................................................... 13

Regulatory Background .............................................................................................. 13

    A.    The law governing Investigational New Drug applications. ........................ 13

    B.    The FDA's limited authority to impose clinical holds on new drug trials. ... 16

    C.    The FDA has established categorical requirements for nonclinical toxicity studies. ......................................................................................................... 17

    D.    The FDA has effectively incorporated international guidelines as law. ....... 19

Procedural Background ............................................................................................... 23

    A.    Vanda's initial Phase II clinical trial of tradipitant (Study 2301) ............... 23

    B.    The FDA relies on the ICH Guidance to require a 9-month nonrodent study. ............. 24

    C.    The FDA imposes a partial clinical hold and rejects Vanda's appeal. ......... 28

    D.    The FDA requests voluntary remand to address its deficient partial clinical hold. ............................................................................................................. 31

Arbitrary and Capricious Agency Conduct ................................................................ 35

    A.    The Remand Response is based on arbitrary and capricious reasoning. ...... 36

    B.    The FDA's claimed regulatory consensus is not scientific consensus. ........ 43

    C.    The scientific consensus confirms that a 9-month dog toxicity study is not necessary and would not be useful for determining human toxicity. .......... 44

Claims for Relief ........................................................................................................ 48

    A.    Count I: failure to provide an opportunity for notice and comment. ........... 48

    B.    Count II: arbitrary and capricious agency action (failure to ground the decision in scientific evidence). ................................................................... 49

    C.    Count III: arbitrary and capricious agency action (standardless decisionmaking). ........................................................................................ 52

Prayer for Relief ........................................................................................................ 53

Plaintiff Vanda Pharmaceuticals, Inc. (Vanda) brings this First Amended Complaint against Defendants and alleges as follows:

## INTRODUCTION

1.      Gastroparesis is a debilitating chronic digestive disorder. It is a disease in which the stomach cannot empty itself of food in a normal fashion. Patients who suffer from gastroparesis often experience exceptional distress from eating, including chronic vomiting of food that does not pass through the stomach. Gastroparesis frequently causes constant and oppressive nausea, a nausea that is so severe and recurrent that everyday life functions—from working to spending time with family to basic travel—become functionally impossible.

2.      Plaintiff Vanda Pharmaceuticals is currently developing the drug tradipitant. Tradipitant has shown exceptional promise to treat the nausea associated with gastroparesis. During a 3-month human clinical trial, Plaintiffs December Guzman, Cathy Hartwig, and Louisa Jenniss all experienced significant improvement to their nausea symptoms while on tradipitant. Important life activities that many take for granted—such as Hartwig visiting her grandchildren—suddenly became possible for these individuals.

3.      Tradipitant has been studied in over 2,000 animals during pre-clinical studies. This includes 3-month tests in canines. Tradipitant has also been studied in approximately 600 humans. While additional testing in human trials is needed prior to marketing approval, Vanda believes that the evidence from the previously-conducted studies presents an overwhelming basis to conclude that tradipitant is sufficiently safe for continued testing in humans.

4.      In particular, Vanda seeks to sponsor additional clinical trials with additional par-
ticipants, so that it can more fully understand the complete efficacy and safety profile of the drug
as it relates to gastroparesis.

5.      To that end, Vanda seeks to extend human trials beyond 3 months' duration.
Plaintiffs Guzman, Hartwig, and Jenniss desperately want to continue treatment beyond 3
months, so as to contribute to the development of tradipitant and to benefit from the relief they
previously experienced while taking tradipitant.

6.      While the FDA is currently allowing Vanda to study tradipitant in humans in tri-
als up to 3 months—and it allowed the individual plaintiffs to experience the relief tradipitant
provided for up to 3 months—the FDA has issued a partial clinical hold, precluding Vanda from
continuing its studies even a single day past 3 months. The FDA takes the position that, notwith-
standing all the evidence presented by Vanda, a 9-month study in nonrodents is required before
Vanda may proceed to a 12-month human trial.

7.      There is no evidence that a 9-month nonrodent study will have any predictive val-
ue for safety or efficacy in humans beyond the studies already submitted to the FDA by Vanda.

8.      At the same time, conducting scientifically unhelpful animal tests imposes very
real costs. It diverts limited time and resources from innovative drug research and development
efforts. It causes significant delay in the availability of drugs that help patients, including the in-
dividual plaintiffs in this case.

9.      In addition, animal studies always conclude with the destruction of the animals;
the FDA's insistence on needless nonrodent animal testing thus means the pointless killing of

dogs, typically beagles. In the aggregate, the FDA's inflexible requirements lead to the pointless destruction of thousands of dogs and other animals each year.

10.     In structuring its testing requirements, the FDA must be responsive to the need for access to new therapies for disorders lacking effective treatments—and not just the need for evidence regarding drug efficacy and toxicity.

11.     The original partial clinical hold, issued prior to this litigation, was unambiguous in its reasoning: the agency employs an inflexible, bureaucratic requirement that sponsors of Investigational New Drugs (IND) first conduct a 9-month nonrodent toxicity study.

12.     After Vanda filed this lawsuit, the FDA voluntarily remanded the case, ostensibly so that it could further articulate its reasoning. But the agency instead produced entirely new, post hoc rationalizations for the original partial clinical hold. Such post hoc rationalizations are not permissible as a matter of law in these circumstances.

13.     In any event, the new rationalizations for the partial clinical hold fail on their own. The FDA lacks legal or scientific basis for ordering this additional pre-clinical testing. No statute or regulation obligates Vanda to engage in a 9-month nonrodent test.

14.     Rather, the remand response invokes a general regulatory provision that requires sponsors of new drugs to provide non-specific safety information to the FDA. In practice, the FDA is using that provision to require 9-month nonrodent studies as a categorical precondition to approval of 12-month human trials. In this way, the FDA has effectively amended its regulation to require 9-month nonrodent studies without notice-and-comment rulemaking. But the Administrative Procedure Act (APA) does not allow the FDA to modify its regulations so comprehen-

sively without using the procedures specified in 5 U.S.C. § 553 that are designed to ensure transparency, encourage public participation, and safeguard the public interest.

15.     To be sure, if the FDA had a specific basis to believe that a 12-month human clinical trial is unsafe, the FDA has significant authority to block the trial on that basis. But the FDA did not exercise that statutory and regulatory authority here. In fact, the FDA has allowed clinical trials of tradipitant to continue, so long as they do not exceed 3 months. That is all for good reason: the underlying toxicity studies do not provide any meaningful basis to conclude that further pre-clinical study is necessary or appropriate.

## PRELIMINARY ALLEGATIONS

### A.     Gastroparesis is a severe, life-altering condition, and new treatments are needed.

16.     Gastroparesis is a serious chronic digestive disorder. For those with gastroparesis, their stomachs cannot empty food into the small intestines. After undigested food remains in a patient's stomach for some days, patients will typically vomit that food—in violent fashion—after it ferments (or rots) in the individual's stomach. Patients with the disease suffer from constant nausea and abdominal pain. They often are unable to eat full meals in light of what doctors call "early satiety" and "postprandial fullness."

17.     Gastroparesis is a common complication for patients with diabetes. This disorder is particularly threatening for these individuals, and it can result in recurrent hospitalizations.

18.     The estimated number of patients with confirmed gastroparesis in the United

States is approximately 70,000-80,000, with four times as many females affected as males.[1] The actual prevalence of gastroparesis in the U.S. population, including undiagnosed cases, is expected to be significantly higher, with estimates that it may affect roughly 1.8% of the U.S. population (or approximately 5.9 million individuals).[2]

19.     Gastroparesis has a substantial impact on the day to day functioning of those with the disease. Patients often find that the nausea, discomfort, and pain associated with gastroparesis interfere with their employment, social life, and maintaining normal eating patterns. Symptom exacerbations frequently lead to hospitalization. In one study of 1423 adult patients, 45.5% reported that they were not working or were working limited hours due to their gastroparesis.[3]

20.     Moreover, gastroparesis tends to be progressive, with symptoms worsening over time as damage to the gastrointestinal system accumulates. While the early stages of the disease are characterized simply by weight loss (along with nausea, vomiting, and stomach pain), the final stages often require a feeding tube and frequent hospitalizations.

21.     FDA itself has recognized the serious nature of gastroparesis—and the unmet need for treatment options—by approving Fast Track designations for two drugs intended to treat

---

[1]  *See* Hye-kyung Jung et al., *The Incidence, Prevalence and Outcomes of Patients with Gastroparesis in Olmsted County, Minnesota from 1996 to 2006*, 136 Gastroenterology 1225, Table 4 (2009) (reporting an observed prevalence of definite gastroparesis in Olmsted County of 37.8 in women and 9.6 in men per 100,000 persons, with an overall observed prevalence of 24.2 per 100,000). Using a U.S. population estimate of 325 million, it follows that there are between 70,000 to 80,000 confirmed cases of gastroparesis in the U.S based on this epidemiology study.

[2]  *See* Enrique Rey et al., *Prevalence of Hidden Gastroparesis in the Community: The Gastroparesis "Iceberg"*, 18 Journal of Gastroenterology & Motility 34, 39 (2012).

[3]  *See* Daohai Yu, et al., *The Burdens, Concerns, and Quality of Life of Patients with Gastroparesis*, 62 Dig. Dis. Sci. 879, 883 (2017).

the disease.[4] Fast track designation may be granted only where a drug is intended "for the treatment of a serious or life-threatening disease or condition" and "demonstrates the potential to address unmet medical needs for such a disease or condition." 21 U.S.C. § 356(b)(1). As FDA has explained, "[d]etermining whether a condition is serious . . . is based on whether the drug will have an impact on such factors as survival, day-to-day functioning, or the likelihood that the condition, if left untreated, will progress from a less severe condition to a more serious one." *See* FDA, *Fast Track* (Jan. 4, 2018), perma.cc/E83B-6KYF.

22.     There currently are no long-term pharmacological treatment options for gastroparesis in the United States.

23.     Each of the drugs currently available to treat gastroparesis is associated with serious adverse reactions that prevent long-term use.

24.     The FDA-approved label for Reglan (metoclopramide) bears a boxed warning—FDA's most serious warning—regarding the risk of developing tardive dyskinesia (TD), a serious movement disorder that is untreatable and often irreversible. The warning recommends avoiding treatment for longer than 12 weeks because of the risk of developing TD with longer-term use. Reglan is also subject to a Risk Evaluation and Mitigation Strategy (REMS) requiring that a guide for patients be distributed with the drug.[5] A REMS is necessary when a particular

---

[4] *See* Steve Duffy, *Fast Track Designation Granted to Novel Gastroparesis Therapy*, MPR (Dec. 6, 2016), perma.cc/Q552-PTRU (discussing Fast Track designation of velusetrag); Press Release, *Allergan to Aquire GI Disease Subsidiary of Rhythm Holding Company, LLC, Expanding Innovative Gastroenterology Pipeline*, Allergan (Oct. 27, 2016), perma.cc/C2RC-RUH8 (discussing Fast Track designation of relamorelin).

[5] FDA, Reglan Highlights of Prescribing Information (2017), perma.cc/VZ2U-WQZN; Letter from Joyce Korvick, FDA, to Mary Alonso, Alaven Pharm. (Sept. 4, 2009), perma.cc/M8UC-MZ9S.

risk or risks associated with a medication may outweigh its benefits and additional interventions beyond FDA-approved labeling are necessary to ensure that the drug's benefits outweigh its risks.[6]

25.     Domperidone is the second possible option. It is not FDA-approved, but it is potentially available pursuant to an expanded access (or "compassionate use") investigational new drug application. However, Domperidone is associated with serious cardiovascular risks, including sudden cardiac death.[7]

26.     Erythromycin, an antibiotic and prokinetic, is not approved for treatment of gastroparesis, but is sometimes used off-label to treat the disease. Erythromycin generally loses its effectiveness against gastroparesis symptoms after a few weeks of treatment.

**B.     Tradipitant has been extensively studied in animals and humans.**

27.     Tradipitant is an experimental drug that is a neurokinin 1 antagonist. It works by blocking the actions of substance P, a small signaling molecule. Originally, this compound was owned by Eli Lilly and named LY686017. Plaintiff Vanda Pharmaceuticals licensed the compound from Eli Lilly in 2012.

28.     Tradipitant has been studied for efficacy and safety in both animals and humans for multiple indications, beginning in 2003. In particular, Vanda began studying tradipitant for gastroparesis in November 2016. Nonclinical animal studies have included a three-month canine chronic toxicity study, and multiple acute and chronic rodent toxicity studies, including three-

---

[6]  FDA, Frequently Asked Questions (FAQs) about REMS, perma.cc/NPU8-FXYH.

[7]  FDA, How to Request Domperidone for Expanded Access Use, perma.cc/SNJ2-MWA7.

and six-month studies. In Vanda's view, not one of these animal studies has identified clinically relevant safety signals for use of tradipitant in humans. The primary toxicity findings from these studies—which involved dosing of the drug at concentrations many times higher than would be used in humans—do not raise safety concerns because the toxicities identified in the animal studies are not expected to occur in humans or are not considered to be adverse in humans.[8]

29.     The studies conducted of tradipitant include the following, none of which Vanda believes have shown a relevant safety signal:



30.     Similarly, clinical testing of tradipitant in more than 600 patients to date at vari-

---

[8] *See* Vanda, Tradipitant Investigator's Brochure (May 14, 2018), at 43-44.

ous doses has shown no clinically-relevant safety signals.

**C.      Parties.**

31.      Plaintiff **Vanda Pharmaceuticals, Inc.** is a global biopharmaceutical company focused on the development and commercialization of innovative therapies to address high un-met medical needs and to improve the lives of patients.

32.      Vanda is developing a promising new drug called tradipitant to provide long-term treatment for the debilitating nausea symptoms associated with gastroparesis.

33.      Plaintiff **Cathy Hartwig** is an individual residing in Oklahoma. Hartwig is 68 years old and suffers from gastroparesis. She was a participant in Study 2301.

34.      Gastroparesis has seriously reduced Hartwig's quality of life. When her symp-toms are particularly bad, the tremendous pain, pressure, and nausea that she experiences essen-tially prevents her from functioning; she is unable to do anything other than sit still in one place. Even between violent vomiting episodes, Hartwig's gastroparesis causes constant low-level dis-comfort that is always with her, never allowing her to truly feel normal.

35.      Hartwig has also had endometrial cancer. Of the two diseases, gastroparesis has had a greater effect on her life. While her cancer was serious, it did not limit the places that Hartwig could go or what she could do. Because of her gastroparesis, Hartwig is essentially con-fined to sitting still in her home. She is not even able to mow her lawn.

36.      Hartwig participated in a three-month clinic trial for tradipitant. Taking tradipitant changed Hartwig's outlook entirely. Her gastroparesis symptoms were alleviated for most of the time she was taking the drug, other than mild bloating. Taking tradipitant resulted in an enor-

mous improvement to her overall quality of life.

37.     In particular, Hartwig could schedule dinners with her friends while she was taking tradipitant. Perhaps most important, tradipitant allowed Hartwig to travel to see her young grandchildren.

38.     Because of the partial clinical hold, Hartwig is no longer able to obtain tradipitant. Since she stopped taking the drug, Hartwig's debilitating symptoms have returned, forcing her to cancel holiday celebrations, dinners with friends, and trips to be with her grandchildren—all of which she was able to enjoy while taking tradipitant. The partial clinical hold is, in short, preventing Hartwig from living her life.

39.     Plaintiff **Louisa Jenness** is an individual residing in Massachusetts. Louisa is 25 years old and suffers from gastroparesis. She was a participant in Study 2301, the three-month clinic trial for tradipitant.

40.     Gastroparesis has seriously reduced Louisa's quality of life. Before being diagnosed with the disease in 2016, Louisa was physically active—exercising on a daily basis, playing competitive rugby, and running marathons. Gastroparesis ended all of that. Louisa was unable to exercise without becoming nauseated and vomiting. Along with active episodes of vomiting, she experiences constant low-level nausea and queasiness that impacts her quality of life. She even had to quit her job at one point because the symptoms were too severe to permit her to work. The impacts of the disease have been mental and emotional as well as physical; much of Louisa's social life had centered around the athletic activities in which she is no longer able to participate. Louisa and her doctors tried all of the currently available treatments for gastropare-

sis, but all either were ineffective or caused unpleasant side effects.

41.     Taking tradipitant during Vanda's clinical trial significantly improved Louisa's symptoms and her quality of life. Her vomiting episodes were greatly reduced in frequency, and her constant low-level nausea was eliminated entirely. She was able to eat semi-solid foods for the first time in longer than one year, and was able to return and play a full season of rugby with her team. Louisa feels that tradipitant gave her life back.

42.     Louisa wants to continue taking tradipitant—the only treatment that meaningfully helps her gastroparesis symptoms without dangerous and unpleasant side effects—as part of an extension to Study 2301, but FDA's partial clinical hold prevents her from accessing the drug. She has had to go back to using only rescue medications for her symptoms, and bad bouts of nausea have returned.

43.     While she still attempts to play rugby, Louisa's nausea frequently prevents her from taking part in team sessions. Since the tradipitant trial ended, Louisa has gone back to school for electrical engineering, but she is unable to take a full course load for fear that her gastroparesis symptoms will cause her to fall behind academically and prevent her from finishing her degree. The FDA clinical hold is thus preventing her from living the life she was able to live with tradipitant.

44.     Plaintiff **December Guzman** is in individual residing in Utah. December is in her mid-30s, and she suffers from gastroparesis. She was a participant in Study 2301.

45.     Gastroparesis has seriously reduced December's quality of life since she was diagnosed in 2011. Due to the disorder, only about 70% of the solid food she eats digests; the rest

sits in her stomach, causing nausea, pain, and discomfort until she vomits it back up again up to three days later. Gastroparesis frequently causes December to miss work, as the flare-ups are debilitating. All of her paid time off goes to missing work for her symptoms. As a result, December has missed out on opportunities for professional advancement and promotion at the medical records retrieval firm where she works, as her employer cannot be sure whether she will be able to attend her job on any given day. She is also frequently unable to take part in normal social activities, like going out to dinners or drinks with her friends.

46.     December's gastroparesis symptoms meaningfully improved while taking tradipitant as part of Study 2301. Her episodes of serious nausea and vomiting were significantly reduced in duration, and she was able to trade in her normal liquid diet for eating solid-food meals with her family over the Christmas holiday. The improvement in her symptoms gave her the confidence to plan a multi-day train journey down the West coast—a vacation that would normally be impossible due to her gastroparesis—but she was forced to cancel the trip when the FDA imposed the clinical hold, cutting off December's supply of tradipitant.

47.     Each of the three individual plaintiffs participated in an earlier 3-month clinical trial. Each of these individuals would be eligible to participate in the 12-month clinical trial, if Vanda were permitted to proceed with that proposed trial. Each individual would participate in that longer trial. The FDA's partial clinical hold thus directly injures these plaintiffs by depriving of the only treatment that has meaningfully relieved their serious symptoms. In sum, but for the partial clinical hold, the individual plaintiffs would have access to tradipitant today.

48.     Defendant **Food and Drug Administration** is an agency of the United States

government within the Department of Health and Human Services. The Secretary of Health and Human Services has delegated to the FDA the authority to administer the relevant provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*

49.     Defendant **Norman E. Sharpless, M.D.**, is Acting Commissioner of Food and Drugs. He is sued in his official capacity.

50.     Defendant **Alex M. Azar II** is Secretary of Health and Human Services. He is the official charged by law with administering the FDCA. He is sued in his official capacity.

## JURISDICTION AND VENUE

51.     This suit is brought under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

52.     The Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 551, *et seq.*, 28 U.S.C. § 1331, and § 2201.

53.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because at least one defendant resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Plaintiff Vanda resides in this district.

## REGULATORY BACKGROUND

**A.     The law governing Investigational New Drug applications.**

54.     Under the Food, Drug, and Cosmetic Act (FDCA), a new drug may not be introduced into interstate commerce without FDA approval. *See* 21 U.S.C. §§ 355(a), 331(d); *see also, e.g.*, *Actavis Elizabeth LLC v. FDA*, 625 F.3d 760, 761 (D.C. Cir. 2010).

55.     The FDCA requires the FDA to create, by regulation, an exception to this prohibi-

tion for new drugs that are used solely in clinical trials "to investigate the[ir] safety and effectiveness." 21 U.S.C. § 355(i)(1). The statute permits the FDA to promulgate regulations to "condition[] such exemption upon," among other things, the submission of "reports, by the manufacturer or the sponsor of the investigation of such drug, of preclinical tests (including tests on animals) of such drug adequate to justify the proposed clinical testing." *Id.*

56.     The FDA's regulations implementing 21 U.S.C. § 355(i) require the sponsor of a new drug to submit an Investigational New Drug application before clinical trials in the United States may begin. *See* 21 C.F.R. § 312.20. Among other things, an IND must contain information on the drug's chemistry and manufacturing, information on the pharmacological and toxicological effects of the drug from animal studies and in vitro testing, information on any previous human experience, and a protocol for each planned study. *See id.* § 312.23.

57.     An IND automatically becomes active 30 days after it is submitted to the FDA, unless FDA imposes a "clinical hold," as described below. 21 U.S.C. § 355(i)(2), (3). The statutory default rule, in short, favors allowing clinical trials to proceed in the absence of sufficiently compelling reasons to stop them.

58.     Once an IND is active, clinical trials generally are conducted in three phases. *See* 21 C.F.R. § 312.21.

59.     Phase I involves the initial introduction of a new drug into human subjects; it may be conducted in patients or healthy volunteer subjects; and it is "designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." 21 C.F.R. § 312.21-

(a)(1).

60.     Phase II studies are "typically well controlled, closely monitored, and conducted in a relatively small number of patients" and are used to evaluate "effectiveness of the drug for a particular indication . . . and to determine the common short-term side effects and risks associated with the drug." 21 C.F.R. § 312.21(b).

61.     Phase III studies are expanded trials, usually including hundreds or thousands of subjects, designed to "gather . . . additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." 21 C.F.R. § 312.21(c).

62.     During the clinical trial process, a drug sponsor is required to provide ongoing reports to the FDA. In some cases, study investigators seek review and approval of new and amended protocols, submit required safety reports, submit significant findings from other clinical and nonclinical studies of the drug, and submit annual reports summarizing specified categories of information from the past year. *See* 21 C.F.R. §§ 312.30–312.33.

63.     When a drug sponsor wishes to conduct a study that is "not covered by a protocol already contained in" an existing IND, that new study may begin as soon as two conditions are met: (1) the sponsor must submit the protocol to the FDA for its review; and (2) an Institutional Review Board (IRB) with responsibility for the study must review and approve the protocol in accordance with the requirements of 21 C.F.R. Part 56. *See* 21 C.F.R. § 312.30(a). A drug sponsor must also submit to the FDA any amendment to its Phase II or III protocol that "affects the safety of subjects, the scope of the investigation, or the scientific quality of the study" and the

protocol change can be made provided the same two conditions are met. *Id.* § 312.30(b).

**B.      The FDA's limited authority to impose clinical holds on new drug trials.**

64.      At any time during the clinical development of a new drug, including prior to commencing clinical studies under an IND, the FDA has limited authority to enter a clinical hold. The FDA "may prohibit the sponsor of an investigation from conducting the investigation (referred to in this paragraph as a 'clinical hold') if [the FDA] makes a determination described in subparagraph (B)." 21 U.S.C. § 355(i)(3)(A).

65.      If a clinical hold is imposed before a study begins, "subjects may not be given the investigational drug." 21 C.F.R. § 312.42(a). If the study is already underway, "no new subjects may be recruited to the study and placed on the investigational drug" and "patients already in the study should be taken off therapy involving the investigational drug unless specifically permitted by FDA in the interest of patient safety." *Id.*

66.      When imposing a clinical hold, "[t]he Secretary shall specify the basis for the clinical hold, including the specific information available to the Secretary which served as the basis for such clinical hold, and confirm such determination in writing." 21 U.S.C. § 355(i)(3)(A).

67.      21 U.S.C. § 355(i)(3)(B) authorizes the FDA Secretary to impose a clinical hold on a drug if the Secretary determines that "the drug involved represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation" *or* "for such other reasons as the Secretary may by regulation establish."

68.      FDA regulations list four specific circumstances in which IND clinical studies

may be placed on clinical hold. 21 C.F.R. § 312.42(b). *First*, a clinical hold may be imposed if "[h]uman subjects are or would be exposed to an unreasonable and significant risk of illness or injury." *Id.* § 312.42(b)(1)(i). *Second*, a clinical hold will be imposed if "[t]he clinical investigators named in the IND are not qualified by reason of their scientific training and experience to conduct the investigation described in the IND." *Id.* § 312.42(b)(1)(ii). *Third*, a clinical hold may be ordered if "[t]he investigator brochure is misleading, erroneous, or materially incomplete." *Id.* § 312.42(b)(1)(iii). *Finally*, a clinical hold may be imposed if "[t]he IND does not contain sufficient information required under [21 C.F.R.] § 312.23 to assess the risks to subjects of the proposed studies." *Id.* § 312.42(b)(1)(iv).

69.     Prior to imposing a clinical hold, FDA regulations require that, "unless patients are exposed to immediate and serious risk, [the FDA will] attempt to discuss and satisfactorily resolve the matter with the sponsor before issuing the clinical hold order." 21 C.F.R. § 312.42(c). When a clinical hold order is issued, the order "will identify the studies under the IND to which the hold applies, and will briefly explain the basis for the action . . . and no more than 30 days after imposition of the clinical hold, the Division Director will provide the sponsor a written explanation of the basis for the hold." *Id.* § 312.42(d).

70.     A clinical trial subject to a clinical hold order "may only resume after FDA . . . has notified the sponsor that the investigation may proceed." 21 C.F.R. § 312.42(e).

## C.     The FDA has established categorical requirements for nonclinical toxicity studies.

71.     Before a drug is tested on human patients, it is generally tested first in nonclinical toxicity studies so that the sponsor of the drug can better understand its toxicity. Nonclinical

studies include rodent studies and nonrodent studies (typically dogs).

72.     Nonclinical studies range from 3 months in length to 12 months and involve tens or hundreds of animals. At the conclusion of each nonclinical study, the animals are killed so their anatomy can be studied.

73.     Relevant regulations require an IND to include "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or *in vitro*, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8).

74.     To this end, an IND must include "[a]n integrated summary of the toxicological effects of the drug in animals and in vitro." 21 C.F.R. § 312.23(a)(8)(ii). "Depending on the nature of the drug and the phase of the investigation," the regulations provide, "the description is to include the results of acute, subacute, and chronic toxicity tests; tests of the drug's effects on reproduction and the developing fetus; any special toxicity test related to the drug's particular mode of administration or conditions of use (e.g., inhalation, dermal, or ocular toxicology); and any in vitro studies intended to evaluate drug toxicity." *Id.*

75.     The FDA's regulations do not identify any particular nonclinical toxicology studies that must be conducted before a sponsor concludes that a clinical study in human subjects would be reasonably safe. The regulations state that the "kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8). The regulations also note that "[g]uidance documents are available from FDA that describe ways in which these requirements may be met." *Id.* The regulations do

not describe the guidance documents as exhaustive or mandatory.

76.     Certain other federal regulatory agencies, like the Environmental Protection Agency (EPA), include detailed animal toxicology study requirements in regulations. For example, EPA has a detailed "data table" that indicates the specific "toxicology data requirements" required by the EPA "for a particular pesticide product," and includes where applicable "specific conditions, qualifications, or exceptions to the designated test." 40 C.F.R. § 158.500(a). While FDA guidance documents recommend particular study requirements, the FDA has not formally promulgated those recommendations as binding regulatory requirements.

77.     The guidance documents referenced in 21 C.F.R. § 312.23(a)(8) were not adopted pursuant to the notice and comment procedures mandated by the Administrative Procedure Act for binding agency rules. *See* 5 U.S.C. § 553.

78.     In adopting the guidance documents referenced in 21 C.F.R. § 312.23(a)(8), the FDA also did not perform the analysis required for final rules under the Regulatory Flexibility Act. *See* 5 U.S.C. § 604(a).

**D.     The FDA has effectively incorporated international guidelines as law.**

79.     The International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) is a private, non-profit, international association organized under Swiss law. It promotes the harmonization of technical requirements for the registration of pharmaceutical products among the European Union, Japan, and the United States. It has several members and observers, from both national regulatory authorities as well as the private pharmaceutical industry.

80.     The guidance documents referenced in 21 C.F.R. § 312.23(a)(8) adopt the guide-
lines for nonclinical toxicity studies prepared by the ICH. *See* FDA, *Guidance for Industry: M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals* (Jan. 2010), https://www.fda.gov/media/71542/download.

81.     We refer to these guidelines as the "ICH Guidance."

82.     The current ICH Guidance is a revision of guidance originally developed by the ICH and published by FDA as draft guidance on May 2, 1997, and final guidance on November 25, 1997. *See* International Conference on Harmonisation; Draft Guideline on the Timing of Nonclinical Studies for the Conduct of Human Clinical Trials for Pharmaceuticals, 62 Fed. Reg. 24,320 (May 2, 1997) (draft guidance); International Conference on Harmonisation: Guidance on Nonclinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals, 62 Fed. Reg. 62,922 (Nov. 25, 1997) (final guidance).

83.     With respect to chronic toxicity studies in rodents and nonrodents, the ICH Guidance provides that "[t]he recommended duration of . . . repeated-dose toxicity studies is usually related to the duration, therapeutic indication, and scope of the proposed clinical trial." ICH Guidance at 7. "In principle," the guidance states, "the duration of the animal toxicity studies conducted in two mammalian species (one nonrodent) should be equal to or exceed the duration of the human clinical trials up to the maximum recommended duration of the repeated-dose toxicity studies." *Id.* But the guidance clarifies that, "[i]n circumstances where significant therapeutic gain has been shown, trials can be extended beyond the duration of supportive repeated-dose toxicity studies on a case-by-case basis." *Id.*

84.     The ICH Guidance further specifies that "[s]ix-month rodent and 9-month non-rodent studies generally support dosing for longer than 6 months in clinical trials." *Id.* But a different rule applies in Europe; there, "studies of 6 months' duration in nonrodents are considered acceptable." *Id.* at 8. Additionally, there are various exceptions and "examples" where "non-rodent studies of up to 6 months' duration can also be appropriate for Japan and the United States": when immunogenicity or intolerance confounds conduct of longer term studies; drugs with repeated short-term drug exposure, even if the trial duration exceeds six months (e.g., treatment of migraine); and drugs for indications with short life expectancy or for reducing the risk of recurrence of cancer. *Id.* at 8.

85.     The 9-month recommended duration of chronic toxicity studies in nonrodents provided in the ICH Guidance represents a compromise position that the ICH adopted not based on a clear scientific rationale but rather "so as to avoid duplication and to follow a single development plan for chronic toxicity testing of new medicinal products" across the US, EU, and Japan. International Conference on Harmonisation; Draft Guidance on the Duration of Chronic Toxicity Testing in Animals (Rodent and Nonrodent Toxicity Testing); Availability, 62 Fed. Reg. 61,513, 61,515 (Nov. 18, 1997); *see also* International Conference on Harmonisation; Guidance on the Duration of Chronic Toxicity Testing in Animals (Rodent and Nonrodent Toxicity Testing); Availability, 64 Fed. Reg. 34,259, 34,260 (June 25, 1999) (same).

86.     To support the recommendation of 9 months of chronic toxicity studies in nonrodents, regulatory authorities in the European Union, Japan, and the United States, under the auspices of the ICH, undertook a joint evaluation of chronic toxicity studies to "determine

whether a single duration for chronic toxicity testing in nonrodents could be identified." 62 Fed.

Reg. at 61,514. The authorities concluded that "a more detailed evaluation of 6 versus 12 months

data should be undertaken." *Id.*

87.     This "detailed evaluation" by the ICH was limited in its consideration of the

meaningfulness of toxicological findings in chronic nonrodent toxicity studies, "focus[ing] pri-

marily on toxicological outcome, and less weight was given to the potential human significance

of the findings, or the influence of findings on marketing and labeling[.]" Joseph J. DeGeorge et

al., *The Duration of Non-rodent Toxicity Studies for Pharmaceuticals*, 49 Toxicological Sci. 142,

145 (1999).Moreover, the data considered by the ICH were inconclusive on the question of what

duration of nonrodent testing was appropriate. As the FDA explained in the *Federal Register*, in

some of the cases analyzed:

> there were no additional [toxicity] findings at 12 months [as opposed to 6
> months]. For some other cases, there was not complete agreement among the
> regulators with respect to the comparability in study design and conduct to al-
> low assessment of whether there were differences in the findings at 6 and 12
> months due to duration of treatment alone. In a number of cases there were
> findings observed by 12 months, but not by 6 months. It was concluded that
> these would, or could, have been detected in a study of 9 months duration.
> Varying degrees of concern for the differences in findings detected between
> the studies of different durations were expressed. *An agreement on the clinical
> relevance of these findings could not be reached. Studies of 12 months dura-
> tion are usually not necessary and studies of shorter than 9 months duration
> may be sufficient.*

62 Fed. Reg. at 61,514-15 (emphasis added); *see also* 64 Fed. Reg. at 34,260.

89.     In light of the authorities' disagreements over the proper length of nonrodent test-

ing—driven in part by "regional differences in regulatory history, statutes, policies, and perspec-

tives"—a 9-month standard was selected, not due to any scientific consensus but rather for administrative convenience. *See* DeGeorge, *supra*, at 154; *see also* 62 Fed. Reg. at 61,514-15.

## PROCEDURAL BACKGROUND

**A.      Vanda's initial Phase II clinical trial of tradipitant (Study 2301)**

90.      On August 17, 2016, Vanda submitted its original protocol for Study 2301, a multicenter, randomized, double-blind placebo-controlled study of tradipitant for subjects diagnosed with gastroparesis. The study was initiated on November 22, 2016.

91.      Vanda subsequently submitted several protocol amendments to the FDA. Under Protocol Amendment #5, submitted on December 15, 2017, Study 2301 consisted of 150 subjects, aged 18-70 years, who were diagnosed with idiopathic or diabetic gastroparesis with moderate to severe nausea. Study 2301 patients were randomized into one of two treatment arms to receive oral capsules of either 85 mg of tradipitant or placebo, and were studied during a 4-week screening phase, followed by a 4-week evaluation phase. The primary endpoint in Study 2301 measured change from baseline to Day 28 in average daily individual nausea severity scores.

92.      On April 10, 2018, Vanda submitted Protocol Amendment #6 to extend Study 2301 to add a 52-week, open-label extension period. In addition to providing scientifically valuable information on the effect of tradipitant in patients with gastroparesis, Vanda sought the extension, among other reasons, because patients and clinicians were requesting that Vanda continue the study due to patients' desire to stay on the drug as a direct result of the relief they had experienced in the study and the lack of alternative treatments.

93.      The submission included, among other materials, a survey examining the burdens,

concerns, and quality of life of 1,423 adults in the general community diagnosed with gastroparesis. The survey contained responses about participant symptoms and severity, as well as treatments and satisfaction with treatments for gastroparesis.

94.     The submission also included a July 28, 2017 letter from a patient currently enrolled in the tradipitant study voicing strong support for the open-label extension. This patient explained that tradipitant had changed her life by allowing her to "go from taking multiple doses of rescue medications for nausea to only taking 4 over the course of a month" and allowing her to "go back to playing rugby and going to the gym, which was incredible."

95.     During a May 14, 2018, teleconference with Maureen Dewey, the FDA's Senior Regulatory Project Manager assigned to Study 2301, about the possibility of an open-label extension, Vanda informed FDA that the company had already completed both a three-month canine chronic toxicity study and a six-month rat chronic toxicity study of tradipitant, both of which supported tradipitant's safety for human use. During this teleconference, the FDA did not ask whether Vanda had completed any other chronic toxicity studies, and agreed to a subsequent discussion the following day.

**B.      The FDA relies on the ICH Guidance to require a 9-month nonrodent study.**

96.     During a May 15, 2018, teleconference, the FDA informed Vanda that, despite the extensive toxicity and other nonclinical data collected for tradipitant, the FDA would require Vanda to complete a 9-month, repeated-dose, nonrodent toxicity study before the FDA would permit Vanda to conduct a human dosing study for longer than 3 months.

97.     The FDA cited the 9-month study as a "requirement" under the ICH Guidance.

98.     The FDA stated that, if Vanda did not agree to conduct the 9-month study, the FDA would place a clinical hold on Vanda's proposed open-label extension. The FDA did not cite safety concerns as a basis for the threatened clinical hold; instead, it relied exclusively on the absence of a 9-month nonrodent toxicity study.

99.     Vanda told the FDA that it intended to pursue formal dispute resolution procedures to object to a clinical hold.

100.    No one at the FDA informed Vanda that when Vanda submitted an amended protocol limiting treatment to no longer than 3 months, it would (in the FDA's view) forfeit its right to challenge the FDA's position regarding the 9-month nonclinical rodent study "requirement" through the formal dispute resolution process.

101.    Although Vanda strongly disagreed with the FDA's decision, on May 22, 2018, Vanda submitted an amended protocol limiting Study 2301 to a treatment duration of no longer than 3 months in order to avoid being placed on clinical hold and jeopardizing not only Protocol Amendment #6 but the entirety of Study 2301. Vanda did so based on the insistence from the FDA that Vanda withdraw Protocol Amendment #6 as soon as possible.

102.    On May 24, 2018, the FDA sent Vanda a letter agreeing to the amendment. The letter stated that while Vanda's proposed modification was "accepted based on the currently available nonclinical data," the FDA would consider imposing a "clinical hold under 21 CFR 312.42" should Vanda again seek to extend the protocol to provide tradipitant to human subjects for longer than 3 months. It based its position on its view that, without a 9-month study required by the ICH Guidance, Vanda necessarily lacked "adequate nonclinical safety data to support

clinical trials beyond 3 months duration."

103.    On August 1, 2018, Vanda submitted the Formal Dispute Resolution Request (FDRR) to FDA. The FDRR explained that tradipitant's safety profile is supported by a wealth of data from toxicity, nonclinical, and clinical studies. The FDRR also showed that the scientific community has recognized that 9-month animal studies are unlikely to demonstrate any adverse health effects not seen in shorter studies. Furthermore, the FDRR articulated the view that companies and the FDA alike have a moral imperative to limit studies requiring the death of animal participants.

104.    On August 16, 2018, the FDA rejected the FDRR on the ground that a request for formal dispute resolution was not appropriate "at this time" because a protocol for a clinical trial exceeding 3 months in duration "has not been submitted to [Vanda's] application."

105.    On September 26, 2018, Vanda submitted a new clinical study protocol (Study 2302) to FDA in an effort to engage with the FDA on the underlying science behind tradipitant and the good faith reasons Vanda believed a 9-month nonrodent toxicity study was not warranted.

106.    Like the proposed extension to Study 2301, Study 2302 is a planned 12-month open label extension study of tradipitant in patients with gastroparesis who were previously enrolled in Study 2301. Vanda submitted Study 2302 in light of its concern that the FDA might impose a clinical hold that would apply to Study 2301 in its entirety.

107.    Under 21 C.F.R. § 312.30(a), a new protocol to an existing IND can be implemented immediately upon its submission to the FDA provided that the sponsor ensures adher-

ence to other FDA requirements for clinical trials.

108.    FDA's Center for Drug Evaluation and Research (CDER) utilizes an internal manual called the Manual of Policies and Procedures (MAPP).

109.    The MAPP provides a process for the FDA to conduct expedited reviews of new protocols to existing INDs for potential safety issues that might warrant the imposition of a hold.[9]

110.    The MAPP states that, within seven business days of receipt of a new phase 2 protocol, "a [r]eviewer [or] team leader should screen [the submission] … to determine priority status; potential clinical hold issues; and need for consult [with] quality, clinical pharmacology (including pharmacogenomics and pharmacometrics), or other disciplines." MAPP 6030.9 at 37.

111.    To the extent a written safety or efficacy review is needed, the MAPP recommends a 60-day review period and communication with the sponsor as needed during that period. *Id.* Under the MAPP, a protocol change should be reviewed within 30 days for safety issues, and within 60 days for development concerns, and written reviews are recommended by the appropriate discipline(s) for safety concerns as well as other changes, with communication with the sponsor on an as needed basis. *Id.* at 38.

112.    The FDA did not respond to Vanda's submission of Study 2302 for almost 3 months, signaling that the FDA did not have specific concerns with Vanda's proposal. If the

---

[9]  *See* CDER Manual of Policies and Procedures 6030.9, *Good Review Practice: Good Review Management Principles and Practices for Effective IND Development and Review* (Apr. 29, 2013) (MAPP 6030.9), https://perma.cc/JR28-3CQL.

FDA followed the procedures set forth in the MAPP, any significant safety concerns would have been caught within the seven-day screening period, and any clinical hold communicated to Vanda promptly, so that study subjects would not be unnecessarily put at risk.

113.    In November 2018, Vanda contacted the FDA via email to confirm that the FDA was comfortable with the extension study, because there was no reason to begin study implementation if a clinical hold was imminent. Dewey inquired in response as to how many individuals were participating in Study 2302, implying that the FDA by then believed the new protocol was already ongoing.

114.    On the assumption that the FDA no longer had concerns about a 12-month study, Vanda submitted a protocol amendment on December 11, 2018, to add a 12-month open label extension to Study 2301. As amended, the open label extension phase of Study 2301 is similar to Study 2302 in structure, visit number, and in efficacy and safety assessments measured.

**C.      The FDA imposes a partial clinical hold and rejects Vanda's appeal.**

115.    Following Vanda's submission of the protocol for Study 2302, Vanda responded to requests for additional information by the FDA. For example, on October 12, 2018, Vanda provided the final report on Ely Lilly's Phase 1b clinical study of tradipitant as a treatment for IBS.

116.    On December 3, 2018, Vanda forwarded to the FDA an announcement of the topline results for Study 2301. Those results indicated that tradipitant met the primary endpoint of the study, and was well tolerated, with comparable rates of adverse events between the study participants receiving tradipitant and those receiving placebo.

117.    Then, on December 19, 2018, the FDA informed Vanda by telephone that both protocols (2301 and 2302) had been placed on partial clinical hold. During that teleconference, Vanda asked if the FDA had a specific concern with respect to tradipitant. Dr. Lisa Soule at CDER responded that this was not the case, and that the clinical hold was "not based on data on your individual program." Vanda understood this to mean that the FDA had no concerns about the data or studies that Vanda had presented with respect to tradipitant. Instead, the FDA's sole concern was that Vanda had not complied with the FDA's demand that Vanda conduct an additional, 9-month toxicity study in a nonrodent species. Dr. Soule stated that this additional study was a requirement of the ICH Guidance, and that Vanda had not complied with that requirement.

118.    The FDA followed the December 19, 2018 call with a letter dated December 21, 2018, to provide a written explanation of the clinical hold it had initially communicated orally (the Partial Clinical Hold Letter). The letter stated that both Study 2301 and Study 2302 were put on clinical hold to the extent they have a duration longer than 3 months. The Partial Clinical Hold Letter also noted that the Division had discussed Vanda's concerns with FDA's MPPRC, and that FDA as an agency was in agreement that "non-rodent toxicity studies of 9 months duration are required for the conduct of [Vanda's] proposed clinical investigations of 52 weeks (12 months) duration, per the ICH [Guidance.]" Partial Clinical Hold Letter at 2.

119.    The Partial Clinical Hold Letter further explained that "[t]he rationale to support the ICH requirement for the 9-month duration for non-rodent toxicity studies is summarized in the following publication: DeGeorge JJ, Meyers LL, Takahashi M, Contrera JF. *The duration of non-rodent toxicity studies for pharmaceuticals. Toxicol Sci 1999; 49: 143-155*, which noted that later

toxicologic findings have been observed in the absence of earlier toxicologic findings." Partial Clinical Hold Letter at 2.

120.     The Partial Clinical Hold Letter did not acknowledge or address the scientific arguments raised by Vanda, or Vanda's request that the agency apply the ICH Guidance's exception to the 9-month nonrodent toxicity study requirement. Nor did it square its categorical position with respect to the 9-month study as a requirement with the DeGeorge article's observation that "[s]ome flexibility [is] necessary, since in some cases, shorter duration studies (less than 9 months) might be adequate to detect relevant toxicities[.]" DeGeorge, *supra,* at 154.

121.     The Partial Clinical Hold Letter did not assert that further clinical studies of tradipitant would pose an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation.

122.     The FDA offered Vanda the "potential option" of conducting a staggered canine toxicity study chronologically ahead of the clinical trial. Still, a 9-month study would be required, and the staggered approach "would require inclusion of additional animals to provide for interim sacrifice" to stay ahead of the clinical trial. Partial Clinical Hold Letter at 2.

123.     The Partial Clinical Hold Letter made clear that the FDA would give Vanda only one of two choices. Either Vanda would "submit satisfactory results from a chronic toxicology study of 9 months duration in a non-rodent species, per ICH M3(R2) guidance prior to conducting a clinical trial exceeding 3 months (12 weeks) in duration," or Vanda's clinical studies of tradipitant as a potential treatment option for gastroparesis would be at an end. *Id*.

124.     On December 21, 2018, Vanda responded to the Partial Clinical Hold Letter by re-

questing reconsideration from Janet Woodcock, M.D., the Director of CDER, and then-FDA Commissioner Dr. Scott Gottlieb. Vanda once again reiterated tradipitant's well-documented safety profile and the more recent retrospective studies questioning whether an extended canine toxicity study was likely to find any significant safety data beyond that found in a three-month study.

125.    Vanda further noted that the FDA's rote reliance on the ICH Guidance reflects arbitrary decisionmaking and improper treatment of the ICH Guidance as a de facto regulation mandating 9-month nonrodent toxicity studies without complying with notice-and-comment rulemaking requirements.

126.    On January 4, 2019, Dr. Peter Stein, Director of CDER's Office of New Drugs, communicated by telephone to Vanda's Chief Executive Officer about Vanda's communication. Dr. Stein explained that he had conferred with Dr. Woodcock about Vanda's concerns. He stated that Vanda's question as to whether the additional 9-month study would yield any additional information that would be meaningful from an FDA regulatory decisionmaking perspective was a thoughtful one, but that the FDA would not change its position. Dr. Stein also stated that the FDA had considered granting a waiver to Vanda based on its safety data but had decided not to do so because this would imply that the FDA was changing its policy on the issue.

**D.    The FDA requests voluntary remand to address its deficient partial clinical hold.**

127.    On February 5, 2019, Vanda filed this action against FDA, then-Commissioner Gottlieb, and Alex M. Azar, Secretary of Health and Human Services. Dkt. 1. The complaint argued that the FDA had violated the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, by

treating the ICH Guidance as a legislative rule even though it was not adopted through notice and comment, and by making an arbitrary and capricious determination that Vanda's trials of tradipitant could not proceed until Vanda conducted a 9 month nonrodent toxicity study, including by ignoring the scientific evidence that Vanda had submitted. *Id.* ¶¶ 144-68.

128.    The FDA moved for voluntary remand of the case to the agency, and the Court granted that motion, noting that the "FDA has identified substantial and legitimate concerns related to the completeness and accuracy of the agency's explanation for the clinical hold." Dkt. 11 at 2-3 (internal quotation marks omitted).

129.    The partial clinical hold remained in place during the remand. *Id.* at 3.

130.    On remand before the FDA, Vanda and third parties submitted substantial additional evidence demonstrating the safety of tradipitant, and the lack of any justification for requiring Vanda to conduct another 9 month toxicity study in dogs.

131.    In particular, the Humane Society of the United States submitted a letter to FDA summarizing the results of numerous scientific studies that cast doubt on the need for an additional 9 month dog study when a drug has already been tested extensively on animals and proven safe in human trials. These studies concluded that canine testing does little to detect toxicity concerns beyond what rodent testing already accomplishes (Humane Society Letter at 1-2) and that regulators such as FDA should take a flexible, rather than formulaic, approach to determining whether and when canine testing is warranted (*id.* at 2-5). The letter challenged FDA to determine whether there is any validated scientific evidence that a 9-month dog study would provide "useful data to determine the risks to human health for a drug that has already been used in clini-

cal trials." *Id.* at 5.

132. Vanda also submitted a copy of its March 2019 application to FDA for "breakthrough therapy" designation for tradipitant. The Breakthrough Therapy process is designed to expedite FDA's review and approval of drugs that represent a significant improvement over available therapies for a particular condition.

133. Vanda's application for breakthrough designation explained that existing therapies for gastroparesis are unsatisfactory; the only FDA-approved drug to treat the condition, metoclopramide, carries a high risk of serious side effects, including tardive dyskinesia. Breakthrough Application at 12. Tradipitant, by contrast, had thus far produced clinically significant improvements for gastroparesis patients (*id.* at 16-21), while proving to be safe and well tolerated in human trials (*id.* at 23-25).

134. On April 26, 2019, FDA issued its Remand Response to Vanda, informing it that the FDA remained of the view that Vanda must perform a 9 month nonrodent toxicity study before engaging in any further clinical studies of tradipitant.

135. In explaining why the FDA was insisting on a 9 month nonrodent study, the Remand Response begins by contending that certain disparities in the results of the 1 month and 3 month dog studies conducted by Vanda, and between the results of Vanda's tests on two different strains of rats, render those studies inconclusive and warrant requiring an additional 9 month nonrodent study to gather more information. Remand Response at 11-14. It also suggests (in a heavily redacted discussion) that a 9 month nonrodent study is warranted because casopitant, a drug in a family related to tradipitant's, was rejected by the FDA in 2009 after toxicities were

discovered in dog studies longer than 3 months. *Id.* at 14-15.

136.    These concerns are manifestly post-hoc rationalizations that do not address the real basis for the FDA's imposition of the clinical hold. The FDA's December 2018 letter imposing the clinical hold mentioned nothing about any substantive concerns regarding the results of Vanda's existing toxicity studies. Nor did it mention the FDA's 2009 decision on casopitant.

137.    The pretextual, post-hoc nature of the FDA's stated concerns about the results of Vanda's earlier toxicity studies, and about the FDA's experience with casopitant, is underscored by Section IV.C of the Remand Response, which makes clear that even if these purported tradipitant-specific concerns were absent, FDA's decision would be the same. In that section, FDA repeats its view that 9 month nonrodent studies "are the accepted scientific minimum to assess risks to human subjects in long-term clinical investigations." Remand Response at 15. The FDA cites the ICH Guidance as the basis for this "scientific consensus." *Id.* at 16 & n.48.

138.    The Remand Response does not address the conclusions of commentators that the 9 month recommendation in the ICH Guidance was a *practical* compromise, rather than a "scientific consensus." *See* ¶¶ 181-200, *infra*.

139.    Nor does the Remand Response address the voluminous scientific evidence, submitted by the Humane Society, that long-term nonrodent toxicity studies are generally unjustified and unnecessary to ensure safety in clinical drug trials. *See* ¶¶ 187-200, *infra*.

140.    The Remand Response explains that "exceptions to this scientific standard are rare and apply only in instances where a limited characterization of human risk may be acceptable such that developing a drug with a potentially undetected toxicity would not be irrational or un-

ethical." *Id.* at 16. It concludes that there is "no scientific rationale for Vanda to be excepted from the scientific standard" (*id.* at 18) because gastroparesis is a nonfatal condition that "patients will live with for many years" (*id.* at 19). The Remand Response does not address Vanda's showing, in its application for Breakthrough Treatment status, that tradipitant offers a significant and urgently needed improvement over existing gastroparesis treatments.

141.    The Remand Response does not assert that further clinical studies of tradipitant would pose an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation.

## ARBITRARY AND CAPRICIOUS AGENCY CONDUCT

142.    The reasons for the clinical hold provided by the FDA in its Remand Response are inconsistent with scientific principles.

143.    The tradipitant-specific arguments set forth in the FDA's Remand Response are not an amplified articulation of the agency's reasoning in the Partial Clinical Hold Letter. They are instead new, post hoc rationalizations for the original action.

144.    The Partial Clinical Hold Letter said nothing about findings from prior toxicology studies on tradipitant. Rather, it reasoned that "nonrodent toxicity studies of 9 months duration are required for the conduct of your proposed clinical investigations of 52 weeks (12 months) duration, per the ICH *Guidance*." Partial Clinical Hold Letter at 2.

145.    The Remand Response provides new and independent reasons for a clinic hold that the agency could have invoked, but did not originally invoke, for the Partial Clinical Hold.

A.      **The Remand Response is based on arbitrary and capricious reasoning.**

146.    As to the weight-related observations in the three-month canine study, the FDA points to cumulative weight loss in dogs receiving a dose of 1500mg/kg/day, as well as decreased weight gains at other dosing levels.

147.    The FDA does not cite scientific evidence for its assertion that the lower-than-expected body-weight-gains "indicate general poor health." Remand Response at 12. Tradipitant is intended to increase gastrointestinal motility, with the predictable result of decreased food absorption. This is consistent with the observation of "white material" in the stool of the dogs receiving high doses of tradipitant, which is likely to have been unabsorbed drug.

148.    Over-dosing of tradipitant is expected to have thyroid effects, which results in the observed weight changes. This is not an indication of "general poor health."

149.    The changes in body weight on which the FDA relies are within the normal margin of variability.

150.    The FDA's Remand Response asserts that a longer canine study is required because "[t]he adverse weight-related findings seen during the 3-month study had not been observed in the 1-month study." In fact, decreased weight gain had been observed in the 1-month study but was not reported in the summary of findings because it was deemed insignificant. The findings were, however, reported in the actual data, which were submitted to the agency, but which the agency arbitrarily overlooked.

151.    Weight loss was observed as early as week 1 of the three-month study.

152.    The FDA calculated a no-observed-adverse-effect-level (NOAEL) for tradipitant

at the second-highest dosing level of 275 mg/kg/day. Even this reduced NOAEL results in a dose that is 80 times higher than the proposed human dose. The FDA does not explain why the resulting margin of safety is inadequate for safe human clinical studies.

153.     In sum, the FDA's suggestion that the 3-month canine study shows a safety signal suggesting the need for a lengthier canine study is incorrect. Because it is unsupported by scientific evidence or reasoning, it constitutes arbitrary and capricious agency action.

154.     With respect to the 13-week nonclinical study in Han Wistar rats, the FDA asserts that the results showed "foci of inflammatory cells with hepatocyte necrosis . . . increased plasma gamma-glutamyl transferase . . . increased liver weight, and minimal to mild hepatocyte hypertrophy." Remand Response 13.

155.     "The consensus of opinion" involving rat studies is that "hepatomegaly as a consequence of hepatocellular hypertrophy without histologic or clinical pathology alterations indicative of liver toxicity [is] considered to be an adaptive non-adverse change." A.P. Hall et al., *Liver Hypertrophy: A Review of Adaptive (Adverse and Non-adverse) Changes—Conclusions from the 3rd International ESTP Expert Workshop*, 40 Toxicologic Pathology 971, 988 (2012).

156.     If the rat results were concerning, the result would be a need for longer-term study in rats, not in dogs.

157.     Additionally, the FDA asserts that "the studies in rats (Han Wistar and Fischer strains) reflected inconsistent outcomes, i.e., the liver toxicities seen in the Han Wistar rats were not detected in the Fischer rats." That indicates that toxicity tests in one strain of rat is not predictive of toxicity in another strain of *rat*. This argument undercuts the FDA's underlying asser-

tion that additional animal testing will yield evidence predictive of toxicity in humans.

158.    No evidence of liver injury has been observed in human studies to date.

159.    In sum, the FDA is wrong to suggest that the results observed in Han Wistar rats are a safety signal indicating the need for a lengthier canine study. Because the FDA's conclusion is unsupported by scientific evidence or reasoning, it constitutes arbitrary and capricious agency action.

160.    GlaxoSmithKline withdrew its European application for approval of casopitant "based on the company's assessment that further safety data, as requested by the US Regulatory Authority, is required to support the registration of casopitant on a worldwide basis and that it would take considerable time to produce these data." Letter from GlaxoSmithKline to E. Abadie, European Medicines Agency, Withdrawal of Marking Authorisation Applications for ZUNRISA (Sept. 25, 2009), https://tinyurl.com/y4vc4nof.

161.    The European Medicines Agency (EMA), which is FDA's European counterpart, concluded that casopitant's "risk/benefit balance is favorable" for indications of chemotherapy-induced nausea and vomiting and postoperative nausea and vomiting. EMA, Withdrawal Assessment Report for Zunrisa at 26-27 (Nov. 19, 2009), https://tinyurl.com/y6d46qqw.

162.    The EMA's concerns about casopitant were not related to long-term safety, and instead concerned the effectiveness of the drug for the studied indications. *See* EMA, Questions and Answers on the Withdrawal of the Marketing Authorisation Application for Zunrisa (Oct. 22, 2009), https://tinyurl.com/y3dk74mc.

163.    The FDA's asserted conclusions with respect to casopitant do not reflect sound

scientific evidence or reasoning, and they are reflective of arbitrary and capricious agency action.

164.     The FDA's Remand Response further misrepresents the results of the case studies described in DeGeorge, *supra,* cited at pages 16-17 and footnotes 49-52 of the Remand Response.

165.     The Remand Response states without context that "[i]n 83% of the case studies (15 of 18 cases) the panel identified toxicities in 12-month studies that were not observed in 6-month studies (7 cases) or were observed in 6-month studies but increased in severity or occurred at a lower dose in the 12-month studies (8 cases)." Remand Response at 16,

166.     Those case studies were not based on a representative sampling of studies.

167.     On the contrary, "[o]nly those cases were included that were judged, by the FDA assessors, to demonstrate significant toxicological differences in 6- and 12-month studies." DeGeorge, *supra*, at 144. In other words, it is accurate to say only that 83% of cases studies *selected for that very characteristic* demonstrated toxicities at twelve months that were not apparent at six months.

168.     The FDA's reliance on a subsequent ICH meta-analysis cites only an article summarizing an unpublished study. *See* Remand Response at 17 (citing A.C. Jacobs & K.P. Hatfield, *History of Chronic Toxicity and Animal Carcinogenicity Studies for Pharmaceuticals*, 50 Veterinary Pathology 324, 330 (2012)). Unpublished, non-peer-reviewed studies are not a basis for rational scientific decisionmaking.

169.     The ICH document that the FDA cites (*see* Remand Response at 17 n.54) states that the unpublished summary found "6 months in non-rodents (primarily dogs) is usually but not

always sufficient," further undermining an inflexible 9-month rule. ICH, *Presentation on M3(R2)*, slide 9, https://tinyurl.com/y5ejpwpp.

170.    The Merck study cited by the FDA (*see* Remand Response at 17-18) does not demonstrate clinical relevance—that is, relevance to humans—because the findings in the few chronic dog studies that showed additional toxicities were never confirmed in humans. *See* Alema Galijatovic-Idrizbegovic et al., *Role of Chronic Toxicity Studies in Revealing New Toxicities*, 82 Regulatory Toxicology & Pharmacology 94 (2016).

171.    The FDA's requirement of a 9-month study in all cases also imposes significant harms on the public interest—considerations that the FDA has never taken into account. *First*, it causes the delayed development of new drugs for unmet needs, even if there is no scientific basis for that delay. This causes considerable harm among the impacted patient population. *Second*, this requirement creates opportunity cost by precluding the FDA from considering, developing, or requiring non-animal, pre-clinical testing that, if further explored, would lead to more probative results than those obtained via a 9-month nonrodent study. *Third*, the FDA's requirement leads to pointless destruction of animal life, an interest that the FDA should be obligated to take into account.

172.    Ultimately, the FDA must take into account the need for the public to access new medicines that provide relief from disorders that otherwise lack effective treatment options. The FDA cannot reasonably prioritize obtaining all possible evidence at the expense of timely patient access to such new medicines. That is especially when, as here, the evidence that the FDA requests is not probative of future action by the FDA and thus does not supply reasonable utility.

173.     Indeed, the FDA has recognized precisely this point. Janet Woodcock, the director of the Center for Drug Evaluation and Research at the FDA, observed the need to balance "evidence development" with "access to markets on the part of drug developers and access to new medicines on the part of patients." Janet Woodcock, *Evidence vs. Access: Can Twenty-First-Century Drug Regulation Refine the Tradeoffs?*, 91 Nature 378 (2012).

174.     When the FDA uses inflexible approaches, it may result in a several year delay in a drug's development for no practical reason. For example, in 2018, the FDA approved prucalopride. This was 9 years after it was approved by Europe, delaying the availability of this therapy for Americans for nearly a decade. *See* FDA Briefing Document, Gastrointestinal Drug Advisory Committee Meeting, Oct. 18, 2018. The delay was caused in substantial part by the FDA's imposition of a clinical hold. Ultimately, however, the FDA allowed approval of the drug by relying on post-marketing studies from Europe. Additionally, while testing in rats identified certain carcinogenicity effects, the FDA concluded that "the increased tumor incidences observed are likely through epigenetic mechanisms, and their occurrence at high exposure multiples suggests a lack of tumor risks in humans at the therapeutic dose." *Id.* at 27. Thus, these studies were ultimately no reason to deny approval of the pharmaceutical. Other findings, including weight changes, were also deemed not clinically relevant.

175.     At least one other federal administrative agency with responsibilities analogous to those of the FDA, the EPA, has shifted its approach significantly in recent years to adjust for updated scientific consensus on nonclinical toxicity studies. The EPA has done so through binding regulations, which it has revised in light of new scientific understanding.

176.    Pesticides, like pharmaceutical products, pose direct risks to human health through sustained exposure. In fact, pesticides pose much greater risks, as significantly greater numbers of people are exposed to pesticides—on produce and because they are sprayed across large swaths of territory where people live and work—and without the informed consent that participants in clinical studies receive. Because of human and animal exposure to pesticides through ingestion and other means, EPA data requirements for pesticide registration—similar to FDA requirements for pharmaceutical products—typically include extensive laboratory and animal studies, including toxicity studies. *See* 40 C.F.R. Part 158.

177.    The EPA's regulations governing data requirements for pesticide registration spell out in detail the type and duration of required animal toxicity studies and the conditions under which they are required. *See* 40 C.F.R. Part 158. By contrast, the FDA's regulations provide comparably little detail on data requirements for investigational new drug applications, including preclinical animal toxicity studies, in keeping with the FDA's practice of relying on non-binding guidance documents.

178.    The EPA initially issued regulations governing data requirements for pesticide registration in 1984. *See* 40 C.F.R. § 158.135 (1985); Data Requirements for Pesticide Registration, 49 Fed. Reg. 42,856, 42,892-93 (Oct. 24, 1984). The 1984 regulations identified a chronic feeding study in both a rodent and nonrodent species as "required" for all pesticides used on food crops and "conditionally required" for pesticides used in non-food settings if use of the pesticide product is likely to result in repeated human exposure over a significant portion of the human life-span. 40 C.F.R. § 158.135 (1985); 49 Fed. Reg. at 42,892-93. The regulations specified that

the chronic toxicity study in a nonrodent species should be conducted in dogs for a minimum twelve-month duration. *Id.*

179.    The EPA issued the 1984 regulations requiring the conduct of twelve-month, non-rodent chronic toxicity studies based on its belief at the time that such studies provide "scientifically defensible data to assess the non-oncogenic chronic effects of a pesticide," "that [the] recommended time periods . . . satisfactorily harmonize [the EPA's] requirements with those published by other governmental agencies and international groups," and "that use of the rodent (rat) and nonrodent species (dog) in the chronic studies allows a better evaluation of non-oncogenic chronic effects." 49 Fed. Reg. at 42,869.

180.    Subsequently, an extensive analysis of toxicity studies in dogs that compared findings from three-month studies against findings in twelve-month studies found that twelve-month studies "d[id] not provide additional essential toxicity information." Pesticides; Data Requirements for Conventional Chemicals, 72 Fed. Reg. 60,934, 60,940-41 (Oct. 26, 2007). In 2007, on the basis of that analysis, the EPA revised its regulations to eliminate the requirement to conduct chronic toxicity studies in dogs. *Id.*; 40 C.F.R. § 158.500.

**B.      The FDA's claimed regulatory consensus is not scientific consensus.**

181.    FDA's Remand Response concludes that "9-month nonrodent toxicity stud[ies]" are "the accepted scientific minimum to assess risks to human subjects in long-term clinical investigations." Remand Response at 15.

182.    In fact, there is no scientific consensus that 9-month canine studies are required to assess the risks of toxicity in human clinical trials.

183.    Regulatory consensus developed by bureaucrats is not the same thing as scientific consensus developed by the scientific community in peer-reviewed publications. Indeed, the requirement of a 9-month nonrodent study is not a "scientific standard," but rather a bureaucratic compromise. That matters because regulatory consensus can be grounded in factors other than science having nothing to do with the safety of the particular drug and protocols under review by the agency.

184.    Dr. Joseph Contrerra was closely involved with the negotiations among the FDA and the European and Japanese regulators that ultimately led to the drafting and adoption of the ICH Guidance.

185.    Europe and Japan generally believed that 6-month nonrodent testing was sufficient. The United States took the position that 12-month testing is necessary.

186.    With regard to the negotiations that led to the 9-month standard in the ICH Guidance, Dr. Contrerra stated in a 2018 interview that "there were agreements, and then there were quid pro quos and then there were all kinds of things that I didn't realize . . . you had to negotiate[.] . . . I think we compromised on nine months." *See* Interview, Dr. Joseph Contrerra (Dec. 18, 2003), https://perma.cc/LH34-JCTP. In that interview, he further characterized the ICH process leading to the current guidelines as "sort of like a poker game." *Id.*

C.    **The scientific consensus confirms that a 9-month dog toxicity study is not necessary and would not be useful for determining human toxicity.**

187.    Overwhelming scientific literature indicates that 9-month dog studies are not in fact necessary or even useful in predicting human toxicity.

188.    According to one peer-reviewed paper, "[o]verall, 94% of animal target organ toxicities correlated with [human toxicities] were first observed in studies less than or equal to 1 month in duration." *See, e.g.*, Harry Olson et al., *Concordance of the Toxicity of Pharmaceuticals in Humans and in Animals*, 32 Regulatory Toxicology & Pharmacology 56, 61 (2000).

189.    Another study cited in the Remand Response (at 17 n.52) confirms that "a 6-month period of dosing is all that is routinely required for evaluating the chronic toxic (excluding carcinogenic) potential of a new chemical entity intended for therapeutic use." Cynthia E. Lumley et al., *An International Appraisal of the Minimum Duration of Chronic Animal Toxicity Studies*, 11 Human & Experimental Toxicology 155, 155 (1992).

190.    Thus, "only 4 of 24 toxicities were found in animals first," and "in only 6 of 114 cases did clinical toxicities have animal correlates." Niall Shanks et al., *Are Animal Models Predictive for Humans*, 4 Philosophy, Ethics & Humanities in Medicine at 6  (2009).

191.    According to a 2013 paper, "the most comprehensive quantitative database of publicly-available animal toxicology studies yet compiled[] suggests that dogs are highly inconsistent predictors of toxic responses in humans, and that the predictions they can provide are little better than those that could be obtained by chance—or tossing a coin—when considering whether or not a compound should proceed to testing in humans." Jarrod Bailey et al., *An Analysis of the Use of Dogs in Predicting Human Toxicology and Drug Safety*, 41 Altern. Lab. Anim. 335, 340 (2013)

192.    A 2015 paper reports that its data and analysis "suggest strongly that a lack of toxicity in any species cannot be reliably used to imply a probable lack of toxicity in any other

species. This is absolutely crucial, because the critical observation for deciding whether a candidate drug can proceed to testing in humans is the *absence* of toxicity in tests on animals, yet our analyses show that this contributes no additional confidence in the eventual human outcome." Jarrod Bailey et al., *Predicting Human Drug Toxicity and Safety via Animal Tests*, 43 Altern. Lab. Anim. 393, 400 (2015).

193.    Against this background, a 2014 paper has noted that "[a] consensus exists among scientists inside and outside of drug development that animal models have no predictive value." Ray Greek, *The Ethical Implications for Humans in Light of the Poor Predictive Value of Animal Models*, 5 Int'l J. Clinical Medicine 966, 972 (2014).

194.    Similarly, a paper published in *BioMed Central Medical Ethics* observed that "there remains no substantial, robust, published evidence that" animal testing in pre-clinical drug development "has a scientific basis—i.e. that these tests are reliably predictive of human responses, both with respect to efficacy and toxicity/safety." Jarrod Bailey & Michael Balls, *Recent Efforts to Elucidate the Scientific Validity of Animal-Based Drug Tests by the Pharmaceutical Industry, Pro-Testing Lobby Groups, and Animal Welfare Organisations* at 1, 20 BMC Medical Ethics no. 16, 1 (2019).

195.    The FDA's Remand Response fails to engage with the standard scientific methods used to evaluate the predictive validity of a test. This material was all known to the FDA, however, and it is (or should be) part of the administrative record in this matter.

196.    Scientists use statistical measures such as positive predictive value (PPV), negative predictive value (NPV) and likelihood ratio (LR) to determine the value of a test in predict-

ing actual outcomes. *See, e.g.* FDA, *Statistical Guidance on Reporting Results from Studies Evaluating Diagnostic Tests* at 7-8 (Mar. 13, 2007), https://www.fda.gov/media/71147/download (discussing the use of these measures in describing diagnostic accuracy).

197.    Measures PPV, NPV, and LR have repeatedly been used to evaluate the predictive value of nonclinical animal toxicity studies in predicting toxicity in humans. *See* Shanks et al., *supra*, at 5-6; Bailey et al., *An Analysis*, *supra*, at 335-38; Greek, *supra*, at 975-81; Thomas M. Monticello et al., *Current Nonclinical Testing Paradigm Enables Safe Entry to First-in-Human Clinical Trials*, 334 Toxicology & Applied Pharmacology 100, 102-08 (2017).

198.    Without analyzing these or other measures of predictive validity, FDA has no scientific basis for its conclusion that 9-month nonrodent toxicity studies will enable it to more accurately determine the risk involved in a human study than is already provided by the extant nonclinical data.

199.    In 2011, FDA Commissioner Margaret Hamburg wrote that "[m]ost of the toxicology tools used for regulatory assessment rely on high-dose animal studies and *default extrapolation procedures* and have remained relatively unchanged for decades, despite the scientific revolutions of the past half-century." Margaret A. Hamburg, *Advancing Regulatory Science*, 331 Science 987, 987 (2011) (emphasis added).

200.    The FDA's unreasoned, bureaucratic requirement for a 9-month nonrodent toxicity study is not based on the body of prevailing scientific evidence. It does not reflect a scientific consensus.

## CLAIMS FOR RELIEF

**A.      Count I: failure to provide an opportunity for notice and comment.**

201.      Plaintiffs hereby incorporate and re-allege foregoing paragraphs 1-200 as though fully set forth herein.

202.      While the agency characterizes it as a guidance document, the FDA in fact applies the 9-month nonrodent study requirement contained in the ICH Guidance as a binding, legislative rule. *See Mendoza v. Perez*, 754 F.3d 1002, 1021-22 (D.C. Cir. 2014).

203.      The FDA's Partial Clinical Hold Letter was quite clear that the ICH Guidance was being deployed with the force of law. *See* Partial Clinical Hold Letter at 2 ("[N]on-rodent toxicity studies of 9 months duration *are required* for the conduct of your proposed clinical investigations of 52 weeks (12 months) duration, *per the ICH Guidance*[.]") (emphases added).

204.      The FDA's Remand Response adds impermissible, post-hoc rationalizations for the clinical hold (*see, e.g.*, *NAACP v. Trump*, 315 F. Supp. 3d 457, 465-67 (D.D.C. 2018) (Bates, J.)), but the Remand Response is nevertheless clear that, in FDA's view, it is "*necessary* for a sponsor to support the safety of a drug intended for a long-term (e.g., 12-month) clinical study in humans with a chronic toxicity study in nonrodents." Remand Response at 16 (emphasis added).

205.      The FDA thus continues to apply an inflexible requirement for 9-month dog studies, notwithstanding that no such requirement is present in the regulations. *See* 21 C.F.R. §§ 312.42(b)(1), 312.23(a)(8). In fact, the FDA expressly declined to adopt such a requirement by regulation. *See* New Drug, Antibiotic, and Biologic Drug Product Regulations, 52 Fed. Reg. 8,798, 8,812 (Mar. 19, 1987) ("Because of the dynamism and complexity of the scientific issues

involved, the agency does not believe that it would be either feasible or wise to specify in the regulation detailed, substantive pharmacology and toxicology testing requirements.").

206.    By applying a strict, 9-month nonrodent study requirement that is absent from the applicable regulations, the FDA has "effectively amend[ed]" the IND regulations, resulting in a legislative rule. *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34 (D.C. Cir. 2005) ("[A] rule that effectively amends a prior legislative rule is a legislative, not an interpretative rule.") (internal quotation marks omitted).

207.    The 9-month nonrodent study requirement has not been subjected to the APA's mandated notice and comment procedures. 5 U.S.C. § 553; *see Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).

208.    Because it is a legislative rule that was not adopted through notice and comment, the 9-month nonrodent study requirement was instituted "without observance of procedure required by law" and must therefore be "set aside." 5 U.S.C. § 706(2)(D).

**B.    Count II: arbitrary and capricious agency action (failure to ground the decision in scientific evidence).**

209.    Plaintiffs hereby incorporate and re-allege foregoing paragraphs 1–208 as though fully set forth herein.

210.    An agency must base its actions "'on a consideration of the relevant factors'" and "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted).

211.    In particular, agency action must be set aside where, as here, the agency "has failed to 'examine[] [the] relevant data.'" *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311-12 (D.C. Cir. 2018) (quoting *Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005)). "[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Id.* at 312; *see also Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position"); *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003) (holding that the agency could not rely on a "clipped view of the record" to support its conclusion); *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("[An agency's] failure to respond meaningfully to the evidence [before it] renders its decisions arbitrary and capricious.").

212.    Here, FDA has refused to consider any of the evidence Vanda has presented, including: (1) evidence of tradipitant's significant efficacy in treating symptoms of gastroparesis; (2) data showing the lack of serious safety signals in the many animal studies and fifteen clinical studies already conducted with tradipitant, supporting that, in this specific case, an additional study is unlikely to provide any meaningful additional data with respect to tradipitant's safety profile; (3) analyses questioning the utility of 9-month nonrodent toxicity studies for human drugs generally; and (4) concerns about animal welfare issues.

213.    Failing to assess properly the costs and benefits of an agency action is precisely "the sort of claim that federal courts routinely assess when determining whether to set aside an agency decision as an abuse of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018); *see also Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("When reviewing an

agency action, we must assess . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (internal quotation marks omitted). Agencies are also required, under longstanding executive orders, to "assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Exec. Order 12,866, § 1(b)(6), 58 Fed. Reg. 51,735 (Sept. 30, 1993); *see also* Exec. Order 13,563, 76 Fed. Reg. 3821 (Jan. 18, 2011).

214.    Here, however, the FDA failed to engage in any such analysis. The FDA relied, in large part, on a purported categorical rule requiring a 9 month nonrodent study before a drug sponsor may conduct clinical trials lasting longer than 3 months. But the FDA did not consider whether, much less explain why, that categorical rule made sense in light of the evidence that 9 month nonrodent studies have little value—or applying it in this case made sense given the extensive testing already conducted on tradipitant and the great potential benefits of making tradipitant available to gastroparesis patients.

215.    The FDA's arbitrary and capricious refusal to consider the evidence is exemplified by its unwillingness to even consider applying the exceptions *contemplated by the ICH Guidance*. In particular, the text of the ICH Guidance states that "[i]n some circumstances, clinical trials of longer duration than 3 months can be initiated, provided that," as is the case here, "the data are available from a 3-month rodent and a 3-month nonrodent study, and that complete data from the chronic rodent and nonrodent study are made available . . . before extending dosing beyond 3 months in the clinical trial." The ICH Guidance further explains that flexibility is particularly

appropriate "[i]n circumstances where significant therapeutic gain has been shown." ICH Guidance at 7-8. FDA, however, refused to consider the possibility of such an exception, stating without substantiation that exceptions are only warranted in the case of "severe, rapidly progressive disease[s] that result[] in death or irreversible morbidity." Remand Response at 18.

216.    The FDA's imposition of the Clinical Hold represents final agency action, and Vanda has no adequate remedy at law.

217.    The Court should therefore set aside the FDA's Clinical Hold and enter a judgment declaring that the FDA's imposition of the Clinical Hold on Vanda's proposed twelve-month clinical trials is in violation of the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**C.      Count III: arbitrary and capricious agency action (standardless decisionmaking).**

218.    Plaintiffs hereby incorporate and re-allege foregoing paragraphs 1-217 as though fully set forth herein.

219.    FDA regulations provide that an IND must contain "[a]dequate information about pharmacological and toxicological studies of the drug," and that a clinical hold may issue if "[t]he IND does not contain sufficient information required under § 312.23 to assess the risks to subjects of the proposed studies." 21 C.F.R. §§ 312.42(b)(1)(iv), 312.23(a)(8).

220.    FDA here has not identified any objective criteria or standards—other than the 9-month nonrodent study requirement derived from the ICH Guidance—under which it has determined that the current nonclinical toxicology studies of tradipitant are not "adequate" or "sufficient." Thus, FDA is either applying the ICH Guidance as a legislative rule (*see supra* ¶¶ 71-78,

201-208), or it is applying *no* standard—in which case its failure to identify objective criteria that govern the agency action renders its decisionmaking arbitrary and capricious.

221.    Furthermore, and for the reasons described above (at ¶¶ 146-180), FDA's evaluation of the tradipitant-specific evidence contained in its Remand Response is arbitrary and capricious in that the agency "has made a clear error in judgment" and has failed to demonstrate "a rational connection between the facts found and the choice made." *Vill. of Bensenville v. FAA*, 457 F.3d 52, 70-71 (D.C. Cir. 2006) (internal quotation marks omitted)..

222.    Finally, FDA's conclusion that there is a "scientific standard" requiring 9-month nonrodent toxicity studies before clinical trials may proceed is arbitrary and capricious in that the agency again "has made a clear error in judgment" and has failed to demonstrate "a rational connection between the facts found and the choice made." *Vill. of Bensenville*, 457 F.3d at 70-71 (internal quotation marks omitted) . As explained above (at ¶¶ 181-200) that standard represents a bureaucratic compromise, and there simply is no science-based consensus that such studies are necessary or even helpful.

223.    For all these reasons, FDA's clinical hold must be "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and that the Court:

1.    Set aside and vacate the FDA's Clinical Hold on Vanda's proposed twelve-month clinical studies of tradipitant.

2.   Declare that the FDA may not, under the FDCA and consistent with the APA, impose a clinical hold on Vanda without strictly complying with the requirements of the statute or without appropriately relying upon a duly enacted regulation.

3.   Award Plaintiffs attorney's fees pursuant to the Equal Access to Justice Act.

4.   Award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: May 29, 2019

Respectfully submitted,

*/s/ Paul W. Hughes*
Paul W. Hughes (D.C. Bar No. 997235)
Michael B. Kimberly (D.C. Bar No. 991549)
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C. 20006
(202) 263-3000
phughes@mayerbrown.com
mkimberly@mayerbrown.com

*Attorneys for Plaintiffs*