# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Vanda Pharmaceuticals, Inc., et al.,

*Plaintiffs*,

v.

Food and Drug Administration, et al.,

*Defendants*.

Civil Action No. 1:19-cv-00301 (JDB)

Hon. John D. Bates

## PLAINTIFFS' COMBINED RESPONSE/REPLY MEMORANDUM
## REGARDING SUMMARY JUDGMENT

Paul W. Hughes (D.C. Bar No. 997235)
  phughes@mwe.com
Michael B. Kimberly (D.C. Bar No. 991549)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ...........................................................................................................ii

Glossary ............................................................................................................................v

Introduction ......................................................................................................................1

Argument ..........................................................................................................................6

I.  FDA applies the ICH Guidance as a binding rule in violation of the APA ..........6

II.  Because the procedures were fatally defective, the Remand Response cannot
     rehabilitate the partial clinical hold. ...................................................................9

     A.  The Remand Response is an impermissible post hoc rationalization ..........10

     B.  FDA openly admits that, during remand, it considered only evidence
          favorable to its preordained decision while ignoring evidence that supports
          Vanda. ...................................................................................................15

III.  FDA's maintenance of the partial clinical hold is procedurally and substantively
      unreasonable. ...................................................................................................19

     A.  FDA ignored and minimized contrary evidence that it admits is part of the
          record. ...................................................................................................19

     B.  FDA's assertion that the science requires 9-month dog studies is defective
          and unsupported. ....................................................................................21

     C.  FDA's newfound tradipitant-specific arguments are defective as well........24

IV.  Vacatur is the proper remedy .............................................................................28

Conclusion ......................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*ACA Int'l v. FCC,*
885 F.3d 687 (D.C. Cir. 2018)............................................................................25, 26

*Allina Health Servs. v. Sebelius,*
746 F.3d 1102 (D.C. Cir. 2014).................................................................................29

*Alpharma, Inc. v. Leavitt,*
460 F.3d 1 (D.C. Cir. 2006).................................................................10, 13, 19, 21

*Am. Bioscience, Inc. v. Thompson,*
269 F.3d 1077 (D.C. Cir. 2001)...........................................................................28, 29

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
724 F.3d 243 (D.C. Cir. 2013).................................................................................29

*Am. Wild Horse Pres. Campaign v. Salazar,*
859 F. Supp. 2d 33 (D.D.C. 2012)...........................................................................16

*ANR Storage Co. v. Fed. Energy Regulatory Comm'n,*
904 F.3d 1020 (D.C. Cir. 2018).........................................................................14, 23

*Bean Dredging, LLC v. United States,*
773 F. Supp. 2d 63 (D.D.C. 2011)...........................................................................16

*Bechtel v. FCC,*
10 F.3d 875 (D.C. Cir. 1993).......................................................................................9

*Butte Cty. v. Chaudhuri,*
887 F.3d 501 (D.C. Cir. 2018)...................................................................................17

*Butte Cty. v. Hogen,*
613 F.3d 190 (D.C. Cir. 2010)...................................................................................15

*Catholic Health Initiatives v. Sebelius,*
617 F.3d 490 (D.C. Cir. 2010).....................................................................................8

*Comcast Corp. v. FCC,*
579 F.3d 1 (D.C. Cir. 2009)..........................................................................28, 29, 30

*Council of Parent Attorneys & Advocates, Inc. v. DeVos,*
365 F. Supp. 3d 28 (D.D.C. 2019)............................................................................15

*CropLife Am. v. EPA,*
329 F.3d 876 (D.C. Cir. 2003).....................................................................................8

*Cumberland Pharm. Inc. v. FDA,*
981 F. Supp. 2d 38 (D.D.C. 2013)............................................................................27

*Daimler Trucks N. Am. LLC v. EPA,*
737 F.3d 95 (D.C. Cir. 2013).....................................................................................29

*Delta Air Lines, Inc. v. Export-Import Bank of U.S.,*
85 F. Supp. 3d 436 (D.D.C. 2015)..............................................................10, 14, 19

*Dithiocarbamate Task Force v. EPA,*
98 F.3d 1394 (D.C. Cir. 1996)...................................................................................26

*Elec. Privacy Info. Ctr. v. DHS,*
  653 F.3d 1 (D.C. Cir. 2011)............................................................................8

*FBME Bank Ltd. v. Lew,*
  209 F. Supp. 3d 299 (D.D.C. 2016)..............................................................15

*Food Mktg. Inst. v. ICC,*
  587 F.2d 1285 (D.C. Cir. 1978)....................................................................12

*Gen. Elec. Co. v. EPA,*
  290 F.3d 377 (D.C. Cir. 2002).................................................................7, 8

*\*Genuine Parts Co. v. EPA,*
  890 F.3d 304 (D.C. Cir. 2018)......................................................15, 20, 28

*Graceway Pharms., Inc. v. Sebelius,*
  783 F. Supp. 2d 104 (D.D.C. 2011)..............................................................27

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.,*
  589 F.2d 658 (D.C. Cir. 1978).................................................................7, 9

*Heartland Reg'l Med. Ctr. v. Sebelius,*
  566 F.3d 193 (D.C. Cir. 2009)......................................................................29

*Hoctor v. USDA,*
  82 F.3d 165 (7th Cir. 1996).............................................................................8

*Lee Mem'l Hosp. v. Burwell,*
  109 F. Supp. 3d 40 (D.D.C. 2015)................................................................16

*McLouth Steel Prods. Corp. v. Thomas,*
  838 F.2d 1317 (D.C. Cir. 1988)......................................................................7

*Menkes v. DHS,*
  637 F.3d 319 (D.C. Cir. 2011)......................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .................................................................................15, 23

*Muwekma Ohlone Tribe v. Salazar,*
  708 F.3d 209 (D.C. Cir. 2013)......................................................................12

*\*NAACP v. Trump,*
  315 F. Supp. 3d 457 (D.D.C. 2018)......................................................*passim*

*Nat'l Min. Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014).........................................................................8

*Nat. Res. Def. Council, Inc. v. Rauch,*
  244 F. Supp. 3d 66 (D.D.C. 2017)................................................................23

*New Life Evangelistic Ctr., Inc. v. Sebelius,*
  672 F. Supp. 2d 61 (D.D.C. 2009).........................................................20, 28

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n,*
  506 F.2d 33 (D.C. Cir. 1974)..........................................................................7

*Philadelphia Gas Works v. F.E.R.C.,*
  989 F.2d 1246 (D.C. Cir. 1993)....................................................................18

*Shands Jacksonville Med. Ctr., Inc. v. Azar,*
  366 F. Supp. 3d 32 (D.D.C. 2018)..........................................................22, 25

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991)............................................................................29

*Smith v. Berryhill*,
    139 S. Ct. 1765 (2019) ..................................................................................18

*St. Francis Med. Ctr. v. Azar*,
    894 F.3d 290 (D.C. Cir. 2018)) .......................................................................16

*St. Lawrence Seaway Pilots Ass'n v. United States Coast Guard*,
    357 F. Supp. 3d 30 (D.D.C. 2019)...................................................................30

*Tesoro Alaska Petroleum Co. v. Fed. Energy Regulatory Comm'n*,
    234 F.3d 1286 (D.C. Cir. 2000).......................................................................21

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
    785 F.3d 740 (D.C. Cir. 2015)..........................................................................26

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ........................................................................................16

## Statutes and Regulations

5 U.S.C. § 706(2)..................................................................................................19

21 U.S.C. § 355(i)(3)(B)(i)...................................................................................30

21 C.F.R.
    § 312.23(a)(8) ...........................................................................................7, 12
    § 312.42(a)(1)(iv) ..........................................................................................12
    § 312.42(e)..............................................................................................18, 19
    § 312.42(e)-(f) ...............................................................................................18
    § 312.48 ...................................................................................................18, 19

## Other Authorities

*Center for Drug Evaluation and Research Medical Policy Council; Request for
    Comments*, 78 Fed. Reg. 16,679 (Mar. 18, 2013)....................................11

CDER, *Program Description* (effective Sept. 6, 2017) ....................................12

FDA, *Impact Story: Evaluating the Potential of Microengineered Human Cellular
    Systems to Predict Drug Effects in the Clinic* (Feb. 5, 2019).....................3

Janet Woodcock & Raymond Woosley, *The FDA Critical Path Initiative and Its
    Influence on New Drug Development*, 59 Ann. Rev. Med. (2008) ..........4, 23, 24

Margaret A. Hamburg, Comm'r, U.S. Food & Drug Admin., *Editorial: Advancing
    Regulatory Science,* 331 Science 987 (2011) .............................................3

Toni M. Fine, *Agency Requests for "Voluntary" Remand: A Proposal for the
    Development of Judicial Standards*, 28 Ariz. St. L.J. 1079 (1996)............12

## GLOSSARY

CDER ............ Center for Drug Evaluation and Research (within FDA)

FDA ............... U.S. Food and Drug Administration

FDCA ............ Food, Drug, and Cosmetic Act

FDRR............. Formal Dispute Resolution Request

IND ................ Investigational New Drug

MPPRC.......... Medical Policy and Program Review Council (within CDER)

## INTRODUCTION

FDA's imposition of the partial clinical hold is unlawful—and the Court should promptly vacate it.

*First*, FDA does not disagree that if it applies the ICH Guidance's 9-month dog-study standard as a binding requirement for all standard INDs, it has violated the APA. Nor could it. The APA obligates the agencies to use notice-and-comment rulemaking before adopting and applying binding legislative standards. FDA also does not offer any persuasive refutation of the voluminous evidence demonstrating that the agency *does* in fact treat the ICH Guidance as establishing a binding requirement. Again, nor could it—in FDA's own words, the 9-month dog-study standard established by the ICH Guidance "is a requirement, not a recommendation, prior to proceeding to long-term studies in humans." FDA-10990; *accord* Pls. S.J. Mem. 15 (list of additional examples). FDA asks the Court to disregard that, prior to remand, the ICH Guidance was the *sole* basis for the partial clinical hold. But even if that tactic were tenable (it is not), FDA doubles down in the Remand Response itself, reiterating that the very same rules adopted in the ICH Guidance *are* binding. *See* FDA-11120 to FDA-11121. FDA's failure to use notice-and-comment rulemaking to support the legislative rules at issue here fatally undermines its action.

*Second*, undoubtedly recognizing that its imposition of a binding legislative rule is unlawful, FDA supplied new reasons purportedly justifying its action in the Remand Response. But FDA's arguments suffer from fatal flaws.

Virtually everything in the Remand Response is impermissibly post hoc and thus must be set aside. Given the procedures FDA used on remand (that is, its failure to resubmit the issue to its policy-making counsel), FDA *could not* have reached a new result, meaning the arguments it advanced were unlawfully pretextual. Additionally, they bear no rational relationship to the original arguments that FDA advanced.

FDA, moreover, has acted in stunningly arbitrary fashion. FDA says that, on remand, it "consulted additional scientific literature," "developed this evidence," and "included it within the record." FDA S.J. Mem. 39. That is, for evidence it *wanted* to consider, FDA reopened the record.

1

But FDA says it was free to "decline[] to consider post-December 2018 submissions by Vanda" because it did not want to consider that evidence. *Id*. at 36. Thus, for Vanda, the record remained closed. That obviously cannot be correct; agencies cannot engage in such one-sided conduct to arrive at pre-determined outcomes.

*Third*, FDA's arguments reflect significant procedural and substantive arbitrariness. The agency ignored and improperly minimized evidence, admittedly part of the record, that was adverse to its conclusions. It failed to address significant aspects of the underlying problem. And its arguments regarding tradipitant are standardless and unreasonable.

\*     \*     \*

Before saying more, a reorientation is in order: Vanda is not asking the Court to force FDA to approve tradipitant for distribution and sale to the general public. Rather, Vanda seeks to continue testing tradipitant in clinical trials for up to 12 months with patients who have already received (and well tolerated) tradipitant for 3 months. These clinical trials would be under the direction of an expert investigator, and patients would be regularly monitored through laboratory and clinical testing.

For its part, FDA never once says that a 12-month human clinical investigation would be unsafe. (FDA would, as always, retain its regulatory tools to impose a clinical hold if it has any basis to assert that a particular trial is unsafe.) To the contrary, based on the very same studies discussed in the Remand Response, FDA has permitted 3-month trials of tradipitant to proceed. And, throughout the lengthy discussions between Vanda and FDA prior to the issuance of the partial clinical hold, FDA never asserted that there was any safety signal with respect to tradipitant. FDA's invocation of safety has emerged only after Vanda brought this lawsuit—when FDA scrambled to find justifications for a decision it had already made.

FDA nonetheless maintains that, unless a drug sponsors provides 9-month nonrodent testing data, the sponsor "has not provided sufficient information to facilitate FDA's assessment of the risks of a proposed study." FDA S.J. Mem. 1. But the problem with this position is what we said at the outset—if FDA wishes to implement this binding rule, it must undertake the notice-

and-comment rulemaking process that the APA requires. These procedural protections are of critical importance here. They would permit all impacted parties—patients' rights organizations, pharmaceutical companies, animal welfare organizations, and others—to participate through the submissions of comments. And, per the APA, FDA would be obligated to meaningfully respond.

This is why Vanda and the individual plaintiffs have brought this lawsuit. It is not, as FDA suggests, to "cut corners." FDA S.J. Mem. 23. As we said earlier, the dog studies involved are not very expensive from a financial perspective. The problem with acceding to FDA's bureaucratic entrenchment in the status quo—denying the public the opportunity to be heard—is that the status quo is *bad*. It is bad science, with bad results for patients. Because chronic dog tests do not yield predictive results, there are false negatives, sometimes giving the public a false sense of security. Other times, there are false positive test results, forcing the delay or abandonment of therapies that would have met unaddressed medical needs. It is ultimately *patients* who lose.

FDA's own decisionmakers, including those at the highest level, have questioned the very testing procedures that FDA defends here. As FDA researchers wrote the day before this lawsuit was filed, "[o]ur ability to detect drug toxicity before the clinical phase of drug evaluation is limited by physiological differences between animal models used in preclinical testing and human subjects in clinical trials." FDA, *Impact Story: Evaluating the Potential of Microengineered Human Cellular Systems to Predict Drug Effects in the Clinic* (Feb. 5, 2019), perma.cc/2XV6-QU45. The then-FDA Commissioner, moreover, observed that "[m]ost of the toxicology tools used for regulatory assessment rely on high-dose animal studies and default extrapolation procedures and have remained relatively unchanged for decades, despite the scientific revolutions of the past half-century." Margaret A. Hamburg, Comm'r, U.S. Food & Drug Admin., *Editorial: Advancing Regulatory Science*, 331 Science 987, 987 (2011), perma.cc/6PF5-EJZH.

And as Dr. Janet Woodcock, the director of FDA's Center for Drug Evaluation and Research (CDER) has written, "[a]nimal toxicology tests . . . often fail to uncover the types of toxicities seen after widespread human exposure," and although "FDA holds the world's largest collection of animal test data and correlated human trial data, . . . most of this information is

unusable in its current form. . . . As a result, opportunities for major improvement are missed." Janet Woodcock & Raymond Woosley, *The FDA Critical Path Initiative and Its Influence on New Drug Development*, 59 Ann. Rev. Med. 1, 5, 7 (2008), https://perma.cc/SG25-975F.

In sum, even senior leadership at FDA recognizes that the current approach to pharmaceutical testing is deeply flawed. If FDA is made to do what the APA demands—that is, submit its legislative rules for notice-and-comment rulemaking, where the public may participate—there is significant reason to believe that the results of that process would look nothing like the testing regime that FDA has now implemented. The APA exists because agencies, no matter how noble their putative goals may be, must adhere to legal structures that balance the interests of those they regulate.

*      *      *

It is imperative that the Court vacate FDA's unlawful partial clinical hold. FDA has already had a first remand—requested by the agency—without vacatur. During that remand, FDA engaged in procedures blatantly incompatible with its obligations under the APA, all while delaying continued clinical testing of tradipitant. Now, FDA contends that, if its action is unlawful, it should *again* be entitled to remand without vacatur. That is flatly wrong. The statutory structure creates a default presumption that pharmaceutical companies may proceed with clinical trials of new drugs; that is, clinical trials—in which patients give informed consent and are carefully monitored by professional drug investigators—may proceed *without* FDA approval. *See* Pls. S.J. Mem. 5. For FDA to block a trial, it is incumbent on the agency to identify a *lawful* reason for doing so. FDA has twice failed at identifying lawful reasons to achieve that result. Vacatur is thus necessary—otherwise, the agency's failure to act lawfully would carry no consequence. The APA would mean precious little if vacatur is not ordered here.

Indeed, when taken together, FDA's conduct is extraordinary. For several months prior to the partial clinical hold, FDA insisted that a 9-month non-rodent study was *required* by the ICH Guidance—and that was the sole rationale FDA gave for the clinical hold. After Vanda sued, identifying the patent illegality of adopting a legislative rule without notice-and-comment

4

rulemaking, FDA sought a voluntary remand. Now, after resting solely on the ICH Guidance originally, FDA says our argument on this score is a "strawman" (FDA S.J. Mem. 40) and a "distraction" (*id.* at 3). That is obviously wrong, both because of the history of FDA's action, and because FDA continues to insist that a 9-month nonrodent study is required. In any event, what FDA did on remand remains shocking.

After securing a remand, FDA did not resubmit the matter to the policy council—the MPPRC—that decided it the first time around, meaning that the agency was not free to change its position. As a result, virtually everything in the Remand Response is post hoc and pretextual rationalization, offered to support a result that the agency earlier reached—then, based solely on the ICH Guidance. Because, prior to litigation, FDA relied solely on the ICH Guidance, FDA knew that it had to reopen the record in order to find any support for its position. But, while reopening the record to add material favorable to its preordained result, FDA refused to address evidence adverse to its conclusion, saying that—for Vanda—the record remained closed. And then, while identifying a safety-based rationale for the first time, FDA relied on a clinical review by one of its doctors. But that review expressly notes that another FDA doctor had earlier agreed with Vanda that the evidence reveals no safety signal. Rather than including the Vanda-favorable FDA analysis in the administrative record and addressing it, FDA takes the stunning position that it can simply exclude it from consideration—not allowing Vanda or the Court to so much as review it.

All of this is illegal agency conduct. While FDA is no doubt committed to protecting its historical practice of regulating through guidance documents, it cannot be permitted to violate the APA. Nor may it erect—long after the decision has been made—allegations of patient safety in an effort to insulate its unlawful regulatory practices from review.

Ultimately, this case is about patients, and the need to swiftly and safely develop new therapies for unmet needs. Plaintiffs December Guzman, Cathy Hartwig, and Louisa Jenness desperately seek renewed access to tradipitant. They wish to return to clinical testing to alleviate the excruciating symptoms that they experience. Plaintiffs respectfully request that the Court hold FDA accountable to the APA and swiftly vacate the agency's unlawful action.

## ARGUMENT

I.    **FDA APPLIES THE ICH GUIDANCE AS A BINDING RULE IN VIOLATION OF THE APA.**

We explained in our opening brief that the partial clinical hold must be set aside because FDA issued it pursuant to the ICH Guidance, which FDA unlawfully treats as a binding legislative rule. First, we catalogued at length the FDA documents making clear that its application of the ICH Guidance as a binding requirement—and not anything specific to tradipitant—was the basis for the partial clinical hold. *See, e.g.*, FDA-10990 ("[P]er ICH M3(R2), a chronic toxicology study of 9 months duration in a non-rodent species will be needed," and this ICH standard "is a requirement, not a recommendation."); FDA-10890 ("Per International Council for Harmonization (ICH) Guidance M3(R2), the conduct of this proposed 12-month clinical trial is <u>not</u> supported by the currently available nonclinical studies."); *see also generally* Pls. S.J. Mem. 14-17 (collecting additional examples). Second, we demonstrated that the ICH Guidance does not fall into any of the three exceptions from notice-and-comment rulemaking. *See* Pls. S.J. Mem. 17-25. And, finally, we showed that the ICH Guidance did not go through notice and comment rulemaking, as required by the APA. *See id.* at 25-26.

To be clear, before the remand, the ICH Guidance was the *sole* basis for FDA's partial clinical hold. *See* Pls. S.J. Mem. 14-17. FDA does not disagree. Instead, FDA attempts to walk entirely away from its pre-remand reasoning, going so far as to say that it "has not applied the Guidance at all to Vanda, let alone in a binding fashion," in the Remand Response. FDA S.J. Mem. 42. FDA must recognize that its use of the ICH Guidance as binding law is indefensible.

Yet FDA's assertion that it does not apply ICH Guidance as a binding rule is transparently wrong. Even accepting FDA's invitation to don blinders and examine the Remand Response in isolation, FDA *still* relies on a blanket policy. In the Remand Response, FDA doubles down on its earlier position, asserting:

> Even if it were not so clear that Vanda's own data confirm the need for a 9-month nonrodent toxicity study, such studies are the accepted scientific minimum to assess risks to human subjects in long-term clinical investigations. . . .

6

> FDA has long considered it scientifically necessary for a sponsor to support the
> safety of a drug intended for a long-term (e.g., 12-month) clinical study in humans
> with a chronic toxicity study in nonrodents.

FDA-11120 to FDA-11121. Thus, in the Remand Response itself, FDA makes clear that, save for

"rare" instances in which an "exception[] to this scientific standard" may be warranted,[1] chronic

nonrodent studies are "necessary" as a matter of FDA rule. And, in support of this requirement,

FDA relies *on the ICH Guidance*. *See* FDA-11121 & n.48.[2]

In both its original analysis, and in the Remand Response, FDA has announced the

application of a binding rule—a 9-month nonrodent study is virtually always required, regardless

of the specifics of the drug at issue. As we have described, this is an effective amendment to the

governing regulation, without the notice-and-comment rulemaking procedure that the APA

requires. *See* Pls. S.J. Mem. 17-22. While the regulation that FDA actually promulgated requires,

generically, "adequate information about . . . toxicological studies" (21 C.F.R. § 312.23(a)(8)),

---

[1]   We explained earlier (Pls. S.J. Mem. 25) that the possibility of discretionary waiver does not
render an agency's legislative rule non-binding for purposes of the policy exception to notice-and-
comment rulemaking. As we noted, "a discretionary waiver provision is not sufficient to qualify
an otherwise nondiscretionary regulation as a 'general statement of policy.'" *Guardian Fed. Sav.
& Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 667 (D.C. Cir. 1978); *see also
McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) ("[A] provision for
exceptions obviously qualifies a rule," but "does not push it much in the direction of a policy
statement."); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("In
subsequent administrative proceedings involving a *substantive* rule, the issues are whether the
adjudicated facts conform to the rule *and whether the rule should be waived* or applied in that
particular instance.") (emphases added). Indeed, the key consideration is whether the agency rule
has "binding force . . . in *standard* cases." *Gen. Elec. Co.* v. *EPA*, 290 F.3d 377, 384 (D.C. Cir.
2002) (emphasis added). FDA does not respond to this argument.

[2]   FDA's assertion that the Remand Response did not offer "a single citation to" the ICH
Guidance is difficult to understand, given that the Remand Response justifies the so-called
"[s]cientific [s]tandard of 9-[m]onth [n]onrodent [t]oxicity [s]tudies" by referencing the outcome
of "scientific panel" assembled by "the International Conference on Harmonisation of Technical
Requirements for Registration of Pharmaceuticals for Human Use (ICH)." FDA-11121. As the
Remand Response explains, ICH endeavors "to achieve greater harmonization" "through the
development of ICH Guidelines." *Id*. n.48.

In all events, what matters is that FDA has imposed a binding requirement of a 9-month
nonrodent study in standard situations. FDA cannot avoid the procedural infirmity of the ICH
Guidance by continuing to require the exact same substantive outcome, but by calling it something
else.

FDA has revised the governing rules to adopt numeric standards that are not discernable from the regulatory text. This is not interpretation of that regulation; it is a binding, substantive amendment. There can be no doubt on this score: FDA *admits* that it "is not claiming to have *interpreted* the text of the IND regulations and found a 9-month nonrodent toxicity study compelled by the regulatory language." FDA S.J. Mem. 45.[3]

FDA's only response is to say that the ICH Guidance constitutes a general statement of policy, as to which notice and comment was unnecessary. FDA S.J. Mem. 40 ("[t]he Guidance is a policy statement"). In support, FDA notes only that the ICH Guidance *says* it is not binding, and is written in permissive language. *See* FDA S.J. Mem. 40-41 ("Every page repeats the admonishment that it "Contains Nonbinding Recommendations.").

But what matters here is what the agency actually *does*—not what it *says*. That is, "the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise." *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003). Thus, courts must "look[] to post-guidance events to determine whether the agency has *applied* the guidance as if it were binding on regulated parties." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014). And if an agency's statement is given "present binding *effect*," then "the APA calls for notice and comment." *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (emphasis added). Put another way, an agency standard "will be considered binding as a practical matter if it *either* appears on its face to be binding, *or* is applied by the agency in a way that indicates it is binding." *Id.* at 7 (emphases added) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)).[4]

---

[3]   Strangely, FDA attempts to distinguish *Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996), and *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010). *See* FDA S.J. Mem. 43-45. But those cases deal with the interpretive-rule exemption from notice and comment, upon which FDA explicitly declines to rely. FDA S.J. Mem. 45; *see* Pls. S.J. Mem. 18-20 (discussing *Hoctor* and *Catholic Health Initiatives*).

[4]   To be sure, Vanda earlier took FDA at its word, believing that the ICH Guidance was—as it said—non-binding. That is why Vanda asked FDA to approve 12-month tradipitant studies without data from a 9-month non-rodent study. *See, e.g.*, FDA-1 ("Proposal to Waive Chronic Dog Study"); Pls. S.J. Mem. 10-12 (laying out administrative procedural history). But Vanda later

The record here indicates forcefully that FDA applies the ICH Guidance as a binding rule, and that it did so in this case. That is clear not only from FDA's own candid and repeated characterization of the Guidance as establishing a "requirement" rather than a "recommendation" (FDA-10990), but also from its enforcement conduct. Because (true) policy statements are (truly) nonbinding, "[w]hen the agency applies the policy in a particular situation, it must be prepared to defend it, and cannot claim that the matter is foreclosed by the prior policy statement." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978). Here, however, FDA refused "to hear new argument and to reexamine the basic propositions under-girding the policy." *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C. Cir. 1993) (quotation marks omitted). Rather, it applied the Guidance reflexively as a settled and binding rule. And, even in the Remand Response, FDA *continues* to maintain 9-month nonrodent studies are obligatory, regardless of the drug at issue. FDA-11120 to FDA-11121. The ICH Guidance accordingly is not a non-binding policy statement, no matter what words the agency may have intoned when adopting it.

In sum, FDA has amended its governing regulations in an unlawful way, and that illegal amendment supplied the rule of decision here. That unlawful agency action must be set aside. *See* Pls. S.J. Mem. 14-17; 23-24.

## II.     BECAUSE THE PROCEDURES WERE FATALLY DEFECTIVE, THE REMAND RESPONSE CANNOT REHABILITATE THE PARTIAL CLINICAL HOLD.

As we just described, the Remand Response perpetuates FDA's unlawful application of the ICH Guidance as a binding legislative rule. This reasoning was the *sole* basis of the original partial clinical hold (a point FDA does not contest), and FDA continues to apply that inflexible and binding rule on remand. But even if the Court could look past this unlawful conduct, the Remand Response is still fatally defective.

---

learned that, while the ICH Guidance *says* it is non-binding, that is not how FDA implements it in practice. Instead, per FDA, a chronic toxicology study in a non-rodent "is a requirement, not a recommendation." FDA-10990. *See also* Pls. S.J. Mem. 14-16.

A.       **The Remand Response is an impermissible post hoc rationalization.**

We demonstrated in our opening brief (at 26-37) that the arguments in the Remand Response constitute impermissible post-hoc rationalizations under the framework articulated by this Court in *NAACP v. Trump*, 315 F. Supp. 3d 457, 466 (D.D.C. 2018) (Bates, J.), *cert. granted on other grounds*, 139 S. Ct. 2773 (2019). *NAACP* provides that, "when faced with an explanation offered for the first time on remand, a court must determine whether it is an 'amplified articulation' of the agency's prior reasoning (which must be considered) or instead 'a new reason for why the agency *could* have' taken the action (which must be disregarded)." *Id.* (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) and *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 436, 453 (D.D.C. 2015)). We explained (Pls. S.J. Mem. 29-32) that the Remand Response's principal rationales—that alleged safety signals from tradipitant's past testing demonstrated a need for a 9-month dog study, and a more general requirement for 9-month dog studies in all cases is mandated by the scientific literature—do not appear in the pre-remand record and bear no analytical relation to FDA's original clinical hold letter. They therefore are not an "amplified articulation" of the agency's prior reasoning. *See NAACP*, 315 F. Supp. 3d at 461 ("DHS . . . cannot rely on new reasons that it now articulates for the first time."). Indeed, FDA's pre-remand documents were clear that the ICH Guidance was the *only* basis for the partial clinical hold, not the concerns identified in the Remand Response. *See* Pls. S.J. Mem. 14-17.

1. Despite the applicability of the *NAACP* inquiry to the situation here, FDA spends curiously little time addressing it. *See* FDA S.J. Mem. 35. Instead, FDA focuses on whether the Remand Response was issued by a decisionmaker empowered to state the views of the agency, arguing that review by the Medical Policy and Program Review Council (MPPRC) was not necessary. *Id.* at 33-34 (citing *Delta Air Lines*, 85 F. Supp. 3d at 403-404).

FDA misunderstands our point with respect to the MPPRC. *See* Pls. S.J. Mem. 28-29. We did not mean to suggest that the signatory of the Remand Response lacks statutory or regulatory authority to issue a hold, or that the MPPRC must always be consulted. Rather, our point is that, since the MPPRC issued the clinical hold the first time around, lower level FDA employees could

not have come to a different conclusion; only by returning the matter to the MPPRC would FDA been in a position genuinely to reconsider its earlier decision. FDA does not disagree with any facet of that argument.

To begin with, per FDA's guidelines, the MPPRC is the body that sets policy for CDER, the office responsible for the partial clinical hold. *See* Pls. S.J. Mem. 28 n.7.[5] FDA does not disagree. And FDA decided to send this issue to the MPPRC, which directed issuance of the partial clinical hold *because of* the ICH Guidance. *See id.* at 12, 16. There is no evidence that the MPPRC issued its decision for any other reason—and FDA does not argue otherwise. Finally, as we said earlier, there is no evidence that, during the remand, the issue ever returned to the MPPRC. *Id.* at 29. The lack of any such review in the administrative record—coupled with FDA's silence on the point—confirms that the MPPRC did not address the issue during the remand.

The point is not whether the agency official who wrote the Remand Response had authority to issue partial clinical holds in the usual course. Rather, the question is whether that official had authority to overrule the MPPRC. Because the MPPRC—comprising the most senior staff in the relevant FDA office, CDER—originally made *this* decision, the junior staff were not at liberty to

---

[5]   FDA has described the MPPRC in the Federal Register:

> In January 2012, CDER established the Council to ensure better coordination of medical policy development and implementation within CDER and consistent, predictable communication of medical policy decisions to the public through guidance, notice and comment procedures, or other means.

> Chaired by CDER's Associate Director for Medical Policy, the Council provides a senior-level forum through which medical policy issues can be raised, considered, developed, and implemented. Council members include the following senior clinical leaders: The Center Director, the Deputy Center Director for Clinical Science, the Director of the Office of New Drugs, and the Director of the Office of Surveillance and Epidemiology. Experts from within CDER and other FDA offices provide expertise as needed for specific policy topics under consideration.

*Center for Drug Evaluation and Research Medical Policy Council; Request for Comments*, 78 Fed. Reg. 16,679, 16,679 (Mar. 18, 2013). The body exists to, among other things, address "[a] novel medical policy issue requiring senior management input" or "[a]n issue on which CDER seems to have taken inconsistent positions." *Id.* These purposes would be defeated if MPPRC decisions could be disregarded by more junior staff.

change the agency's position. Therefore, on remand, the outcome of the remand necessarily was preordained. As we noted in the opening brief (at 28)—and FDA does not disagree—to be valid, "an agency's further explanation on remand 'must be more than a barren exercise of supplying reasons to support a pre-ordained result.'" *NAACP*, 315 F. Supp. 3d at 466 (quoting *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 217 n.8 (D.C. Cir. 2013)).

To put it another way: Prior to the issuance of the partial clinical hold, the MPPRC "establish[ed] . . . policy" by "confirm[ing] the ICH M3(R2) Guidance requirement for a non-clinical, non-rodent chronic toxicity study of 9 months to support clinical trials with tradipitant beyond 3 months of duration." CDER, *Program Description*, at 1 (effective Sept. 6, 2017), tinyurl.com/yyg2k7pz; FDA-10864 (emphasis added). FDA has pointed to no authority allowing the director of the Office of Drug Evaluation III—the official who signed the Remand Response—to overrule that policy. The director was not free to come to any different conclusion. Against this background, there is no denying that FDA, "having reached a particular result" at the direction of the MPPRC during the original clinical-hold decisionmaking process, was "so committed to that result as to resist engaging in any genuine reconsideration of the issues." *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978). A "genuine reconsideration" would have required resubmitting the issue to the MPPRC. *Cf.* Toni M. Fine, *Agency Requests for "Voluntary" Remand: A Proposal for the Development of Judicial Standards*, 28 Ariz. St. L.J. 1079, 1113-14 (1996) ("Giving the agency another chance to justify its order(s) [through voluntary remand] raises the possibility that the agency will be reacting to counsel's concerns with the agency's litigation position rather than to any rationale genuinely invoked by the agency.").

2. As for the *NAACP* standard—whether the "explanation offered for the first time on remand" represents "an 'amplified articulation' of the agency's prior reasoning" (*NAACP*, 315 F. Supp. 3d at 466)—FDA offers nothing persuasive. It states that "[t]he legal basis" for the original partial clinical hold and the Remand Response was "the same," in that both relied on the same general regulatory provisions. FDA S.J. Br. 35 (citing 21 C.F.R. § 312.23(a)(8) (requiring "[a]dequate information about . . . toxicological studies of the drug") and *id.* at § 312.42(a)(1)(iv)

(providing for clinical hold if "[t]he IND does not contain sufficient information required under § 312.23 to assess the risks to subjects of the proposed studies")). That is silly. The question is the agency's *reasoning*, not the general regulatory or statutory basis for its authority to act. Were it otherwise, the amplified-articulation standard would mean nothing. Here, the record lays bare the agency's original reasoning for requiring a 9-month non-rodent study: because the ICH Guidance says so, not because of any case-specific analysis.

FDA's only other attempt to fit its conduct within the "amplified articulation" standard is an assertion that "FDA's earlier references to the [ICH] Guidance"—that is, the agency's repeated invocation of the guidance as a binding rule in lieu of a substantive scientific explanation— "embodied the scientific issues because the Guidance recommended minimum durations of repeated-dose animal toxicity studies." FDA S.J. Br. 35. But that assertion is belied by the record. If FDA was using "ICH Guidance" merely as shorthand for "good science," it would not have responded to Vanda's science-based objections by proclaiming—without engaging the substance of Vanda's position—that the guidance "*is a requirement, not a recommendation*." FDA-10990 (emphasis added). Relying on guidance *as a rule of decision* is not the same as relying on the science supposedly underlying the guidance. Here, the record indicates that FDA was indifferent to the science. *See* Pls. S.J. Mem. 14-17, 23-24 (collecting numerous examples of FDA reliance on the ICH Guidance). Rather than "amplified articulation[s]," the rationales set out in the Remand Response represent—at best—"new reason[s] for why the agency *could* have" issued the partial clinical hold, and are therefore impermissibly post hoc. *NAACP*, 315 F. Supp. 3d at 466.

3. FDA takes the position that any time a court remands to an agency for further explanation of a challenged agency decision, "it is incumbent upon the court to consider that explanation when it arrives." FDA S.J. Mem. 33 (quoting *Menkes v. DHS*, 637 F.3d 319, 337 (D.C. Cir. 2011)); *see also id.* at 43 n.12. That is true but incomplete. While the court must consider "further explanation" that the agency produces on remand (*see Menkes*, 637 F.3d at 337 (quoting *Alpharma*, 460 F.3d at 6)), it need not give credence to—indeed, it "must" disregard—"new reason[s]" that "appear[] for the first time on remand" (*NAACP*, 315 F. Supp. 3d at 466-467). This is a reflection of the familiar

*Chenery* rule, which requires reviewing courts to judge an agency's decision on its own terms, and not on the basis of "post-hoc rationalizations." *ANR Storage Co. v. Fed. Energy Regulatory Comm'n*, 904 F.3d 1020, 1024 (D.C. Cir. 2018). Indeed, this Court in *NAACP* itself remanded to the agency for further explanation but ultimately rejected DHS's new justification as impermissibly post hoc. *See NAACP*, 315 F. Supp. 3d at 467; *see also id.* at 461 ("[T]his reason was articulated nowhere in DHS's prior explanation for its decision, and therefore cannot support that decision now."). Like DHS in *NAACP*, FDA here has offered not "further explanation," but *different* explanation, in violation of the prohibition on post-hoc rationalization.

It is no answer to say that FDA, through the Remand Response, has issued a new and independent clinical hold that would excuse its reliance on post-hoc rationalizations. To be sure, if an agency on remand "opt[s] to issue a new decision" achieving the same result as the previous agency action (rather than simply providing further explanation of the original decision), then "the explanations offered in [the new] memorandum would be contemporaneous and, consequently, not *post hoc*." *NAACP*, 315 F. Supp. 3d at 467 n.7; *see also Delta Air Lines*, 85 F. Supp. 3d at 453 (an agency might "avoid a *post-hoc* rationalization" by "mak[ing] a *new* authorizing decision on remand using a different justification," but the agency "could not . . . provide a new justification for its *initial* decision") (emphases added).

Here, however, FDA has expressly disclaimed that its Remand Response constitutes a new final agency action. In its papers seeking a remand, FDA explained that a remand was necessary to allow the agency to "review and clarify the regulatory basis for its decision," not to make a new one. ECF No. 6-1, at 6. Thus, in its opposition to Vanda's motion to supplement the record, FDA takes the position that, on remand, it "re-evaluated only the materials that Vanda had submitted to FDA *before* FDA's original decision" (ECF No. 30, at 7), a limitation that would make no sense if the agency were undertaking a new decisionmaking process altogether. And following FDA's re-evaluation, the Remand Response itself declares that "the partial clinical hold issued on December 19, 2018, remains in place" and "continues to be appropriate." FDA-11106, -11127 (emphases added). This is not a new decision; it is a reaffirmation of an old one. *See NAACP*, 315

14

F. Supp. 3d at 463 (agency memorandum "declin[ing] to disturb" the agency's "earlier decision" was not "a new decision" that would avoid post-hoc problems).

**B.      FDA openly admits that, during remand, it considered only evidence favorable to its preordained decision while ignoring evidence that supports Vanda.**

The Remand Response is procedurally invalid for another reason: At the same time that FDA reopened the record to add evidence to support its one-sided reasoning, it expressly refused to consider the evidence that Vanda and others put before the agency. That is an outrageous position. It is fundamental that "[a]n agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 47-48 (D.D.C. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *accord, e.g.*, *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 310 (D.D.C. 2016). Thus, "an agency cannot ignore evidence that undercuts its judgment." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). An agency's refusal to consider all of the relevant evidence before it—that is, a decision to focus selectively on evidence that serves a predetermined outcome while ignoring the rest—is a textbook example of arbitrary and capricious decisionmaking. *Council of Parent Attorneys*, 365 F. Supp. 3d at 47-48 (citing cases); *see also Genuine Parts Co.*, 890 F.3d at 312 ("[A]n agency cannot ignore evidence contradicting its position.") (quoting *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

FDA nevertheless has taken the position that it was free to supplement the administrative record with "additional materials" of its own choosing, including "scientific literature and [other] materials" from other IND applications (FDA A.R. Mem. 8; *see also* FDA S.J. Mem. 39)—while at the same time refusing to consider any of the scientific literature cited in Vanda's complaint or in the Humane Society letter submitted in connection with the remand (FDA S.J. Mem. 35-39). In defense of this one-way ratchet procedure, FDA complains (FDA S.J. Mem. 35-38) that requiring the agency to consider evidence other than the evidence that it cherry-picks to support its position

would "impose procedural requirements" on the agency in violation of *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978). Not so.

It is of course a "basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vermont Yankee*, 435 U.S. at 544. A reviewing court may not "devise[] procedures to be followed by the agency on the basis of [the court's] conception of how the public and private interest involved could best be served." *Id*. Vanda has never argued otherwise. Our point is only that an agency's general discretion to adopt decision-making procedures is not a license to adopt *any* procedures it wishes, including ones that operate as an end-run around that APA's constraints. The point is simple and obvious: Under the APA, "[a]n agency may not skew the record by excluding unfavorable information." *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 47 (D.D.C. 2015) (quotation marks omitted). Recognizing the common sense rule that an agency "may not skew the record in its favor by excluding pertinent but unfavorable information" (*Am. Wild Horse Pres. Campaign v. Salazar*, 859 F. Supp. 2d 33, 41 (D.D.C. 2012)) is not to invade the agency's procedure-setting prerogative; it is to enforce the APA.

FDA is also correct that "when the reviewing court does not expressly require additional fact gathering on remand, the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed." *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 78 (D.D.C. 2011) (quotation marks omitted); *see* FDA S.J. Mem. 35. But the question here is not *whether* FDA should have reopened the record; as it admits, it determined that additional fact gathering *was* needed and thus "developed [additional] evidence and included it within the record" on remand. FDA S.J. Mem. 39. The only question is whether an agency, *when* it exercises its discretion to conduct further fact gathering on remand, is free to "skew the record by excluding unfavorable information." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 46-47. It obviously is not. To say otherwise would be "the very definition of arbitrary and capricious." *St. Francis Med. Ctr. v. Azar*, 894 F.3d 290, 298 (D.C. Cir. 2018) (Kavanaugh, J., concurring).

Our argument is ultimately a straightforward one. We acknowledge that, on remand, FDA could structure its procedures in a myriad of ways, including by deciding whether to reopen the

record to include new evidence. But what FDA most decidedly could not do is reopen the administrative record in a one-sided fashion—to stack the record with evidence supporting its preferred position, while disregarding material that Vanda submitted. Not only is this the law, it is basic common sense. Yet, as FDA admits, that is precisely what it did here.

The literature and argument from Vanda's original complaint was undeniably before the agency (*see* Pls. S.J. Mem. 34), and FDA does not really disagree. FDA incredulously claims that the complaint was "never submitted to the agency." FDA S.J. Mem. 38. But the entire point of the remand was, according to FDA, to *address Vanda's Complaint*. As FDA put it:

> Voluntary remand at this early stage will afford FDA an opportunity to address certain procedural issues Vanda noted in its Complaint, including the allegations about the agency's response to scientific arguments submitted by Vanda and the treatment of a guidance document as a binding rule.

Dkt. 6-1, at 2. Since FDA asked for a remand to address Vanda's initial complaint, FDA cannot meaningfully claim that the material in the complaint was not before it.

As to the Humane Society letter, CDER Director Dr. Janet Woodcock expressly confirmed receipt and assured its author that "[w]e will take your comments into account and evaluate the studies you reference." Woodock Email (Ex. M) at 1.[6] FDA's lawyers insist that the agency had an alternative basis for refusing to consider the Humane Society's letter—the letter "was submitted

---

[6]   FDA's insistence that "the APA did not require that FDA consider the Humane Society's comments" (FDA S.J. Mem. 37) is particularly puzzling. Dr. Woodcock expressly assured the Humane Society that "[w]e will take your comments into account and evaluate the studies you reference." Woodock Email (Ex. M) at 1. The question is whether FDA, having acknowledged receipt of the letter and committed to consider it, was required to include the letter in the administrative record and respond to its analysis. In other words, when an agency "voluntarily go[es] beyond the procedural requirements of the Administrative Procedure Act" (*Butte Cty. v. Chaudhuri*, 887 F.3d 501, 505 (D.C. Cir. 2018)), it is bound by the APA's requirements with respect to its extra-statutory conduct. As we explain in our contemporaneously filed reply in support of Vanda's motion to complete the administrative record, FDA plainly was obligated to adhere to the APA requirements, having agreed to consider the material. In all events, the fact of the matter is that Vanda's own *complaint* contained significant information—all of which was undoubtedly before FDA—yet the agency ignored it all. *See* Pls. S.J. Mem. 34.

at the eleventh hour." FDA S.J. Mem. 38. Perhaps.[7] And perhaps also that would have been a permissible basis for refusing to consider the letter and the attached studies (a fact we do not concede). But either way, that is not what the agency said in the Remand Response. Instead, it simply ignored the letter without explanation. Under *Chenery*, this Court cannot credit reasons provided for the first time by FDA's lawyers. *See Philadelphia Gas Works v. F.E.R.C.*, 989 F.2d 1246, 1250 (D.C. Cir. 1993) ("*Chenery I*'s premise—reviewing courts may affirm based only on reasoning set forth by the agency itself—applies equally when the agency gives an inadequate explanation for its conclusions.").

All of this evidence—disregarded by the agency—undercuts the Remand Response's assertion that 9-month nonrodent studies "are the accepted scientific minimum." FDA-11120. FDA was not free to invent one-sided procedures that relieved it of its obligation to consider this material.

Finally, FDA objects that Vanda's scientific evidence was not submitted through the formal channels the agency claims were available. *See* FDA S.J. Mem. 38-40. We note at the outset that this is not an argument that Vanda has failed to exhaust formal administrative remedies; indeed, FDA regulations involved do not require exhaustion before judicial review. *See generally* 21 C.F.R. §§ 312.42(e)-(f), 312.48.[8]

Moreover, the argument lacks substance. The cited procedures offer the sponsor an opportunity to "submit[] a complete response to the issue(s) identified in the clinical hold order." 21 C.F.R. § 312.42(e). But the one and only "issue[] identified in the clinical hold order" (*id.*) was FDA's demand that Vanda conduct a 9-month dog study according to the ICH Guidance. FDA-10185. And FDA had already made clear to Vanda that the ICH Guidance was "a requirement, not

---

[7]   Also, perhaps not. After acknowledging receipt of the letter and saying that it would consider it and the attached studies, FDA could have requested more time to evaluate the evidence, had it thought that necessary. FDA declined to do so. It had, moreover, multiple days to evaluate and consider the letter—precisely what Dr. Woodcock said the agency would do.

[8]   Even if exhaustion were a prerequisite to review, FDA has waived that argument by failing to argue that Vanda did not fully exhaust its remedies. *See Smith v. Berryhill*, 139 S. Ct. 1765, 1773-1774 (2019) (exhaustion is non-jurisdictional and may be waived by the government).

a recommendation" (FDA-10990), and refused to entertain Vanda's substantive arguments that noncompliance should be excused. Any additional "response" under 21 C.F.R. § 312.42(e) would have been redundant and pointless.

The other regulation that FDA relies on—21 C.F.R. § 312.48—describes the agency's Formal Dispute Resolution procedure. Vanda attempted to use that procedure but was rebuffed by FDA. *See* Pls. S.J. Mem. 11.

*     *     *

On remand, FDA was permitted only to issue an "amplified articulation" of the reasoning contained in its original partial clinical hold letter. *NAACP*, 315 F. Supp. 3d at 466 (quoting *Alpharma*, 460 F.3d at 6). That is not what the agency did. Instead, it came up with "new reason[s] for why the agency *could* have" issued the original hold. *NAACP*, 315 F. Supp. 3d at 466 (quoting *Delta Air Lines*, 85 F. Supp. 3d at 453. Adding insult to injury, it developed new evidence to support those new reasons, while insisting that it had no obligation to consider the voluminous evidence before it that was contrary to the result it was determined to reach. In both of these respects, the Remand Response violates fundamental principles of administrative law. That document cannot save FDA from its unlawful adoption of the ICH Guidance as binding law.

## III.    FDA'S MAINTENANCE OF THE PARTIAL CLINICAL HOLD IS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE.

FDA's adherence to a binding guidance document that it failed to adopt through notice and comment—and the agency's refusal to address that shortcoming on remand—are not the only problems with the agency's partial clinical hold. As we explained, FDA's action is riddled with additional shortcomings independently requiring the partial clinical hold be "set aside." 5 U.S.C. § 706(2).

### A.    FDA ignored and minimized contrary evidence that it admits is part of the record.

We explained in our opening brief that—wholly apart from FDA's refusal to consider new evidence that was put before it on remand—the agency ignored or unduly minimized contrary

19

evidence that it admits is in the administrative record. *See* Pls. S.J. Br. 34-36. Needless to say, "[a]n agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision." *New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d 61, 74 (D.D.C. 2009).

Most obviously, FDA has simply ignored the Parkinson et al. study (FDA-10721 to FDA-10729), whose "results [call into] question the scientific basis of the routine requirement for chronic toxicity studies in this valuable nonrodent species [dogs]." FDA-10728 (emphasis omitted); *see also id.* (study concluding "that the majority of information provided by long-term studies in the dog does little more than confirm effects seen in shorter-term studies in the dog or studies in the rat"); Pls. S.J. Br. 35. Having included in the record a scientific study that comes to precisely the opposite conclusion as the agency, FDA cannot "ignore" or "minimize" that evidence "without adequate explanation." *Genuine Parts Co*, 890 F.3d at 312. But the Remand Response provides no explanation for disregarding or discounting the Parkinson study. And in its brief, FDA offers not one word in defense of its failure to do so.

FDA's brief does take issue with our explanation of why the Broadhead et al. study supports Vanda's position and not the agency's. *See* FDA S.J. Mem. 28. While FDA is wrong about Broadhead,[9] the Court need not address this issue, because this is precisely the kind of substantive analysis that should have been conducted by FDA on remand, rather than by its counsel in a legal brief. FDA's "failure to respond meaningfully" and engage with the aspects of the

---

[9]   Vanda has not "mischaracterize[d]" or "misstate[d]" the findings of the Broadhead study. *Cf.* FDA S.J. Mem. 27, 28. The data that FDA seizes on—the set of 54 drugs reported in Table 2 of the study—was constrained to include *only those drugs for which a dog study demonstrated toxicity*. *See* FDA-10701 & tbl. 2. That is, FDA's calculations ignore the drugs for which the dog study did *not* report any toxicity, thus inflating the numbers in the agency's brief. And the finding that 11% of studied drugs "were terminated due to findings seen uniquely in the dog" is not broken down further to demonstrate the duration of the study that revealed those adverse findings. FDA-10702. In other words, a majority of that 11% may have followed a one-month study. Indeed, the Broadhead paper's other conclusion was just that: New "findings were seen in studies of 1 month duration or less" for 74% of drugs that showed findings. *Id.* Finally, FDA is correct that Broadhead's statement that "there [is] not sufficient convincing evidence in the published literature to support or refute regulatory requirements for the routine use of the dog" was actually one of the "main conclusions" of an earlier study by the same lead author (*id.*)—but FDA does not explain why that means the agency may ignore that conclusion.

scientific record that are contrary to its position is arbitrary and capricious (*Tesoro Alaska Petroleum Co. v. Fed. Energy Regulatory Comm'n*, 234 F.3d 1286, 1294 (D.C. Cir. 2000)), and that failing cannot be cured by any amount of "argument[] of counsel" after the fact (*Alpharma*, 460 F.3d at 6).

**B.     FDA's assertion that the science requires 9-month dog studies is defective and unsupported.**

We further explained in our opening brief the procedural and substantive flaws with Remand Response's assertion that scientific consensus supports a 9-month nonrodent study requirement.

1. We demonstrated that FDA failed to consider or test the predictive power of 9-month dog studies—that is, the power of such studies to predict human toxicities, such that they may be deemed indispensable to an "adequate" human toxicology profile. *See* Pls. S.J. Br. 38-40. As we explained, FDA has acknowledged the general scientific principle that analyzing predictive power—expressed in such measures as positive and negative predictive value, likelihood ratios, and sensitivity and specificity—is critical to understanding how successful a test is at predicting what it is supposed to predict. Pls. S.J. Mem. 38-39.[10] We also highlighted a robust scientific literature applying those tools to precisely the issue at hand: whether long-term animal toxicology studies are predictive of human outcomes. *See* Pls. S.J. Mem. 39 & n. 9. And as we explained, those studies concluded that long-term animal studies generally do *not* add value in assessing the likelihood of human toxicity. *Id.*

The true reason that FDA has failed to undertake this critical underlying analysis is clear enough: A 9-month dog study is required by dint of bureaucratic rule (adopted without notice and comment rulemaking) rather than as the result of genuine scientific analysis.

---

[10]   FDA asserts that the document in which it mandates use of statistical measures of predictive power "deals with binary-outcome diagnostic devices—not the kind of testing at issue here." FDA S.J. Mem. 27 n.7. But it fails to explain why that distinction makes a difference. The point is not that FDA is disobeying its own guidance; it is that good science requires the predictive power of a test to be validated through statistical analysis before its mandatory use is reasonable.

FDA thus does not defend its lack of statistical validation on the merits. It instead attempts a dodge, insisting that the scientific studies cited by Vanda "are not part of the administrative record." FDA S.J. Mem. 27 & n.7. But that misses the point, which is not that FDA was required to consider these *particular* studies that we cited. Rather, the point is that FDA has failed to undertake an analysis that is logically indispensable to its assertion that a 9-month dog study is a necessary component of the "[a]dequate information" Vanda must make available—an analysis of whether dog toxicities are in fact predictive of human toxicities. If dog toxicities do *not* shed helpful light on human toxicities, then requiring dog studies is arbitrary and capricious. Yet FDA offers precisely *zero* analysis of the predictive power of dog studies.

FDA shunts additional argument on this point into its administrative-record response brief. The agency says that it already considered "whether [9-month dog studies] are effective at their intended task" by observing "that new toxicological findings are observed in 9-month nonrodent studies." FDA A.R. Mem. 17. That is an obvious red herring. What matters is whether FDA has analyzed whether 9-month dog studies are predictive of toxicities *in humans*; that is, whether any "toxicological findings . . . observed" in such studies accurately predict that the drug will be toxic to humans—and, equally importantly, whether the lack of findings in dogs implies a corresponding lack of human toxicity. FDA offers no evidence or reasoned analysis on this point. And without that analysis, "a rational connection between the facts found and the choice made"—one of the prerequisites of reasoned decisionmaking—is completely lacking. *E.g. Shands Jacksonville Med. Ctr., Inc. v. Azar*, 366 F. Supp. 3d 32, 48 (D.D.C. 2018).

The costs of FDA's analytical oversight do not only accrue to new drug sponsors, like Vanda, who are required to conduct animal testing that will add no value. (Relatively speaking, the financial cost of these tests is inconsequential; the moral and scientific costs, however, are extraordinary.) To the contrary, patients and the public are put at risk when the agency bases its safety decisions on animal models that are of untested and therefore offer uncertain value in predicting human toxicities. Not only may false negative results lead to human trials using drugs whose toxicities the dog testing failed to expose, but, importantly, false *positive* results in the

unvalidated dog studies may delay or even derail development of drugs that could have addressed human suffering from unmet medical needs.

It is not only the APA that requires more from FDA; the agency's own mission of "ensuring reasonable product safety while *also* facilitating the translation of scientific innovations into commercial products," is fundamentally disserved when the agency insists on (and relies on) dog studies without examining their predictive power for *human* toxicities. Woodcock & Woosley, *supra*, at 2, 7 (emphasis added). This is particularly so when "FDA holds the world's largest collection of animal test data and correlated human trial data," and is therefore in a uniquely powerful position to perform such analysis. *See id*. at 7 (emphasis added). These are statements from Dr. Woodcock herself—the head of the FDA office responsible for this decision, CDER.

In sum, "[f]aced with an unsupported assumption on which its decision necessarily relied"—that is, that 9-month dog studies accurately predict human toxicities—FDA "cannot identify any portion of the administrative record in which it so much as acknowledged the gap in its reasoning." *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 95 (D.D.C. 2017) (citing *State Farm*, 463 U.S. at 43). "This omission alone" is fatal to the Remand Response. *Id*.

2. We explained that FDA is wrong to describe the 9-month nonrodent-study requirement as "the *scientific* standard" rather than "the *regulatory* standard." The scientific literature is at best mixed (*see, e.g.*, pp. 19-21, *supra*), and the evidence shows that the 9-month number was selected by an international standardization organization as a policy-based compromise. *See* Pls. S.J. Mem. 20-21, 33-36, 38-42.

FDA responds not at all to the history of how a 9-month nonrodent-study requirement was developed through bureaucratic compromises at the ICH meeting. *See* Pls. S.J. 20-21 (citing and discussing evidence). All it offers instead are quibbles with Vanda's reading of the science. For example, FDA says that Vanda "misunderstands the analysis" of the 1999 DeGeorge et al. study that underlies the ICH's adoption of the 9-month nonrodent-study standard. It defends the study's decision to consider only "cases showing 'significant toxicological differences in 6- and 12-month' nonrodent studies." FDA S.J. Mem. 27 (quoting FDA-10709).

That once again misses the point. Vanda does not question that the *study* appropriately limited the cases it considered. Our point is simply that the Remand Response omits that necessary context when it asserts that the authors identified new findings following long-term dog studies "[i]n 83% of the case studies. FDA-11121. The missing context is that the case studies were selected by the authors *for that trait*. In other words, the cases studies did not comprise a representative sample that would suggest that new findings arise 83% of the time in long-term animal studies. Yet that is just what the Remand Response misleadingly implies.[11]

In all events, FDA neither explains how 9-month studies are predictive of *human* results nor engages with the scientific evidence that runs contrary to its position. *See* pp. 19-23, *supra*. For all these reasons, the Remand Response's conjuring of a "scientific standard" requiring 9-month dog studies is unfounded and cannot be credited.

### C.    FDA's newfound tradipitant-specific arguments are defective as well.

The Remand Response's tradipitant-specific reasoning is also arbitrary and capricious for several reasons (*see* Pls. S.J. Mem. 42-45), none of which FDA rebuts. It bears repeating, moreover, that prior to this litigation, FDA *never* raised any concern whatsoever with respect to tradipitant itself. That was not for lack of opportunity. Vanda previously (and currently) sponsors 3-month trials of tradipitant in humans—and FDA has raised no concerns regarding tradipitant's safety. And there was extensive communication between Vanda and FDA regarding the necessity of a 9-month dog study (*id*. at 9-16)—yet FDA then never raised concerns with tradipitant then either. As we have explained, the post hoc nature of these arguments obligates the Court to disregard them. And this procedural protection exists for good, substantive reason—if the arguments had merit, surely FDA would have raised them long ago in the regular course, and not merely as a response to litigation.

---

[11]    Again, FDA is in possession of "the world's largest collection of animal test data and correlated human trial data," and so would be in an excellent position to evaluate how frequently new findings *actually* arise in 9-month dog studies, and whether those studies predict human results. Woodcock & Woosley, *supra*, 7. The agency has not done so.

First, we explained that FDA's evaluation of tradipitant's safety profile is impermissibly standardless; that is, it "'fails to articulate a comprehensible standard' for assessing" (*ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018)) whether and when arguable findings in 3-month and shorter studies mandate the performance of a 9-month dog study. *See* Pls. S.J. Mem. 42-43. Instead, the Remand Response jumps from the "facts found" (weight-related findings in a 3-month dog study) to the "choice made" (tradipitant's toxicology data is inadequate without a 9-month dog study) without "articulat[ing] . . . [the] rational connection between" the two. *Shands Jacksonville Med. Ctr.*, 366 F. Supp. 3d at 48.

FDA brushes this observation aside, asserting that "Vanda may not like the scientific standard, but one exists." FDA S.J. Mem. 29-32. To be sure, FDA arguably has articulated a standard for when 9-month dog studies are required: *always*, unless some undefined grace-of-the-agency exception applies. *See* FDA-11120 (Remand Response) ("9-month nonrodent toxicity stud[ies] . . . are the accepted scientific minimum.").[12] But if that is what FDA means, we have already explained why that contention fails—it is a legislative rule adopted without notice-and-comment rulemaking and, in event, it is arbitrary and capricious for multiple reasons.

Aside from that, FDA does not answer what standard the agency is using when it makes the (allegedly) tradipitant-specific conclusion that "the risks of long-term tradipitant use in humans cannot be predicted by the studies conducted to date." FDA-11119. FDA claims that its decision is not standardless because "the existing data from short-term toxicity studies failed to fully establish 'the toxicological profile of tradipitant' and could not be used to predict 'the risks of long-term tradipitant use in humans.'" FDA S.J. Mem. 30 (quoting FDA-11119). But that is a question-begging *ipse dixit*. It "offers no meaningful guidance" (*ACA Int'l*, 885 F.3d at 700) about when the "toxicological profile" of a drug *will be* deemed less than "fully establish[ed]" as a general matter. FDA S.J. Mem. 30. It thus does nothing to dispel Vanda's point that the agency's

---

[12]  It is difficult for FDA to call that 9-month standard "the accepted scientific minimum" (FDA-11120), given that the European Union's pharmaceutical regulator requires only 6-month nonrodent studies. FDA-10917 & tbl. 1, n.d; *see* Pls. S.J. Mem. 7, 21.

"application of [the adequacy standard] [is] an exercise in totally standardless discretion," and thus renders the agency's analysis arbitrary and capricious. *Dithiocarbamate Task Force v. EPA*, 98 F.3d 1394, 1402 (D.C. Cir. 1996); *accord ACA Int'l*, 885 F.3d at 700; *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 753 (D.C. Cir. 2015).

Second, we pointed out that the Remand Response relies for one of its central conclusions on a review of tradipitant's 3-month dog study that found weight-related findings to be adverse, while ignoring a prior review of the same findings that reached the opposite conclusion. *See* Pls. S.J. Mem. 43-44. The Remand Response makes the following assertion:

> In the 3-month dog study, FDA determined the NOAEL (no-observed-adverse-effect-level) to be 275 mg/kg/day, due to body weight loss in the 1500 mg/kg/day dosage group. Vanda, however, reported the NOAEL to be a much higher dose, i.e., the highest dose administered, 1500 mg/kg/day. The difference between these doses is important because the margins of safety are determined by comparing the expected exposure in humans at the proposed clinical doses to the exposure at the NOAEL in the animal studies.

FDA-11117. For this point, FDA relies on Dr. Wang's nonclinical review dated September 21, 2016. *See* FDA-11117 n.34.

Dr. Wang's review, in turn, says:

> Dr. Chalecka-Franaszek agreed with the sponsor that no significant adverse effects were noted in this study and the NOAEL was identified as the HD [high dose, of 1500 mg/kg/day] (review dated 09/02/2005). However, the weight loss noted in HD males is considered adverse by this reviewer and the NOAEL is suggested to be changed to the MD [medium dose], 275 mg/kg/day.

FDA-10839.

In sum, two FDA doctors have reviewed the same study. One doctor, Dr. Chalecka-Franaszek, agreed with Vanda that there was no adverse results at the extraordinarily high dosing of 1500 mg/kg/day.[13] Dr. Wang disagreed and believed that nothing was observed at the dosing level of 275 mg/kg/day. There is thus a disagreement among the two FDA doctors who have

---

[13]   As we noted earlier (Pls. S.J. Mem. 44 n.12), the dosing used in human is roughly 3 mg/kg/day—thus a tiny fraction of the amounts studied in these trials.

evaluated this study. The Remand Response credits solely Dr. Wang's evaluation, without acknowledging that Dr. Chalecka-Franaszek came to a different result.

FDA responds by saying that what it calls "[i]nternal disagreement" cannot "justify according the agency's final decision less deference than usual." FDA S.J. Mem. 25 (quoting *Cumberland Pharm. Inc. v. FDA*, 981 F. Supp. 2d 38, 52 (D.D.C. 2013)). But *Cumberland Pharmaceuticals* makes clear that such internal disagreement *can* render a decision arbitrary and capricious, as would be the case if "FDA entirely ignored the opinion offered by" its staff. *Cumberland Pharm.*, 981 F. Supp. 2d at 52 (emphasis added) (quoting *Graceway Pharms., Inc. v. Sebelius*, 783 F. Supp. 2d 104, 113 (D.D.C. 2011)); *see also Graceway Pharms*, 783 F. Supp. 2d at 113 (similar). Indeed, FDA's decision in *Cumberland Pharmaceuticals* survived arbitrary-and-capricious review precisely because "[t]he later opinion by the Gastroenterology Division *reviews each reason given for the initial conclusion and refutes it*." 981 F. Supp. 2d at 53 (emphasis added). But that refutation is lacking here.[14]

In fact, FDA's conduct is far more concerning that its failure to explain why it has rejected Dr. Chalecka-Franaszek's conclusions. FDA takes the astounding position that this earlier review is not even part of the administrative record—so neither Plaintiffs nor the Court can even review it. *See* Pls. A.R. Mem. 3-5. As we describe more fully in the reply brief regarding the administrative record, this contention is preposterous. A different FDA doctor arrived at a result opposite to a central conclusion of the Remand Response, that material is squarely identified on the face of one of the most important documents in the administrative record, yet FDA asserts carte blanche authority to disregard it. Respectfully, that is not a position this Court should countenance. It is simply not how administrative agencies may operate. By "ignor[ing] evidence that undercuts its

---

[14]   FDA seems to imply that Dr. Chalecka-Franaszek's opinion may be disregarded because "[t]wo FDA reviewers in 2016" found the weight findings adverse and thus outvoted Dr. Chalecka-Franaszek's earlier conclusion. FDA S.J. Mem. 25. Even supposing that being outvoted were a ground for refusing to tackle contrary evidence (it is not), the second of those two reviewers, Dr. Peretz, merely noted that "[t]he weight loss . . . is considered adverse *by Dr. Wang*," rather than coming to an independent conclusion on that score. FDA-11044 (emphasis added).

judgment," FDA has rendered the Remand Response arbitrary and capricious. *Genuine Parts Co.*, 890 F.3d at 312; *accord New Life Evangelistic Ctr*, 672 F. Supp. 2d at 74 ("An agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision.").

Finally, we explained that FDA misinterprets the tradipitant-specific evidence, most obviously through its reliance on safety data for a different NK-1 receptor antagonist, casopitant. *See* Pls. S.J. Mem. 45. FDA holds up casopitant as an independent reason why tradipitant requires more study in dogs, particularly on the basis that "[t]he safety concerns from casopitant toxicities observed in 39- and 52- week dog studies had not been signaled in a shorter-term (13-week) toxicity study in dogs." FDA-11119 to FDA-11120. But as we explained, the *reason* why the shorter study did not reveal the toxicities—which affected the animals' hearts—was not the study's duration; instead, "[c]ardiotoxicity was not adequately evaluated in the 4-week and 13-week oral toxicity studies in rats and dogs, *since these studies did not include highly sensitive measures of myocardial injury*." FDA-11621. When such sensitive measures were used in the longer studies, "[e]vidence of cardiac injury . . . in dogs was observed as early as 15 days of treatment." *Id.* And even in the 13-week study, "increased heart weight occurred" (*id.*)—something not seen in the 13-week study of tradipitant. *See* FDA-05261, -05263 (showing, for tradipitant, heart weights comparable to or lower than control). FDA again entirely fails to respond to this gap in its reasoning. FDA S.J. Mem. 26-27.

## IV.   VACATUR IS THE PROPER REMEDY.

Contrary to FDA's cursory assertion (*see* FDA S.J. Mem. 45), the Court should order vacatur in these circumstances.[15] As we noted (*see* Pls. S.J. Mem. 45), the "normal[]" remedy for an APA violation is "vacatur of the agency's order." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). The normal remedy of vacatur should apply here: FDA has *already*

---

[15]   Some judges on the D.C. Circuit question whether the APA provides courts authority to decline to vacate invalid agency action under *any* circumstances. *See Comcast Corp. v. FCC*, 579 F.3d 1, 10-12 (D.C. Cir. 2009) (Randolph, J., concurring) ("I continue to believe that whenever a reviewing court finds an administrative rule or order unlawful, the Administrative Procedure Act requires the court to vacate the agency's action.").

had a remand without vacatur once; each of the errors at issue here carries a presumption of vacatur; FDA has no reasonable basis to oppose vacatur; and a vacatur is necessary to correct FDA's egregious shortcomings in this case and provide plaintiffs a meaningful remedy.

*First*, FDA has already had one remand without vacatur; it is not entitled to a second. The D.C. Circuit frequently vacates actions that the agency has already had one opportunity to correct on remand. *See Am. Bioscience*, 269 F.3d at 1086 ("We have already directed the district court to remand this case once to compile a record. . . . [A]t this point we think the only appropriate course is to vacate the [FDA] action appellant challenges[.]"); *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) (refusing to leave agency rule in place while the FCC "tries yet again to justify it"). Indeed, this Court did exactly the same in the analogous procedural posture presented by the *NAACP* case: "The Court has already once given DHS the opportunity to remedy these deficiencies . . . so it will not do so again." *NAACP*, 315 F. Supp. 3d at 473. As in *American Bioscience*, *Comcast Corp.*, and *NAACP*, FDA does not deserve a third bite at the apple.

*Second*, each of FDA's errors carries a presumption of vacatur. As we have shown, FDA violated the APA's notice-and-comment requirement by treating as binding law a guidance document that had not gone through the APA's prescribed rulemaking process. *See* Pls. S.J. Mem. 14-16. "[D]eficient notice is a 'fundamental flaw' that almost always requires vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). Accordingly, the D.C. Circuit "typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991)). That is precisely what happened here.

Additionally, FDA's Remand Response is the product of post hoc rationalization and disregards conflicting evidence. Pls. S.J. Mem. 26-37. Where an agency returns to court after remand with a "hodgepodge of illogical or post hoc policy assertions," vacatur is warranted. *NAACP*, 315 F. Supp. 3d at 473-474; *see also Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 253 (D.C. Cir. 2013) (vacating requirement justified by "conclusory,

post-hoc rationalization"). And the D.C. Circuit "ha[s] not hesitated to vacate a rule when the agency has not responded to empirical data or to an argument inconsistent with its conclusion." *Comcast Corp.*, 579 F.3d at 8 (collecting cases).

FDA's Remand Response is also substantively arbitrary and capricious—and as with FDA's other errors, "[v]acatur is the presumptive remedy for arbitrary and capricious agency action." *St. Lawrence Seaway Pilots Ass'n v. United States Coast Guard*, 357 F. Supp. 3d 30, 38 (D.D.C. 2019).

*Third*, FDA's brief arguments against vacatur do not hold water. Notwithstanding the strong presumption of vacatur, FDA raises two points: First, it says that any "issues" are within its "expertise to explain"; and second, it asserts without foundation the select individuals who have consented to participate in Vanda's clinical trial could suffer "unpredictable and irreversible consequences." FDA S.J. Mem. 45. Neither objection has merit under the circumstances.

As to the first point, FDA has already had an opportunity to explain its position on remand, and it failed in that endeavor. Having once failed—and now advancing a vision of administrative law so discordant with basic principles of fairness—FDA should not receive a *second* remand without vacatur.

As to FDA's second argument, the agency's invocation of "unpredictable and irreversible consequences" is unfair and unsupported. As we explained in the opening brief, FDA has not placed a partial clinical hold on tradipitant because it believes further study would be unsafe. On the contrary, FDA completed a safety review and determined that Study 2301 was safe to proceed for a three-month human study. FDA-10196 to FDA-10199. And FDA stated in discussions following the partial clinical hold that the 9-month dog study requirement was not being required "due to a specific scientific rational[e] from the already conducted studies." FDA-09340. The agency has never found that tradipitant "represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation." 21 U.S.C. § 355(i)(3)(B)(i). And nothing in this case bears on FDA's power to exercise that authority when the facts warrant it.

As FDA observes, tradipitant is not currently approved for use in the general public—and Plaintiffs assuredly do not asking for the Court to order that result. But tradipitant *has* been used on more than 600 human patients, for periods of up to three months, in carefully-controlled clinical studies. Indeed, further tradipitant trials are *now* ongoing—a Phase 3 clinical trial has enrolled hundreds of patients to study tradipitant for patients with atopic dermatitis, a Phase 3 clinical trial is ongoing for tradipitant to alleviate the symptoms of gastroparesis, and tradipitant is currently being studied in humans with respect to its effects on opioid cravings. FDA has never used its authority to block these clinical studies—steps it would take if it actually had concerns about the safety associated with human patients having access to tradipitant. Likewise, FDA *never* surfaced *any* concern regarding tradipitant's safety profile prior to this litigation; then, FDA's decisionmaking turned solely—FDA candidly admitted—on bureaucratic guidelines. It was only after Vanda and the individual Plaintiffs filed this lawsuit that FDA scoured the record and invented new rationales.

Vacatur—the remedy that Vanda requests, and the individual Plaintiffs desperately need—will simply allow clinical trials to extend beyond 3 months, up to 12 months. The volunteer participants will be those who have already tolerated tradipitant well in a 3-month trial, and only those who give informed consent to longer term trials. These patients will be closely monitored, under the care of an expert investigator, through clinical and laboratory monitoring. If any patient shows adverse signs associated with tradipitant, the individual will be removed from the trial.

*Fourth*, only a vacatur will provide plaintiffs the relief that they deserve—the ability to move forward with clinical trials in tradipitant.

FDA issued the partial clinical hold in December 2018. But that action was so obviously defective that, after Vanda filed this lawsuit, FDA sought voluntary remand. That first do-over produced the Remand Response. As we have described, the Remand Response perpetuates the same unlawful legislative rule absent notice-and-comment rulemaking. And it is beset with enormous procedural and substantive unreasonableness—including reliance on obviously post hoc rationalizations and use of a one-way-ratchet approach to reopening of the record.

31

It would be fundamentally unfair to Vanda if FDA were allowed yet another attempt to consider this issue, while maintaining the clinical hold. It is crucial to recall that, per the FDCA, the statutory default is that clinical trials—in which patients provide informed consent to using experimental new drugs and are closely monitored by expert investigators—may proceed *unless* FDA has a basis to impose a hold. *See* Pls. S.J. Mem. 5. All of the reasons FDA has come up with to date to halt clinical trials of tradipitant are unlawful. This has caused lengthy delay. FDA should not be permitted to further delay testing—perpetuating the notion that the agency may, without meaningful practical consequences, regulate through forced compliance with guidance documents that do not satisfy the APA.

A remand without vacatur, moreover, would be devastating to the individual plaintiffs. Many patients desperately want to take part in further studies to relieve the agonizing symptoms of gastroparesis. *See* Pls. S.J. Mem. 8-9. This includes plaintiffs December Guzman, Cathy Hartwig, and Louisa Jenness—three individuals who urgently seek renewed access to tradipitant. In the words of one of the plaintiffs when she wrote to FDA: "Tradipitant *gave me my life back*. Please, please, *please* allow Vanda Pharmaceuticals to continue giving me this medication!" FDA-09709.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs, deny FDA's motion for summary judgment, and vacate the partial clinical hold.

Dated: August 21, 2019

Respectfully submitted,

/s/ *Paul W. Hughes*

Paul W. Hughes (D.C. Bar No. 997235)
   phughes@mwe.com
Michael B. Kimberly (D.C. Bar No. 991549)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)