**PUBLIC VERSION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| VANDA PHARMACEUTICALS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-CV-00301 (JDB) |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' <u>MOTION FOR SUMMARY JUDGMENT</u>**

PUBLIC VERSION

TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 1

**BACKGROUND** ......................................................................................................... 3

    A.   Vanda is studying tradipitant through an investigational new drug application............ 3

    B.   Vanda must sufficiently develop tradipitant's toxicity profile to ensure the safety of long-term human studies, and FDA may intervene if the company does not................. 5

    C.   FDA raised concerns about insufficient data to support Vanda's proposed long-term testing of tradipitant in humans.......................................................................................... 7

    D.   FDA imposed a partial clinical hold on Vanda's proposed long-term human studies. .. 9

    E.   On remand, FDA reevaluated and ultimately reaffirmed its decision to implement a partial clinical hold. ........................................................................................................ 12

**STANDARD OF REVIEW** ........................................................................................ 13

**ARGUMENT** ............................................................................................................. 14

    I.   FDA'S PARTIAL CLINICAL HOLD DECISION WAS NEITHER ARBITRARY NOR CAPRICIOUS. ... 14

        A.   FDA reasonably determined that, absent a 9-month nonrodent toxicity study, it has insufficient information to assess the risks of long-term human studies. ...................... 15

            1.   Data from previous animal studies of tradipitant are insufficient to assess the safety of long-term tradipitant use in humans. ................................................................ 16

            2.   Tradipitant's safety cannot be predicted by approved drugs in the same pharmaceutical class. ............................................................................................. 18

            3.   FDA reasonably determined that data from a 9-month nonrodent toxicity study are necessary to assess the risks of long-term testing of tradipitant in humans............. 19

            4.   FDA reasonably determined that no alternative approach to the 9-month nonrodent toxicity study was scientifically justified. ............................................................... 22

        B.   Vanda's disagreements with FDA's scientific determinations are meritless................ 23

            1.   Vanda unduly minimizes the toxicity signals in its own animal studies. ................. 24

            2.   Vanda mischaracterizes the scientific publications cited by FDA............................ 27

            3.   Vanda may not like the scientific standard, but one exists and it is reasonable. ...... 29

    II.   FDA'S REMAND RESPONSE WAS PROCEDURALLY SOUND AND MUST BE CONSIDERED BY THE COURT. .......................................................................................................... 32

**PUBLIC VERSION**

A. The remand response was issued by the proper decisionmaker and presents the agency's considered opinion. ........................................................................................... 33

B. FDA permissibly exercised its discretion to set its procedures during remand. ........... 35

    1. FDA permissibly declined to consider post-December 2018 submissions by Vanda and the Humane Society. ........................................................................................... 36

    2. While reevaluating Vanda's submissions, FDA permissibly exercised its discretion to gather additional evidence. ................................................................................... 39

    3. Vanda is not entitled to more than the existing legal pathways, which it has failed to use, to submit additional evidence to FDA. ............................................................... 39

III. FDA'S PARTIAL CLINICAL HOLD DECISION DID NOT TREAT THE NONCLINICAL STUDY GUIDANCE AS A BINDING RULE. ........................................................................................... 40

A. The Nonclinical Study Guidance's context and text show it is a policy statement. ..... 40

B. Through the remand response, FDA has not applied the Guidance at all to Vanda, let alone in a binding fashion. ........................................................................................... 42

IV. EVEN IF THIS COURT WERE TO GRANT VANDA'S MOTION FOR SUMMARY JUDGMENT, IT SHOULD REMAND THE MATTER TO FDA WITHOUT VACATUR. ............................................. 45

**CONCLUSION** ................................................................................................................ **45**

PUBLIC VERSION

## TABLE OF AUTHORITIES

**CASES**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ............................................................................................ 3

*ACA Int'l v. FCC*,
885 F.3d 687 (D.C. Cir. 2018) .......................................................................................... 30

*\*Alpharma, Inc. v. Leavitt*,
460 F.3d 1 (D.C. Cir. 2006) ....................................................................................... 33, 34

*Am. Forest Res. Council v. Ashe*,
946 F. Supp. 2d 1 (D.D.C. 2013) ..................................................................................... 45

*Am. Min. Congress v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) ....................................................................................... 44

*Appalachian Power Co. v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ....................................................................................... 38

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
118 F. Supp. 3d 388 (D.D.C. 2015) .................................................................................. 13

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) ......................................................................................... 41

*Ass'n of Private Sector Colleges & Univ. v. Duncan*,
110 F. Supp. 3d 176 (D.D.C. 2015) .................................................................................. 13

*\*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ............................................................................................... 14, 15, 32

*Bean Dredging, LLC v. United States*,
773 F. Supp. 2d 63 (D.D.C. 2011) .......................................................................... 36, 39, 43

*BNSF Ry. Co. v. Surface Transp. Bd.*,
453 F.3d 473, 479 (D.C. Cir. 2006) .................................................................................. 38

*Butte Cty. v. Chaudhuri*,
887 F.3d 501 (D.C. Cir. 2018) ......................................................................................... 37

*Catholic Health Initiatives v. Sebelius*,
617 F.3d 490 (D.C. Cir. 2010) .................................................................................... 43, 44

**PUBLIC VERSION**

*Chamber of Commerce v. SEC*,
443 F.3d 890 (D.C. Cir. 2006) ............................................................. 39

*Conservation Law Found. v. Ross*,
374 F. Supp. 3d 77 (D.D.C. 2019) .................................................. 14, 23

*Cumberland Pharm. Inc. v. FDA*,
981 F. Supp. 2d 38 (D.D.C. 2013) ......................................................... 25

*\*Cytori Therapeutics, Inc. v. FDA*,
715 F.3d 922 (D.C. Cir. 2013) ........................................................ 14, 32

*Delta Air Lines, Inc. v. Export-Import Bank of U.S.*,
85 F. Supp. 3d 387 (D.D.C. 2015) .................................................. 33, 34

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ........................................................................... 15

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ................................................................. 28

*Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*,
215 F.3d 37 (D.C. Cir. 2000) ................................................................. 37

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ............................................................................... 39

*Hoctor v. U.S. Dep't of Agric.*,
82 F.3d 165 (7th Cir. 1996) ...................................................... 43, 44, 45

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019) ............................................................. 13

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .................................................................... 29, 44

*LG Elecs. U.S.A., Inc. v. Dep't of Energy*,
679 F. Supp. 2d 18 (D.D.C. 2010) .................................................. 13, 14

*Limnia Inc. v. U.S. Dep't of Energy*,
857 F.3d 379 (D.C. Cir. 2017 ................................................................. 32

*Local 814, Int'l Bhd. of Teamsters v. NLRB*,
546 F.2d 989 (D.C. Cir. 1976) ........................................................ 32, 34

*Marsh v. Or. Nat. Res. Council*,

**PUBLIC VERSION**

490 U.S. 360 (1989) .................................................................................................. 23

*Menkes v. U.S. Dep't of Homeland Sec.*,
637 F.3d 319 (D.C. Cir. 2011) ................................................................................. 33

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193 (2005) .................................................................................................... 7

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................... 14, 27

*Muwekma Ohlone Tribe v. Salazar*,
708 F.3d 209 (D.C. Cir. 2013) ................................................................................. 35

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007) ........................................................................... 22

*NAACP v. Trump*,
315 F. Supp. 3d 457 (D.D.C. 2018) ................................................................... 34, 35

*\*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ............................................................... 40, 41, 42, 43

*Nat'l Shooting Sports Found. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ........................................................................... 29, 30

*Nat'l Small Shipments Traffic Conference, Inc. v. ICC*,
725 F.2d 1442 (D.C. Cir. 1984) ......................................................................... 30, 44

*Nat'l Treasury Employees Union v. Fed. Labor Relations Auth.*,
30 F.3d 1510 (D.C. Cir. 1994) ................................................................................. 43

*Nuclear Energy Inst., Inc. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004) ............................................................................... 38

*Occidental Petroleum Corp. v. SEC*,
873 F.2d 325  (D.C. Cir. 1989) ................................................................................ 37

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*,
822 F.2d 1105 (D.C. Cir. 1987) ............................................................................... 42

*\*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990) ......................................................................................36, 37, 39

*Pub. Citizen Health Research Grp. v. FDA*,

185 F.3d 898 (D.C. Cir. 1999) ........................................................................................... 4

*Rempfer v. Sharfstein,*
   583 F.3d 860 (D.C. Cir. 2009) .............................................................................. 14, 15, 22

*Serono Labs., Inc. v. Shalala,*
   158 F.3d 1313 (D.C. Cir. 1998) ....................................................................................... 26

*Shalala v. Guernsey Mem'l Hosp.,*
   514 U.S. 87 (1995) ............................................................................................................ 44

*Sierra Club v. Antwerp,*
   560 F. Supp. 2d 21 (D.D.C. 2008) .................................................................................. 43

*Sierra Club v. EPA,*
   873 F.3d 946 (D.C. Cir. 2017) ........................................................................................ 42

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,*
   282 F. Supp. 3d 91 (D.D.C. 2017) .................................................................................. 45

*United States v. L.A. Tucker Truck Lines, Inc.,*
   344 U.S. 33, 37 (1952) ..................................................................................................... 38

*U.S. Post. Serv. v. Postal Regulatory Comm'n,*
   785 F.3d 740 (D.C. Cir. 2015) ........................................................................................ 30

*U.S. Sugar Corp. v. EPA,*
   830 F.3d 579 (D.C. Cir. 2016) ........................................................................................ 45

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519, 544 (1978) ............................................................................................ 35, 37

**STATUTES**

21 U.S.C. § 355(b) ................................................................................................................. 3

21 U.S.C. § 355(i) ................................................................................................................... 3

21 U.S.C. § 355(i)(1) ............................................................................................................. 3

21 U.S.C. § 355(i)(1)(A) .................................................................................................... 5, 7

21 U.S.C. § 355(i)(2) ....................................................................................................... 5, 10

21 U.S.C. § 355(i)(3)(A) .................................................................................................. 7, 37

**PUBLIC VERSION**

21 U.S.C. § 355(i)(3)(B) ........................................................................................... 7, 9

21 U.S.C. § 355(i)(3)(C) ................................................................................. 12, 13, 38, 40


**RULES**

21 C.F.R. § 312.21 ...................................................................................................... 4

21 C.F.R. § 312.22(a) ................................................................................................. 7

21 C.F.R. § 312.22(b) ................................................................................................. 6

21 C.F.R. § 312.22(c) ............................................................................................... 7, 8

21 C.F.R. § 312.23 ...................................................................................................... 5

21 C.F.R. § 312.23(a) ............................................................................................... 10

21 C.F.R. § 312.23(a)(8) ................................................................................... passim

21 C.F.R. § 312.42 ...................................................................................................... 7

21 C.F.R. § 312.42(a) ................................................................................................. 7

21 C.F.R. § 312.42(b)(1)(iv) ................................................................................ 10, 29

21 C.F.R. § 312.42(b)(1) ........................................................................................... 16

21 C.F.R. § 312.42(b)(2)(i) ........................................................................ 9, 11, 13, 35

21 C.F.R. § 312.42(d) ............................................................................................... 33

21 C.F.R. § 312.42(e) ..................................................................................... 12, 13, 38, 40

21 C.F.R. § 312.42(f) ..................................................................................... 12, 13, 38, 40

21 C.F.R. § 312.48 …………………………………………………………12, 13, 40

PUBLIC VERSION

## INTRODUCTION

This case is about safety and science.  The U.S. Food and Drug Administration ("FDA") ensures the safety of humans participating in studies for drugs that are under development.  To fulfill that responsibility, FDA needs sufficient information to assess the risks of proposed studies.  A safety concern arises when a drug sponsor like plaintiff Vanda Pharmaceuticals, Inc. ("Vanda") refuses to provide FDA with the information the agency needs to assess those risks.

Within the penumbra of safety, this case turns on a scientific issue:  The nature and type of toxicological data necessary to allow FDA to assess the risks to humans of a long-term study with the drug tradipitant.  FDA has made clear that it needs additional information from Vanda, but the company disagrees and refuses to provide that information.  Ultimately, neither the company nor this Court may substitute its views for those of the agency charged with making this specialized scientific judgment, which is entitled to substantial deference.

The Federal Food, Drug and Cosmetic Act ("FDCA") establishes a framework under which drugmakers can submit an investigational new drug ("IND") application to study a drug before seeking FDA's marketing approval.  An IND consists of both nonclinical or preclinical (*i.e.*, animal) and clinical (*i.e.*, human) studies.  Drugmakers are responsible for designing and conducting these studies.  FDA is responsible for assuring the safety of human study subjects.

FDA protects the safety of human subjects by receiving and evaluating a host of information about proposed studies, including critical toxicology data about the drug.  The FDCA authorizes FDA to intervene and stop a clinical study with a "clinical hold," when a drug company has not provided sufficient information to facilitate FDA's assessment of the risks of a proposed study.  This case is an example.

**PUBLIC VERSION**

Vanda is currently studying the drug tradipitant.  It has never been approved for use in the United States, meaning it has never been found safe and effective.

Vanda now wants to conduct long-term (52-week) studies of tradipitant in humans.  The drug has never been studied for that long in humans or animals before.  Because long-term exposure to a drug can reveal new toxicities and increased severity in known toxicities, FDA requested that Vanda conduct a 9-month toxicity study of tradipitant in nonrodents (*e.g.*, dogs, minipigs).  This animal study would allow FDA and Vanda to identify any changes in tradipitant's toxicity profile during long-term exposure, providing critical data about whether the proposed long-term human studies should proceed and, if so, how they should be structured.

Vanda refused to conduct the additional animal study, insisting that FDA should simply make do without this information.  In effect, Vanda would use human "guinea pigs" over an appropriate animal model to identify long-term toxicities.  Unwilling to accept that risk, the agency placed the proposed long-term human studies under a clinical hold.

This case does not present any issues of statutory or regulatory interpretation.  Vanda does not challenge FDA's authority under the FDCA and implementing regulations to require Vanda to submit toxicology information.  Nor does it challenge FDA's authority to impose a clinical hold if FDA lacks sufficient information to assess the risks to study subjects.

Instead, this case presents a narrow question: whether FDA's determination that Vanda had not provided sufficient information for the agency to assess the risks to humans in proposed long-term studies of tradipitant violated the Administrative Procedure Act ("APA").  FDA did not.  The agency carefully examined Vanda's data, in light of the agency's considerable experience and expertise in drug toxicology.  The agency's scientific judgment is accorded a

PUBLIC VERSION

great degree of deference.  Its decision to impose the clinical hold was reasonable, and its

reasoning was adequately explained—all that the APA requires.

Vanda alleges a host of procedural infirmities with the decision—none of which has

merit.  Vanda seeks to deny this Court the benefit of FDA's detailed scientific determination

presented in the remand response as pretextual reasoning.  But there is no pretext here.  The

remand response was issued pursuant to this Court's order, and FDA's concerns about Vanda's

proposed clinical studies are genuine and grounded in science.

Vanda's attempt to recast this case as being about a so-called "international guidance

document" is a distraction.  The guidance document is just that—a statement of FDA science-

based policy about the recommended durations of animal toxicity studies necessary to support

human studies.  Any doubt about the document's status was resolved by FDA's remand

response, which justified FDA's decision without a single citation to it.

## BACKGROUND

### A.  Vanda is studying tradipitant through an investigational new drug application.

The FDCA "generally prohibits access to new drugs unless and until they have been

approved by" FDA.  *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,

495 F.3d 695, 697 (D.C. Cir. 2007) (citing 21 U.S.C. § 355(a)).  FDA approval is a

determination based on scientific studies that a drug is safe and effective for use and may be

lawfully marketed in the United States.  *See* 21 U.S.C. § 355(b)-(d) (setting forth grounds for

approval).  To develop the data necessary to gain marketing approval, a drugmaker submits an

IND application to FDA.  21 U.S.C. § 355(i) (IND provision).  An IND provides a limited

exemption to the FDCA's prohibition on distributing unapproved new drugs so sponsors may

"investigate the safety and effectiveness of drugs."  *Id.* § 355(i)(1).

**PUBLIC VERSION**

A drugmaker's investigation under an IND comprises both animal and human studies. *See Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 901 (D.C. Cir. 1999).  Animal testing typically occurs first, allowing sponsors to generate "the maximum amount of information about an investigational drug . . . before commencing clinical trials in humans."  AR 11113.  Clinical testing of a drug generally involves three phases, beginning with small-scale introductory tests and progressing up to larger-scale (and frequently long-term) trials.  *See* 21 C.F.R. § 312.21 (describing the aspects of Phase 1 through 3 studies).  A common goal of all phases is to gather information about a drug's potential risks and benefits for humans.  *See id.*

For the past few years, Vanda has studied the drug tradipitant under IND 131545. Tradipitant is a "new molecular entity" originally synthesized by Eli Lilly & Co.  *See, e.g.*, AR 11016.  Tradipitant is believed to affect the central nervous system, *see* AR 10815, but its exact effect on the human body is not known.  Tradipitant has never been found to be safe and effective  and "has not been approved by FDA for any use."  AR 11109.  Similarly, tradipitant is not marketed in any other country.  AR 10901.

Tradipitant has "limited safety experience."  AR 10162.  It has never been studied in humans for more than three months.  AR 11124-25.  It has never been studied in nonrodents for more than three months.  *See* AR 11116.  The longest study duration was 6 months in a rat species, *see id.*, which Vanda once claimed was "no longer considered a model for toxicity . . . tests" and "not supportive of the proposed clinical trial."  AR 11017; *see* AR 00031.  In short, much remains unknown about tradipitant, especially the effects of chronic, or long-term, use.

**PUBLIC VERSION**

Vanda is studying tradipitant under IND 131545 to see whether the drug mitigates certain symptoms of gastroparesis.[1]  "Gastroparesis is a serious, chronic digestive disorder" that delays the digestive tract from fully emptying, resulting in symptoms like nausea, vomiting, and abdominal pain.  AR 11109.  Vanda is *not* studying tradipitant as a treatment for gastroparesis itself; rather, Vanda hypothesizes that tradipitant helps to "decrease nausea associated with gastroparesis."  AR 11016.  Significantly, if Vanda's hypothesis is correct, patients would be expected to receive tradipitant on a long-term basis because the drug would not alter the underlying chronic condition.  *See* AR 10901.

### B.  Vanda must sufficiently develop tradipitant's toxicity profile to ensure the safety of long-term human studies, and FDA may intervene if the company does not.

Congress required drugmakers to provide FDA with detailed "information about the drug and the clinical investigation," including information "necessary to assess the safety of the drug for use in clinical investigation."  21 U.S.C. § 355(i)(2).  Congress further authorized FDA to, among other things, promulgate regulations that require sponsors to submit, "before any clinical testing of a new drug is undertaken," information "of preclinical tests (including tests on animals) of such drug adequate to justify the proposed clinical testing."  *Id.* § 355(i)(1)(A).  Under that authority, FDA issued regulations that specify the data sponsors must submit.  *See generally* 21 C.F.R. § 312.23 (IND required content).

For any proposed human study, Vanda must submit "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the

---

[1] Vanda also is studying whether tradipitant can be used to treat atopic dermatitis under IND 122741.  Some documents from IND 122741 are contained in the administrative record for this case—namely, certain Vanda submissions and FDA internal reviews of animal data.  However, the partial clinical hold at issue relates only to human studies proposed under IND 131545.

proposed clinical investigations." 21 C.F.R. § 312.23(a)(8).  The amount and type of

information that must be submitted to FDA depends on several factors, including "the novelty of

the drug, the extent to which it has been studied previously, the known or suspected risks, and

the developmental phase of the drug." 21 C.F.R. § 312.22(b).  Because as human testing

progresses, "there is an evolution in the ability to expose human subjects to a drug," AR 11108,

"[t]he kind, duration, and scope of animal and other tests required" to support a study varies as

well, 21 C.F.R. § 312.23(a)(8).  In other words, the quantum of data necessary to support a week-

long study with a dozen participants is different from that needed to support a year-long study

with hundreds of subjects.

Assembling tradipitant's toxicological profile is among Vanda's critical tasks during drug

development.  *See, e.g.*, 21 C.F.R. § 312.23(a)(8) (requiring the submission of "toxicological

studies of the drug").  Toxicity studies "identify and characterize the toxic effects a drug can

produce." AR 11112.  Because "[a] drug can affect numerous biological processes in the body,"

toxicity studies screen for on-target toxicities, which are "related to the interactions of the drug

with the intended biological target," as well as off-target "effects that relate to the drug

interacting with other cellular components." AR 11113.  Overall, these studies help provide

"complete toxicology information for each individual drug candidate." AR 11120.

Animal toxicity studies are central to this effort, by generating "the maximum amount of

information . . . before commencing clinical trials in humans." AR 11113.  Adverse changes

observed in animals "serve as an indication that the drug has the potential to induce adverse

effects (i.e., toxicities) in humans." AR 11112.  Data from animal toxicity studies assist "in the

management of human risks associated with administering the drug in a clinical trial." AR

11112.  For example, such data may indicate "which physiological systems should be closely

PUBLIC VERSION

monitored (e.g., kidney, liver, heart)" in humans, and sometimes "may also indicate that it is not

safe to conduct a clinical trial with a particular drug under any circumstances." AR 11112. Both

the FDCA and FDA's regulations expressly contemplate that sponsors submit data from "tests on

animals" that are "adequate to justify the proposed clinical testing." 21 U.S.C. § 355(i)(1)(A);

*see* 21 C.F.R. §§ 312.22(c), 312.23(a)(8) (referring to supporting toxicology information from

animal studies).

All of this information enables FDA to fulfill its responsibility of "assur[ing] the safety

and rights" of those people upon whom drugs are being tested. 21 C.F.R. § 312.22(a). FDA

protects their safety by evaluating the risks of proposed and ongoing human studies. *See Merck*

*KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 203–04 (2005). To fulfill that charge,

Congress gave FDA the power to stop a study "[a]t any time" by issuing a "clinical hold." 21

U.S.C. § 355(i)(3)(A). "A clinical hold is an order issued by FDA to the sponsor to delay a

proposed clinical investigation or to suspend an ongoing investigation." 21 C.F.R. § 312.42(a);

*see* 21 U.S.C. § 355(i)(3)(B) (setting forth grounds to issue clinical hold) ; 21 C.F.R. § 312.42

(same). But FDA needs sponsors like Vanda to provide sufficient information so the agency can

assess the risks and know when it should—and need not—intervene in a study.

### C. FDA raised concerns about insufficient data to support Vanda's proposed long-term testing of tradipitant in humans.

In September 2016, Vanda proposed to conduct study VP-VLY-686-2301 ("Study

2301"), a 4-week clinical trial of tradipitant. *See* AR 9923, 9959, 11109. After reviewing

Vanda's supporting data from short-term animal and human studies, FDA determined that Vanda

could proceed with Study 2301. *See* AR 11109; *see also* AR 10196-10200. FDA did *not* find

that tradipitant was safe and effective, "only that the safety and risks of study subjects [were]

adequately protected in the proposed [4-week] clinical trial." AR 11110.

**PUBLIC VERSION**

Then, in April 2018, Vanda proposed to dramatically extend Study 2301 by 52 weeks. *See* AR 11110; *see also* AR 9706, 9714.  A long-term study of tradipitant would be useful because, if the drug were ultimately approved for its intended use, patients would need to take it on a long-term basis.  *See* AR 10901.  But Vanda's proposal to add 52 weeks to the study significantly altered the study's risk assessment.

Given the potential increase in risk to study subjects, Vanda must support its proposal with "additional information, including the results of animal toxicology studies or other human studies as appropriate."  21 C.F.R. § 312.22(c).  By changing the "duration . . . of the proposed clinical investigation[]," necessarily "[t]he kind, duration, and scope of animal and other tests" needed to support the study would vary as well.  21 C.F.R. § 312.23(a)(8).

Specifically, FDA needed to assess "the cumulative toxicity" of tradipitant and discern "the likelihood of [humans] developing toxicity after long-term exposure" to the drug.  AR 11114.  Because toxicity is a product of both dose and duration, *see* AR 10267 and 11114, tradipitant's toxicity profile would not be complete without understanding the toxicological effects from long-term exposure, *see* AR 11115.  Data generated by long-term animal toxicity studies would "help define appropriate doses for human subjects, and what types of monitoring will be necessary in a clinical trial to detect and avoid any potential toxicities that were identified in animal studies."  AR 11115.

Vanda, however, provided *no* additional data to support long-term human studies; it rested upon the same data supplied to support its 4-week trial.  In May 2018, FDA told Vanda that it lacked "adequate nonclinical safety data to support clinical trials beyond 3 months duration."  AR 10192, *see* AR 11110.  To support a study longer than 3 months, FDA "advised [Vanda] to submit the study report from a chronic toxicology study of 9 months duration in a

8

non-rodent species." AR 10192. The agency referred to its M3(R2) Nonclinical Safety Studies

for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals

guidance ("Nonclinical Study Guidance"), which recommended a toxicity study in rodents at

least 6 months long and another study in nonrodents for at least 9 months. *See* AR 10192 (FDA

May 2018 letter), 10917 (guidance document).

Although Vanda initially accepted FDA's suggestion to reduce its proposed extension of

Study 2301 from 52 to 8 weeks (for a 12-week total duration, including the 4-week initial trial),

*see* AR 10192, the company eventually insisted on conducting a long-term human study of

tradipitant without first conducting a 9-month nonrodent toxicity study. By December 11, 2018,

Vanda had re-proposed to extend Study 2301 for an additional 52 weeks and also proposed to

conduct an entirely new 52-week clinical study, VP-VLY-686-2302 ("Study 2302").[2] *See* AR

11111. Vanda also submitted its arguments against conducting a chronic nonrodent toxicity

study. *See* AR 08647-9130 (August 2018 Formal Dispute Resolution Request and September

2018 Study 2302 Protocol).

### D. FDA imposed a partial clinical hold on Vanda's proposed long-term human studies.

Congress authorized FDA to issue a clinical hold when a drug "represents an

unreasonable risk to the safety of the persons who are subjects of the clinical investigation," or

for other reasons FDA establishes by regulation. 21 U.S.C. § 355(i)(3)(B). Among other

grounds, FDA regulations (specifically, 21 C.F.R. § 312.42(b)(2)(i)) allow a clinical hold to be

---

[2] Despite having no unresolved issues before the agency related to Study 2301, on August 1,
2018, Vanda submitted a Formal Dispute Resolution Request, explaining in detail its reasons for
refusing to conduct a 9-month nonrodent toxicity study. *See* AR 08753-09130. FDA found
Vanda's dispute resolution request was "not appropriate at this time." AR 10189. This is
because an open request must first be in dispute before it can be resolved, and FDA already had
accepted Vanda's revised proposal to extend Study 2301 to 12 weeks. *See* AR 11110.

imposed when any one of the conditions in 21 C.F.R. § 312.42(b)(1)(iv) is met.  That section in

turn authorizes a clinical hold when an "IND does not contain sufficient information required

under [21 C.F.R.] § 312.23 to assess the risks to subjects of the proposed studies."  21 C.F.R. §

312.42(b)(1)(iv).  As discussed above, section 312.23 requires that sponsors provide "[a]dequate

information about pharmacological and toxicological studies of the drug involving laboratory

animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to

conduct the proposed clinical investigations."  21 C.F.R. § 312.23(a)(8).

 The number of cross-references should not mask this ground's importance.  Sponsors

bear the burden of submitting adequate information about their proposed clinical trials to FDA.

*See, e.g.*, 21 U.S.C. § 355(i)(2) (placing the burden upon the sponsor to submit information

"necessary to assess the safety of the drug for use in clinical investigation"); 21 C.F.R. §

312.23(a) (setting forth information that a sponsor "shall submit").  If sponsors do not meet their

obligation to provide FDA with adequate data, the agency cannot adequately assess a study's

risks, let alone determine if those risks are acceptable.

 In December 2018, FDA toxicologists, clinicians, and other expert staff had serious

concerns about Vanda's proposed long-term human studies.  They observed that Vanda's data

from short-term studies "may not be predictive of greater than 3 months (or longer-term) safety

of this drug."  AR 10904.  Because Vanda failed to assess "the toxicology of tradipitant . . . for a

sufficient duration in a non-rodent species," "there may be unforeseen risks to patients who are

exposed to tradipitant for longer than a 3 months duration."  AR 10904.

 On December 19, 2018, FDA consulted its Medical Policy and Program Review Council

("MPPRC"), "a senior management group" that "provide[s] counsel and advice on policy and

program issues," including those that are "novel, challenging, and potentially unresolved medical

PUBLIC VERSION

policy issues." AR 11111.  The MPPRC considered "the type and duration of nonclinical

toxicology studies that are necessary to support chronic administration of tradipitant," AR 10870,

and "discussed the value of chronic non-rodent toxicity studies given the currently available

nonclinical data for tradipitant." AR 10871.  FDA nonclinical experts—those who specialize in

evaluating animal toxicity data—recounted "their experience . . . that there are potentially

important findings in chronic nonrodent toxicity studies of 9-12 months duration that were

relevant to human risk, and that these findings were often not observed in shorter duration

toxicity studies (i.e., 3-6 months).  AR 10871.

FDA experts believed that a "9-month chronic nonrodent study [was] an important

component of an appropriate assessment of risk" in human subjects experiencing 12 months of

tradipitant exposure.  AR 10871.  Based on "[a]nalyses by FDA, other drug regulatory

authorities and regulated industry," FDA believed 9 months was the appropriate nonrodent study

duration "needed to identify clinically relevant adverse toxicity findings" for long-term human

studies.  AR 10871.  Ultimately, the MPPRC agreed "that a nonrodent toxicity study of 9 months

in duration was scientifically appropriate and necessary for the conduct of Vanda's proposed 12-

month clinical investigations because chronic nonrodent toxicity studies can reveal potentially

important findings relevant to human risk that are absent from shorter-duration animal studies."

AR 11111-12.

On December 19, 2018, and pursuant to 21 C.F.R. § 312.42(b)(2)(i), FDA placed a

partial clinical hold on IND 131545, preventing Vanda from conducting its proposed long-term

human studies of tradipitant.  *See* AR 10878-79 (Dec. 19, 2018 teleconference with Vanda); AR

10184-87 (Dec. 21, 2018 confirmatory letter).  FDA explained that it had insufficient

information to assess the risks to human subjects because Vanda had not provided "adequate nonclinical safety data to support clinical trials beyond 3 months." AR 10185.

Vanda did not then pursue the available pathways to present rebuttal evidence or pursue additional review within FDA. For example, the FDCA allows sponsors to submit a written request, containing "sufficient information," to support removal of a clinical hold, and requires FDA respond in writing to such requests. 21 U.S.C. § 355(i)(3)(C). FDA's regulations amplify this statutory process, *see* 21 C.F.R. § 312.42(e) (prescribing means for sponsor to submit "sufficient information to support the removal" of a clinical hold), and establish a further avenue of agency appeal, *see id.* §§ 312.42(f), 312.48 (appeal process). Vanda instead went to court.

### E. On remand, FDA reevaluated and ultimately reaffirmed its decision to implement a partial clinical hold.

On February 5, 2019, Vanda filed this action challenging the partial clinical hold. *See* First Compl., ECF No. 1. FDA then sought—and this Court granted—a voluntary remand, so the agency could "re-evaluate" Vanda's scientific submissions and "provide a full written explanation of the agency's analysis and ultimate position," as well as "review and clarify the regulatory basis for its decision," including "the legal import" of the Nonclinical Study Guidance. *See* Remand Order, ECF No. 11, at 5; FDA Remand Mem., ECF No. 6-1, at 6. On Friday, April 26, 2019, FDA issued its remand response.

Because the remand response is discussed at length below, we only briefly outline its contents. *First*, FDA scrutinized Vanda's current nonclinical and clinical tradipitant data, and found it insufficient to allow the agency to assess the risks of the company's proposed long-term studies. *Second*, FDA explained why data from a 9-month nonrodent toxicity study was necessary to support a 12-month human study with tradipitant. Ultimately, the agency re-affirmed the validity of the partial clinical hold and explained its legal basis under 21 C.F.R. §

12

PUBLIC VERSION

312.42(b)(2)(i).  *See* AR 11106-08, 11127.

Vanda again failed to use the established statutory and regulatory means to present rebuttal evidence or argument.  *See* 21 U.S.C. § 355(i)(3)(C); 21 C.F.R. § 312.42(e)-(f), 312.48. Instead, on May 29, 2019, Vanda amended its complaint, continuing to allege that FDA's decision violated the APA.[3]

## STANDARD OF REVIEW

When reviewing agency action under the APA on summary judgment, "the standard set forth in [Federal Rule of Civil Procedure] 56(a) does not apply."  *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015).  Rather, this Court "sits as an appellate tribunal" and "determine[s] whether or not as a matter of law the evidence in the administrative record permitted [FDA] to make the decision it did."  *Ass'n of Private Sector Colleges & Univ. v. Duncan*, 110 F. Supp. 3d 176, 184 (D.D.C. 2015) (internal quotations omitted).  "And that question of law is:  based on the record, did [FDA] act in an 'arbitrary' or 'capricious' manner or otherwise violate the law?"  *Id.* (quoting 5 U.S.C. § 706(2)).

In answering that question, the Court's review is "narrow."  *Ardmore*, 118 F. Supp. 3d at 393.  FDA's action is presumptively valid.  *LG Elecs. U.S.A., Inc. v. Dep't of Energy*, 679 F. Supp. 2d 18, 26 (D.D.C. 2010).  The Court ensures that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

---

[3] At this time, three individual plaintiffs joined Vanda's suit.  FDA does not concede that these individuals have standing to challenge a clinical hold covering studies the individuals are not themselves conducting and in which they have no right to participate.  However, this Court need not resolve the issue because Vanda undoubtedly has standing, which renders "immaterial that other plaintiffs might be unable to demonstrate their own standing."  *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019).

PUBLIC VERSION

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted).  The Court must

not "substitute its judgment for that of the agency."  *LG Elecs.*, 679 F. Supp. 2d at 26 (quoting

*State Farm*, 463 U.S. at 43).  Where, as here, FDA has made a "scientific determination" that is

"within its area of special expertise," "a reviewing court must generally be at its most

deferential."  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983);

*see, e.g.*, *Rempfer v. Sharfstein*, 583 F.3d 860, 867 (D.C. Cir. 2009) (affording a "high level of

deference" to FDA's "scientific judgment within its area of expertise") (internal quotations

omitted).

## ARGUMENT

As the D.C. Circuit has held:  "In [APA] cases alleging arbitrary and capricious agency

action, courts must be careful not to unduly second-guess an agency's scientific judgments.  That

basic principle of administrative law controls this case."  *Cytori Therapeutics, Inc. v. FDA*, 715

F.3d 922, 923 (D.C. Cir. 2013).  So too here.

FDA's conclusion that it lacks sufficient information to assess the risks to human subjects

in Vanda's proposed long-term studies of tradipitant is a paradigmatic exercise of scientific

judgment.  Desperate to escape the shadow of this precedent, Vanda raises a host of meritless

procedural challenges.  Once Vanda's arguments are dispatched, nothing remains of this case

except FDA's scientific judgment about the additional toxicology data the agency needs to assess

the safety of administering tradipitant to humans in a long-term study—a judgment that this

Court should not second-guess.

### I.      **FDA's partial clinical hold decision was neither arbitrary nor capricious.**

"[W]hen an agency talks scientific data, courts listen."  *Conservation Law Found. v.

Ross*, 374 F. Supp. 3d 77, 89 (D.D.C. 2019).  FDA's decision here is described in a lengthy

scientific explication about drug toxicology and the state of knowledge (or lack thereof) about

14

PUBLIC VERSION

the risks of long-term tradipitant studies.  Specifically, FDA evaluated the existing short-term

animal and human studies of tradipitant, and identified several safety-related issues.  The agency

also considered its experience with casopitant, a drug in the same pharmaceutical class as

tradipitant, whose development was abandoned after significant toxicities were identified in

long-term animal studies.  Finally, FDA relied on its experience with the important role of long-

term animal toxicity studies, as corroborated by scientific literature, to determine that an

additional 9-month nonrodent toxicity study is necessary here.

Vanda quibbles with how FDA interpreted the evidence and claims the agency failed to

consider some allegedly relevant issues.  But it is Vanda—not FDA—who misinterprets the

evidence and, in any event, mere disagreement about how to interpret the scientific data does not

render FDA's action arbitrary and capricious.  In the realm of predictive judgments about long-

term drug toxicities, FDA "was required to consider the evidence and give reasons for [its]

chosen course of action."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019).  FDA

did so in a decision that "was reasonable and reasonably explained." *Id.*  And that decision is

entitled to a high level of deference.  *See Baltimore Gas*, 462 U.S. at 103; *Rempfer*, 583 F.3d at

867.

### A. FDA reasonably determined that, absent a 9-month nonrodent toxicity study, it has insufficient information to assess the risks of long-term human studies.

The parameters for FDA's decision are framed by the agency's regulations.  Given "the

duration and nature" of Vanda's proposed long-term clinical studies, the company must have

"[a]dequate information" about tradipitant's toxicology to show that the study is "reasonably

safe."  21 C.F.R. § 312.23(a)(8).  Before evaluating whether the proposed study is "reasonably

safe," FDA must first determine whether Vanda provided it with "sufficient information . . . to

assess the risks to subjects of the proposed studies." 21 C.F.R. § 312.42(b)(1), (2).  FDA's

review of the evidence fit squarely within this regulatory framework.  *See* AR 11115.

**1.  Data from previous animal studies of tradipitant are insufficient to assess the safety of long-term tradipitant use in humans.**

FDA began by re-evaluating the animal toxicity studies submitted by Vanda to support

its development of tradipitant.  Vanda's longest nonclinical study was 6 months in rats; its

longest nonclinical study in nonrodents (dogs) was 3 months.  AR 11116.  (For comparison,

Vanda's longest study in humans was 3 months.  AR 11125.)  FDA concluded from "Vanda's

own data [that] the risks of long-term tradipitant use in humans cannot be predicted by the

studies conducted to date."  AR 11119.  Rather, these data "establish the need for a chronic (9-

month) nonrodent toxicity study because they reveal drug-related toxicities in shorter-duration

studies of tradipitant in dogs and rats."  AR 11115.

In reaching this conclusion, FDA highlighted three aspects of Vanda's toxicity studies.

*First*, during Vanda's 3-month dog study, dogs receiving tradipitant experienced adverse weight

loss or failed to achieve expected weight gain.  AR 11117.  These weight-related effects

"indicate general poor health and may reflect development of other underlying toxicities that

have yet to manifest in a way we can detect."  AR 11117.  This finding alone demonstrates the

need for a long-term toxicity study in nonrodents.  *See* AR 11116.  Weight reductions in animals

over the course of 3 months raise red flags that need to be assessed in a chronic animal study to

determine what, if any, relation they have to systemic animal toxicities and potential toxicity in

humans.  *See* AR 11116-17, 11119.

*Second*, the connection between the weight-related toxicities and tradipitant exposure

revealed in the 3-month dog study was not evident in Vanda's 1-month dog study.  AR 11116-

17.  This notable difference "is indicative of the general principle that a lack of toxicities in

shorter-term nonclinical studies is not predictive of findings in chronic nonclinical studies."  AR

11117.

   *Third*, no pattern emerged from the adverse effects observed in Vanda's rodent and

nonrodent toxicity studies.  *See* AR 11116, 11117-18.  Whereas dogs experienced weight-related

toxicities after repeated dosing with tradipitant, other animals experienced either no toxicities

(rats, Fischer strain) or toxicities indicative of liver injury, including cell death (rats, Han Wistar

strain).  AR 11116, 11119.  The inconsistent toxicity profiles between and within species

illustrate how Vanda's current animal studies cannot characterize the overall toxicity profile of

tradipitant.  AR 11118-19.  They also exemplify "why a second species, specifically, a nonrodent

species, is important for the safety assessment of drugs, in that inconsistent toxicities between

strains of one species can be corroborated as relevant to humans if observed in a second species."

AR 11118.  Indeed, Vanda and FDA agree that the pharmacokinetic similarities of tradipitant in

dogs and humans suggest further study in dogs (rather than rodents) would prove more

beneficial.  *See* AR 11118-19.

   The ultimate impact of the adverse toxicities seen in Vanda's animal studies is unknown.

There are no reliable means to predict the significance of the animal toxicities observed in the

13-week rodent and 3-month nonrodent studies on Vanda's proposed 12-month clinical studies.

*See* AR 11119.  However, FDA has identified strong signals of potential safety issues for long-

term tradipitant use in humans, *see* AR 11119, and these signals indicate the need for further

scientific examination.  *See* AR 11119.

   To be clear, FDA's overall point is that "[b]ased on Vanda's own data, the risks of long-

term tradipitant use in humans cannot be predicted by the studies conducted to date."  AR 11119.

FDA has not stated that the potential safety issues seen in Vanda's animal toxicity studies

indicate that tradipitant is unsafe or inappropriate to administer to humans during studies of any

duration.  Indeed, Vanda's toxicity data adequately supported its short-term, 3-month human

study.  AR 11110.  However, "people taking tradipitant in a clinical study of *longer* duration

could be exposed to potential risk (e.g., serious side effects) from toxicities that have yet to be

identified in the absence of toxicology studies of chronic duration in two species (rodent and

nonrodent)."  AR 11110 (emphasis added).  Thus, Vanda must supply additional toxicity

information specifically related to risks associated with long-term tradipitant exposure.

> **2.  Tradipitant's safety cannot be predicted by approved drugs in the same pharmaceutical class.**

Pharmaceutically, tradipitant is considered an "NK-1 receptor antagonist."  AR 11109.

Although other drugs in this pharmaceutical class have received FDA approval for different

patient populations, AR 11119, there is no reason to presume that an investigational drug will

share a toxicity profile with the approved drugs in the same class, *see* AR 11119 (noting that

"variations in the chemical structure of a particular drug within a class can result in unique

and/or more severe toxicities").  FDA explained that "[d]rugs (especially small molecules like

tradipitant) have on-target toxicities (the toxicities related to intended biological targets) and off-

target toxicities (the toxicities related to unintended biological targets)."  AR 11119.  Because

"each drug has a novel chemical structure that may have particular toxicity not reflected by

findings from other members of the pharmacological class (most often the 'off-target' toxicities),

*each* new drug candidate must have a comprehensive toxicology program to assure appropriate

decisions can be made regarding clinical development."  AR 11120 (emphasis added).

To illustrate this concept, FDA described the cardiac toxicities linked to casopitant, an

unapproved NK-1 receptor antagonist.  AR 11119-20.  Vanda had claimed in support of Study

2302 that long-term nonrodent toxicology studies "are not necessary here where 12-month non-

PUBLIC VERSION

human primate studies show that NK-1 antagonists are well-tolerated with no [serious adverse events]." AR 8661. Casopitant belies that broad assertion.

Casopitant's sponsor had conducted a typical short-term (13-week) toxicity study in dogs, which had not detected histopathological changes in the heart or any other organ tissue. AR 11119-20. However, the safety-related findings were radically different in the chronic dog toxicity studies. AR 11119-20. The 39- and 52-week dog studies identified numerous toxicities, including severe cardiotoxicity involving tissue death, degeneration, and inflammation. AR 11120. FDA surmised that the cardiac toxicities may have been due to the drug's "off-target" activity, as NK-1 receptors are not present in the heart. AR 11120. The drug's serious cardiac risks during chronic use would not have been elucidated without data from chronic animal studies. Casopitant demonstrates the reasonableness of FDA's cautious approach that expects the safety of long-term human studies to be informed by appropriate long-term nonrodent studies.

**3. FDA reasonably determined that data from a 9-month nonrodent toxicity study are necessary to assess the risks of long-term testing of tradipitant in humans.**

When FDA found Vanda's current data insufficient to assess the risks of a long-term tradipitant study, the agency also answered the question of what additional data was necessary. FDA described the extensive information generated by long-term animal toxicity studies, lasting a minimum of 6 months in rodents, and 9 months in nonrodents. *See* AR 11114-15. These durations provide crucial information by their "signal-amplifying function." AR 11114-15. That is, they increase "the probability that weak or minimal indications of toxicity, which may be overlooked or dismissed as non-adverse in shorter-duration studies, could be identified as clinically meaningful toxicities in longer-duration studies." AR 11114-15.

FDA selected a nonrodent study duration of 9 months based on its own experience and analyses described in the scientific literature.  The experience of FDA nonclinical experts—those who specialize in studying animal toxicity data—has shown "that there are potentially important findings in chronic nonrodent toxicity studies of 9-12 months duration that were relevant to human risk, and that these findings were often not observed in the shorter duration toxicity studies (i.e., 3-6 months)."  AR 10871.

A 1999 article described the efforts of FDA and other members of the scientific and regulatory community to examine the necessity of chronic nonrodent toxicity data when evaluating the safety of a drug intended for long-term testing in humans.  *See* AR 11121; *see also* AR 10709-10 (summarizing initial FDA data review); AR 10505-06 (article authored by an FDA scientist describing "an extensive data review at FDA").  FDA and others analyzed nonrodent toxicity studies that had comparable data at 6- and 12-month time periods to determine the duration needed to sufficiently characterize toxicity linked to chronic drug exposure.  AR 11121-22; *see* AR 10710-18 (detailing analysis for each case).  This analysis concluded that 9-months' duration for nonrodent toxicity studies "was believed adequate in most cases to detect important toxicities, recognizing that no single duration could be conclusively determined to capture all potential toxicity, including a standard of 12 months."  AR 10719; *see* AR 10719 (explaining that "most of the toxicities observed in the cases examined were or could have been detected in a study terminated at 9 months").  Drawing on that analysis in the remand response, FDA regarded a 9-month duration as "both necessary and sufficient to form an adequate scientific basis on which to draw conclusions as to the appropriate further study of drugs in humans."  AR 11122.

Again, in the late 2000s, FDA and other regulators analyzed a larger dataset and identified ample instances of "studies in nonrodents showing effects that changed the clinical

PUBLIC VERSION

course of development after 6 months."  AR 10506.  Due to the evidence of toxicities emerging

after 6 months, the analysis found that 9-months' duration for nonrodent studies remained an

appropriate scientific guidepost.  *See* AR 10506; *see also* AR 10532 ("No data that show that 9

months is not sufficient."), AR 11122 (noting that analysis concluded "there was sufficient

evidence to support a 9-month duration for nonrodent toxicity studies to adequately assess the

risks of drugs intended for long-term use in humans").

These findings were supported by an analysis of cases from the drugmaker Merck's

internal database.  This study showed that "non-rodent and rodent chronic toxicology studies do

uncover, as previously suggested, additional target organ toxicities not seen in shorter duration

studies."  AR 10478; *see* AR 11122-23.  It identified additional adverse toxicities in nonrodent

studies of at least 9 months compared with 3-month studies, in nearly 30 percent of drugs (6 of

31) evaluated.  *See* AR 11122; *see also* AR 10478.  Thus, the study concluded that "clear and

significant added value and new information can surface that provide vital support to clinical

trial safety for trial durations that extend beyond what can be gained from the conduct of a 3-

month toxicology study."  AR 10479.

Based on this body of evidence, FDA determined that "[t]he inclusion of data from

chronic toxicity studies (i.e., 9-month studies in nonrodents) is considered part of the initial

foundation for establishing that it is safe to administer an investigational drug to human subjects

in long-term clinical investigations."  AR 11123.  Accordingly, "[t]he lack of chronic toxicity

data would compromise the assessment of risk to human subjects in a proposed clinical study of

long-term exposure to an investigational drug," including tradipitant.  AR 11123.

**4. FDA reasonably determined that no alternative approach to the 9-month nonrodent toxicity study was scientifically justified.**

Although FDA discussed potential alternative approaches to a 9-month nonrodent toxicity study, the agency ultimately determined that none were appropriate. FDA's decision is entitled to deference. *See, e.g.*, *Rempfer*, 583 F.3d at 867; *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) (holding that agency's reasonable choice from among alternatives "may be debatable as a policy matter [but] mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful"). The reasonableness of FDA's decision is bolstered by its consideration of potential alternatives.

*First*, FDA considered whether an additional nonrodent toxicity study must involve animal deaths at the end of the study and concluded it did. "[T]he majority of toxicities are identified through histopathological assessment, which is the microscopic examination of organs and tissues." AR 11113. For a meaningful examination, a broad array of tissues must be collected, which can only be done on euthanized animals. AR 11113. Failing to make a complete histopathological assessment would diminish the utility of the animal study and "not provide meaningful scientific data on which to assess the safety" to humans. AR 11126.

*Second*, FDA addressed Vanda's suggestion that tradipitant's tolerance in a short-term, 3-month human study can close the long-term toxicological gap. *See* AR 11124. FDA disagreed because, for one thing, "complete data [from Vanda's human studies] have not been provided to FDA." AR 11124. And in any event, "the results from short-term clinical studies cannot be extrapolated to support dosing for longer than 3 months in humans." AR 11124. Thus, FDA cannot "assume the percentage of adverse events reported" from short-term tradipitant use "will represent the nature or frequency of adverse events associated with a longer duration of exposure." AR 11125.

*Third*, FDA considered whether the nature of gastroparesis warranted allowing the long-term human studies to proceed without additional animal toxicity data.  AR 11123-24.  For studies involving "a severe, rapidly progressive disease that results in death or irreversible morbidity, there may be greater acceptability of" risks to study subjects.  AR 11123.  Although gastroparesis is a serious condition, FDA did not find that the nature of disease rose to the level at which a higher degree of risk might be accepted.  *See* AR 11123-24.

To be sure, FDA has great sympathy for Americans suffering from gastroparesis.  The agency continues to work with drug sponsors as they investigate therapies to treat or mitigate the symptoms of this disease.  But FDA cannot cut corners along the way and set aside its scientific judgment and statutory charge to protect humans receiving investigational drugs because a drug company is unwilling to assemble needed safety information.  FDA's decision is eminently reasonable and easily passes muster under the APA.

**B.  Vanda's disagreements with FDA's scientific determinations are meritless.**

Notwithstanding FDA's careful assessment and thorough explanation, Vanda argues that the decision is "substantively arbitrary and capricious" for a number of reasons.  Vanda MSJ Mem., ECF No. 23-1, at 37.  Clearly, Vanda disagrees with FDA's interpretation of the scientific evidence, "but that disagreement does not render [FDA's reasoning] irrational."  *Conservation Law Found.*, 374 F. Supp. 3d at 105.  In the face of conflicting scientific interpretations, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).  The reasonableness of FDA's decision withstands Vanda's substantive challenges and should be upheld.

**1.   Vanda unduly minimizes the toxicity signals in its own animal studies.**

As an initial matter, Vanda erroneously claims that FDA's finding that a 4-week tradipitant study was "safe to proceed" automatically extends to the proposed 52-week studies. *See* Vanda MSJ Mem. 43.  Coming two years before Vanda even proposed a study lasting longer than 4 weeks, FDA's "safe to proceed" decision applied solely to the *4-week* clinical trial.  *See* AR 11109 (permitting the 4-week study to proceed in 2016).  FDA's regulations put Vanda on notice that "[t]he kind, duration, and scope of animal and other tests" needed to support a human study vary with the "duration . . . of the proposed clinical investigation."  21 C.F.R. § 312.23(a)(8).  And as discussed above, the animal toxicity studies sufficient to support a 4-week study cannot be presumed to support studies lasting 52 weeks.  *See* AR 11114-15, 11119.

Next, Vanda's attempt to downplay the findings of its animal toxicity studies as "minor", *see* Vanda MSJ Mem. 43, neglects that its own study reports mirrored findings noted by FDA. For example, Vanda reported that administration of tradipitant "to Han Wistar rats at 150 mg/kg/day in males and 1500 mg/kg/day in both sexes caused *adverse changes in the liver*."  AR 00062 (emphasis added).  In addition, according to Vanda's 3-month dog study report, "*Clinically relevant mean body weight losses and/or lower mean body weight gains* were noted throughout the [tradipitant] dosing period in the 275 and 1500 mg/kg/day group males."[4]  AR 05097 (emphasis added).

Vanda further dismisses its own toxicity studies by suggesting that FDA's statements about them are conflicting.  *See* Vanda MSJ Mem. 43-44.  Not so.  FDA has consistently noted that liver toxicities were detected in the Han Wistar rat study.  *See* AR 10792 (2016 FDA review

---

[4] Despite its own determination of clinical relevance, Vanda did not consider the weight changes to "adversely impact the health of the animals."  AR 05097.

noting "liver findings appeared to be more severe in this [Han Wistar] study" than in other rat studies), 11118 (remand response discussing Han Wistar rats); *see also* AR 000020 (sponsor study report stating that tradipitant "caused adverse changes in the liver").  Although these toxicities did not prevent Vanda's 4-week clinical study from proceeding, the Han Wistar findings had new implications within the context of assessing the risks to humans of long-term tradipitant use.  *See* AR 11118.  Moreover, Vanda contradicts itself by now highlighting its study findings in Fischer rats, *see* Vanda MSJ Mem. 45, a strain it previously told FDA "is no longer the industry choice for toxicity . . . studies" and therefore "not supportive of the proposed clinical trial."  AR 00031, 11017.

Regarding the 3-month dog study, Vanda points to an internal difference of opinion among three FDA expert reviewers about whether the dogs' weight-related findings should be considered adverse and therefore lower the "no-observed-adverse-effect-level," or NOAEL.  *See* Vanda MSJ Mem. 43-44.  NOAEL is a drug's highest level of exposure that is not associated with toxicity, and it is used to estimate the risk of adverse effects in humans at a specific drug dose.  AR 11115.  Two FDA reviewers in 2016 considered the 3-month dog study toxicity findings "adverse" and sufficiently significant to reduce the NOAEL, indicating that toxicity in animals was observed at a lower dose of tradipitant; one in 2005 did not.  *Compare* AR 10838-39 (Dr. Wang finding weight-loss "adverse" and reducing NOAEL) *and* AR 11044 and 11046 (same by Dr. Peretz), *with* AR 10839 (Dr. Chalecka-Franaszek finding otherwise).

Internal disagreement does not "justify according the agency's final decision less deference than usual."  *Cumberland Pharm. Inc. v. FDA*, 981 F. Supp. 2d 38, 52 (D.D.C. 2013).  Any difference of opinion among reviewers was resolved by FDA's decisionmaker who concluded that the weight-related findings in Vanda's 3-month dog study were adverse and were

**PUBLIC VERSION**

relevant to the potential safety of humans in long-term studies. *See* AR 11117 (finding weight-loss to be "adverse" and lowering NOAEL); *see Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320-21 (D.C. Cir. 1998) ("[D]eference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee.").

Vanda also erroneously believes that, even at the lower NOAEL (from the 3-month dog study), its plans for long-term clinical studies should not be affected because the proposed human dose is far below the dose administered to the dogs. *See* Vanda MSJ Mem. 44. But toxicity is a product of both dose and duration. AR 11114. In Vanda's animal toxicity studies, high doses do not compensate for a shorter duration of exposure. *See* AR 11114-15. The importance of some toxicities may only become known after *chronic* dosing, independent of the dose.[5] *See* AR 11114-15. None of the existing data can substitute for chronic-exposure testing in a nonrodent species.

Lastly, Vanda suggests that FDA's evaluation of casopitant's toxicity, a drug in the same pharmaceutical class, has changed, and its safety concern is a new phenomenon. *See* Vanda MSJ Mem. 45. Not true. In 2009, an FDA reviewer recommended that casopitant should *not* be approved for prevention of chemotherapy-induced nausea and vomiting, because the drug would be administered repeatedly. AR 11621. The reviewer explained: "The use of repeated dosing for [chemotherapy-induced nausea and vomiting] is highly concerning, given the *strong signal of cardiotoxicity in repeat-dose animal studies*."[6] AR 11621 (emphasis added). The cardiotoxicity

---

[5] As FDA explained, "If an even lower NOAEL were to be determined from a 9-month chronic toxicity study, the margin of safety would be reduced further and would influence dosing, clinical monitoring, and the overall safety of any long-term clinical trial." AR 11117.

[6] Notably, when the reviewer evaluated casopitant for a different indication, the prevention of post-operative nausea and vomiting, approval was recommended at that time specifically because the drug was to be administered only *once*. *See* AR 11621.

concern noted by that reviewer is based on the same evidence that FDA described in the Remand

Response.  *See* AR 11119-20.  Thus, FDA has had a persistent concern about casopitant's safety.

### 2.  Vanda mischaracterizes the scientific publications cited by FDA.

Vanda's critiques of the published literature cited by FDA are unfounded.  *See* Vanda

MSJ Mem. 40-42.[7]  At best, Vanda simply interprets their conclusions differently.  At worst,

Vanda quotes the studies out of context and misstates some of their findings.  Either way, FDA

rationally used these studies to support the choice made.  *See, e.g.*, *State Farm*, 463 U.S. at 43.

*First*, Vanda asserts that the cases analyzed in the 1999 article, which supported a 9-

month threshold to detect chronic toxicities in nonrodents, were "cherry-picked."  *See* Vanda

MSJ Mem. 40; *supra* page 20 (discussing study).  However, Vanda misunderstands the analysis.

The study analyzed cases showing "significant toxicological differences in 6- and 12-month"

nonrodent studies, AR 10709, because those cases fit the study's criteria and purpose:  trying to

determine whether 6-months, 12-months, or some other time period was the appropriate duration

of chronic nonrodent toxicity studies.  Notably, Vanda does not challenge the accuracy of the

study's analytical work.  *See* AR 10709-16 (discussing cases).  The study was robust, and FDA

appropriately relied on it.

*Second*, Vanda criticizes FDA's reference to the subsequent analysis by FDA and other

regulators, which reviewed "all available data sets for drugs, primarily for dogs, between 1999

---

[7] Vanda also cites various statistical publications on the "predictive power of nonrodent studies"
that it believes should have been considered by FDA.  *See* Vanda MSJ Mem. 38-40; *see also id.*
32-35.  As discussed below and in FDA's contemporaneous opposition to Vanda's motion to
complete and supplement the record, these publications are not part of the administrative record
and thus not properly part of the Court's review.  Moreover, the FDA statistical guidance cited
by Vanda deals with binary-outcome diagnostic devices—not the kind of testing at issue here.
*See* Vanda MSJ Mem. 38-39 (citing FDA, Guidance for Industry and FDA Staff:  Statistical
Guidance on Reporting Results from Studies Evaluating Diagnostic Tests (Mar. 13, 2007)).

and 2006" and found "sufficient examples of studies in nonrodents showing effects that changed the clinical course of development after 6 months" to support a 9-month study duration.  AR 10506, 11122 & nn.53-54.  Agencies are not prohibited under the APA from using "unpublished" data as Vanda suggests, *see Vanda MSJ Mem.* 41; the data simply must be relevant and not inaccurate, *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015); *see id.* at 56-57 (clarifying that D.C. Circuit has not "impos[ed] a best-available-data obligation on all agencies").  The study is undeniably relevant because it assesses the value of animal toxicity studies of different durations.  FDA was aware of the data's accuracy because the agency was involved in critically analyzing it.  *See* AR 10505-06 (published article authored by FDA employee describing "an extensive data review at FDA" in the late 1990s and followed up by "another data review of drugs and duration of studies . . . conducted by Japan, the EU and the United States").

*Third*, Vanda's criticism of FDA's reliance on the Broadhead and Merck studies is misguided.  *See Vanda MSJ Mem.* 36, 41.  What Vanda claims to be "one of the [Broadhead] study's 'main conclusions,'" Vanda MSJ Mem. 36, is the conclusion from a *previous* study—not Broadhead's, *see* AR 10700-01.  Vanda also misstates Broadhead's findings, which actually revealed that, of 54 studies with dog findings that could be analyzed by study duration, 8 (14.8%) were 6-12 months in duration.  AR 10701 tbl. 2.  Of those 8 studies, 5 (62.5%) of them added new findings that were not seen in rodent studies.  *Id.*  The analysis also found that, of 159 compounds surveyed, drug development in 18 (11%) were "terminated due to findings seen uniquely in the dog."  AR 10702.  Thus, the study supports FDA's, not Vanda's, position.

**PUBLIC VERSION**

As for the Merck study, Vanda stopped quoting too soon.  *See* Vanda MSJ Mem. 41.

Immediately following Vanda's quote, the study states: "However, 6 [of 32[8]] studies in non-

rodents yielded new findings that were not seen in studies of 3-month or shorter duration, and in

most cases they were not observed in the chronic toxicity studies in rats."  AR 10478.  The

authors concluded that "clear and significant added value and new information can surface [from

chronic nonrodent toxicity studies] that provide vital support to clinical trial safety for trial

durations that extend beyond what can be gained from the conduct of a 3-month toxicology

study."  AR 10479.  This conclusion accords with FDA's use of the study here.

### 3. Vanda may not like the scientific standard, but one exists and it is reasonable.

Vanda claims that FDA's decision is "standardless" because the agency "cannot

demonstrate how it reached the conclusion" that a 9-month nonrodent toxicity study is necessary.

Vanda MSJ Mem. 42.  Vanda is wrong.

Some regulations, like those for INDs, "employ broad and open-ended terms like

'reasonable,' 'appropriate,' 'feasible,' or 'practicable.'"  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2448

(2019) (Kavanaugh, J., concurring); *see, e.g.*, 21 C.F.R. §§ 312.23(a)(8) ("[a]dequate

information" about toxicology), 312.42(b)(1)(iv) ("sufficient information . . . to assess the risks

to subjects").  "Those kinds of terms afford agencies broad policy discretion."  *Kisor*, 139 S. Ct.

at 2448 (Kavanaugh, J., concurring).  Agencies have "wide discretion in making line-drawing

decisions" when setting their policies, as long as the lines drawn are reasonable.  *Nat'l Shooting*

*Sports Found. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013).  And agencies have discretion to

---

[8] The denominator varies between 31 and 32, depending whether the calculation includes the one
study for which short-term nonrodent data came from a 1- rather than a 3-month toxicity study.
*See* AR 10476.

apply those policies through adjudication rather than rulemaking.  *See, e.g.*, *Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1447 (D.C. Cir. 1984) ("It is hornbook administrative law that the choice of proceeding by individual adjudication or general rulemaking lies largely within the agency's discretion.").

Here, FDA applied a standard that is specific, not "indiscriminate," and "'offers . . . meaningful guidance'" to Vanda.  *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (quoting *U.S. Post. Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015)).  For Vanda's proposed 12-month clinical studies of tradipitant, FDA believes 9 months of nonrodent toxicity data are necessary to assess risks.  AR 11127.  FDA's decision to draw a line at 9 months is within the "zone of reasonableness," *Nat'l Shooting*, 716 F.3d at 214 (internal quotations omitted), and "accompanied by an adequate explanation of how the standard applies to the facts of this case," *U.S. Post. Serv.*, 785 F.3d at 754.  Vanda dislikes the standard, but it undoubtedly exists, is based on sound science, and is eminently reasonable.

Similarly, Vanda's unwillingness to accept the answers to the questions it poses does not mean FDA has, in fact, left them unanswered.  *See* Vanda MSJ Mem. 42.  *First*, Vanda wonders "*when* a toxicity study requires follow-up testing."  *Id.*  Here, Vanda must conduct an additional chronic, nonrodent toxicity study before it can conduct long-term human studies because the existing data from short-term toxicity studies failed to fully establish "the toxicological profile of tradipitant" and could not be used to predict "the risks of long-term tradipitant use in humans."  AR 11119.  Vanda's question reveals its consistent undervaluing of the role played by duration in a toxicity study.  A cause-and-effect relationship between the drug and the observations cannot be found based on the first sign of potential toxicity.  *Cf.* AR 11114-15 (describing "signal-amplifying" function of longer-term toxicity studies that assists in identifying clinically

meaningful toxicities). Similarly, identifying correlations between an increase in dose and more serious toxicities or to a shorter time of onset requires more than an initial observation of potential adverse findings. *See, e.g.,* AR 11621 (describing findings of cardiac injury at different times of onset depending on drug dose). FDA, with authority over and expertise in these matters, understands and applies the value of long-term animal toxicity studies in assessing the risks posed in long-term human studies. *See* AR 11120 ("Based on the scientific literature, and borne out by FDA's . . . experience with clinical investigations, it is not possible, at present, to predict long-term systemic toxicity based on subchronic (e.g., 3-month) toxicity studies in animals.").

*Second*, Vanda's question about "*why* that follow-up should be a 9-month study in dogs" also was answered. Vanda MSJ Mem. 42. As for the study's length, FDA's basis for selecting 9-months is detailed above. As for the species, "testing in a minimum of two mammalian animal species (one rodent and one nonrodent) is necessary to provide adequate assurance of detecting toxicities that may be relevant to humans." AR 11114. Vanda's rodent and dog toxicity studies revealed an inconsistent safety profile for tradipitant. *See* AR 11119. A chronic study in nonrodents is needed to add to the toxicity picture. *See* AR 11114. And "a chronic toxicity study of tradipitant in dogs may have more relevance for characterizing human safety in clinical trials" because as FDA and Vanda agree, "the pharmacokinetics of tradipitant appears more consistent between dogs and humans." AR 11118-19.[9]

---

[9] Vanda incorrectly claims that EPA's view of chronic nonrodent toxicity studies in the context of pesticide registration should influence FDA's scientific standards for evaluating investigational drug risks. *See* Vanda MSJ Mem. 36 n.8. But Vanda elides the distinction between each agency's need for toxicity studies. Whereas EPA's focus is on the NOAEL generated from animal data, that piece of information is but one of many vital details that FDA gathers from animal toxicity studies. *See* AR 11112-15 (describing the contributions of animal toxicity studies to the assessment of human risk in clinical studies of investigational drugs).

**PUBLIC VERSION**

Issues of the data necessary to assess the risks to humans in a long-term study involving

an investigational drug that has never been found safe and effective are "at the frontiers of

science" and "within [FDA's] area of special expertise." *Baltimore Gas*, 462 U.S. at 103.  FDA

has undoubtedly announced, reasonably explained, and carefully applied its scientific standard.

This standard receives the Court's "most deferential" review, *id.*, and the agency's decision

should be upheld, *see Cytori Therapeutics*, 715 F.3d at 927.

II.     **FDA's remand response was procedurally sound and must be considered by the
        Court.**

As shown, FDA's decision to impose a clinical hold was legally and scientifically

reasonable.  Yet Vanda seeks to suppress FDA's considered scientific judgments by claiming

that this Court "should disregard virtually everything contained within the Remand Response."

Vanda MSJ Mem. 29.[10]  The law does not support Vanda's attempt; indeed, the stakes—the

safety of human study participants—make clear Vanda's suggestion cannot be countenanced.

---

Because the two agencies examine animal studies for different purposes, the studies' respective
utility can reasonably differ.  This reason explains why Vanda's cite to the Kobel study on
EPA's requirements for pesticide registration, *see* Vanda MSJ Mem. 34-35, is inapt.

[10] Vanda's mischaracterization of a letter from FDA's counsel largely underpins its effort to
exclude the remand response.  Vanda repeatedly claims that FDA's counsel "directly" stated that
"FDA did not reopen the record or reconsider its decision."  Vanda MSJ Mem. 27-28.  Counsel
actually stated that "FDA sought 'to take further action with respect to the *original agency
decision on review*'" and directly quoted FDA's scope of remand from its motion.  Harlow Ltr.,
ECF No. 25-3, at 1 (quoting *Limnia Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386 (D.C. Cir.
2017)); *see Limnia*, 857 F.3d at 387 (recognizing a broad range of permissible activity on
remand, including "reconsider[ing], re-review[ing], or modify[ing] the original agency decision
that is the subject of the legal challenge").  Counsel also made clear that FDA had not reopened
the record for further submissions from Vanda; "rather, FDA stated it would more fully respond
to Vanda's previous submissions related to the partial clinical hold."  Harlow Ltr. 1.  To the
extent the Court finds any disparity between counsel's statements and the agency's conduct, it is
the agency's actual conduct at issue not the "arguments of counsel."  *Local 814, Int'l Bhd. of
Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976).

PUBLIC VERSION

### A. The remand response was issued by the proper decisionmaker and presents the agency's considered opinion.

"[I]f it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives." *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011) (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006)).  A court may consider a remand explanation offered by the "proper decisionmaker" that "represents the considered views of the agency itself." *Alpharma*, 460 F.3d at 7; *see Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 387, 403 (D.D.C. 2015).

*First*, Vanda wrongly claims that the remand response was not issued by the proper decisionmaker, which it believes should have been the MPPRC (Medical Policy and Program Review Council).  Vanda MSJ Mem. 3, 28-29.  The proper decisionmaker is not the highest agency authority; it is the one with authority to make the decision.  *See, e.g.*, *Menkes*, 637 F.3d at 323, 337 (recognizing Director of Great Lakes Pilotage as the "proper decisionmaker" based on authorization under Coast Guard regulations to make decision at issue).

Here, the clinical hold was issued by the officials with "responsibility for review of the IND." 21 C.F.R. § 312.42(d); *see* AR 10187 (initial decision by the Associate Director of the Office of Drug Evaluation III's Division of Gastroenterology and Inborn Errors Products); *id.* 11127 (remand response by the Director of the Office of Drug Evaluation III).  Vanda cites no statute or regulation authorizing the MPPRC to issue a clinical hold or requiring it be consulted about a hold.  *See Delta Air Lines*, 85 F. Supp. 3d at 403-04 (considering Export-Import Bank's remand response even though it was not formally adopted by the Bank's Board because "no authority—whether in the APA, the Bank Act, or elsewhere" required such action).  In short, Vanda focuses on hierarchy rather than actual decisionmaking authority, as the regulations and the record confirm.

33

**PUBLIC VERSION**

*Second*, the remand response undoubtedly conveys FDA's scientific conclusions as an agency. *See, e.g.*, AR 11106 ("Because Vanda has not provided data from a 9-month nonrodent toxicity study, *FDA concludes that IND 131545 contains insufficient information to assess risks to human subjects taking tradipitant in clinical studies exceeding 3 months.*") (emphasis added). The remand response was issued by FDA to Vanda under the auspices of the Court's remand order, and it represents the agency's "experience, judgment, analyses, and conclusions." *Delta Air Lines*, 85 F. Supp. 3d at 403-04; *see Alpharma*, 460 F.3d at 7 (finding "no question" that letter from FDA's Associate Commissioner "represents the considered views of the agency itself" because the letter stated it was the determination of "the *agency*") (emphasis in original).

*Third*, the prohibition against *post hoc* rationalizations invoked by Vanda simply "prevent[s] courts from considering 'rationales offered by anyone other than the proper decisionmakers,' such as those appearing 'for the first time in litigation affidavits and arguments of counsel.'" *NAACP v. Trump*, 315 F. Supp. 3d 457, 466 (D.D.C. 2018) (quoting *Alpharma*, 460 F.3d at 6); *see Local 814*, 546 F.2d at 992 (observing that this exception "is *not* a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning") (emphasis added). Plainly, FDA's remand response is not a "litigation affidavit" or the "argument of counsel." The response is the agency's own scientific examination of the evidence and explanation of its conclusions. The response also demonstrates that FDA did exactly what it told this Court it would do on remand, from "re-evaluat[ing] . . . Vanda's scientific submissions about the necessity of an additional animal toxicology study" and "provid[ing] a full written explanation of the agency's analysis and ultimate position" to "review[ing] and clarify[ing] the regulatory basis for its decision" and the Nonclinical Study Guidance's "legal import." FDA Remand Mem. 6. It was far "more than a

PUBLIC VERSION

barren exercise of supplying reasons to support a pre-ordained result." *Muwekma Ohlone Tribe*

*v. Salazar*, 708 F.3d 209, 217 n.8 (D.C. Cir. 2013).

Moreover, the remand response is not "detached" from FDA's original partial clinical

hold but, instead, constitutes "an 'amplified articulation' of the agency's prior reasoning."

*NAACP*, 315 F. Supp. 3d at 466.  The legal basis for the initial December 2018 hold and its

continued imposition after remand remains the same:  Vanda's failure to comply with 21 C.F.R.

§ 312.42(b)(2)(i)'s requirement to provide sufficient information to allow FDA to assess the risks

to human subjects of its long-term human, tradipitant studies.  *Compare* AR 10185 (citing

regulation), *with* AR 11106 (same).

The safety concerns and scientific judgments underpinning FDA's action also remain the

same.  *Compare* AR 10871 (discussing in December 2018 how a "9-month chronic nonrodent

study [was] an important component of an appropriate assessment of risk" in human subjects

experiencing 12 months of tradipitant exposure), *with* AR 11106 (same in remand response).

FDA's earlier references to the Nonclinical Study Guidance embodied the scientific issues

because the Guidance recommended minimum durations of repeated-dose animal toxicity studies

to support clinical trials.  AR 10917.  None of the remand's explanations are "so far afield" that

they cannot be considered.  *NAACP*, 315 F. Supp. 3d at 465.  Accordingly, this Court's review of

the partial clinical hold decision considers the reasons stated in the remand response, in light of

the record as a whole.

**B.  FDA permissibly exercised its discretion to set its procedures during remand.**

Vanda's challenge to FDA's remand procedures runs contrary to "the very basic tenet of

administrative law that agencies should be free to fashion their own rules of procedure."  *Vt.*

*Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544 (1978).  This

tenet extends to agency proceedings on remand.  *See, e.g.*, *Pension Benefit Guar. Corp. v. LTV*

**PUBLIC VERSION**

*Corp.*, 496 U.S. 633, 653-55 (1990) (reversing appellate court's attempt to impose procedural

requirements on agency during remand as "run[ning] afoul of *Vermont Yankee*").  Neither the

FDCA nor the APA required FDA to adopt Vanda's preferred procedures.  Vanda specifically

contends that FDA should have considered additional materials on remand, yet Vanda has

foregone the available statutory and regulatory means by which it could have received the

process it claims FDA denied.  FDA's decision is not procedurally invalid.

## 1. FDA permissibly declined to consider post-December 2018 submissions by Vanda and the Humane Society.

Vanda complains that FDA did not consider certain materials submitted to the agency

after December 2018 by Vanda and the Humane Society.  *See* Vanda MSJ Mem. 33.  But the

review of such submissions plainly was beyond what the agency said it would do during remand,

and no statute or regulation compelled it to do more.

*First*, FDA's decision not to consider post-December 2018 arguments by Vanda was

consistent with this Court's remand.  *See Bean Dredging, LLC v. United States*, 773 F. Supp. 2d

63, 78 (D.D.C. 2011) ("[A]n agency's review on remand must be responsive to the court's

mandate.").  FDA specifically stated it would re-evaluate "Vanda's scientific submissions about

the necessity of an additional animal toxicology study," FDA Remand Mem. 6, which

necessarily meant those documents Vanda had *already* submitted to the agency.  FDA was aware

of Vanda's objections to conducting a 9-month nonrodent toxicity study from the company's

pre-December 2018 submissions.  *See* AR 08647-9130 (August 2018 Formal Dispute Resolution

Request and September 2018 Study 2302 Protocol).  And on remand, FDA expressly re-

considered these arguments.  *See* AR 11111 & n.18 (identifying Vanda's submissions).

*Second*, Vanda's claim that FDA should have considered post-December 2018

submissions by Vanda and the Humane Society is unsupported by the FDCA or the APA.  The

36

**PUBLIC VERSION**

FDCA does not afford Vanda a right to introduce arguments *before* FDA issues a hold.  *See* 21

U.S.C. § 355(i)(3)(A) (allowing FDA to issue a clinical hold "[a]t any time" as long as it

provides "the specific information . . . which served as the basis" for the hold).  It does not afford

a third party such as the Humane Society an opportunity to comment on a clinical hold.  *See id.*

(providing for no public input).

The APA likewise provides no relief for an informal adjudication like the clinical hold.

*See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989) (observing that "no

provision of the APA contains specific procedures to govern an informal agency adjudication").

The APA does not afford Vanda a right to present additional or contrary evidence during

remand.  *See Pension Benefit Guar. Corp.*, 496 U.S. at 653, 655 (finding no APA provision

requiring agency give party on remand "an adequate opportunity to offer contrary evidence").

Equally, the APA did not require that FDA consider the Humane Society's comments.  *See Dist.*

*No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 43

(D.C. Cir. 2000) (noting that absent a statutory or regulatory requirement "to afford interested

parties the opportunity to submit comments . . . whether [the agency] permits comments and how

it deals with those comments are procedural decisions that . . . are matters within the agency's

discretion") (citing *Vt. Yankee*, 435 U.S. at 524).  Accordingly, because neither the FDCA nor

the APA compelled FDA to consider these submissions, Vanda cannot insist the remand

response was legally deficient for failing to do so.  *See, e.g.*, *Butte Cty. v. Chaudhuri*, 887 F.3d

501, 505 (D.C. Cir. 2018) ("[C]ourts generally cannot compel agencies to do more than the

statute demands . . . .").

*Third*, beyond the absence of statutory support, Vanda's argument transgresses basic

principles of administrability.  Although Vanda repeatedly cites the Humane Society's letter,

PUBLIC VERSION

Vanda omits that this letter was submitted at the eleventh hour.  The effective deadline under the Court's order for FDA's remand response was Friday, April 26, 2019—and it issued that day. *See* Remand Order 5.  With no warning and a mere 36 *hours* before the deadline, the Humane Society emailed its letter to FDA.  FDA was well-within its discretion and the bounds of reason to issue the remand response without considering the Humane Society's letter.  *Cf. Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments that are not timely filed.").[11]

*Finally*, Vanda contends that FDA should have considered several studies that were cited in its initial complaint but never submitted to the agency.  *See* Vanda MSJ Mem. 34.  But "[t]o preserve a legal or factual argument," Vanda must "have given the agency a 'fair opportunity' to entertain it in the administrative forum before raising it in the judicial one."  *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004).  Vanda never submitted this evidence to FDA under the proper statutory or regulatory procedures.  *See* 21 U.S.C. § 355(i)(3)(C) (prescribing means for sponsor to submit "sufficient information to support the removal" of a clinical hold); 21 C.F.R. § 312.42(e)-(f) (same).  Thus, Vanda cannot brandish these studies against FDA now.  *See BNSF Ry. Co. v. Surface Transp. Bd.*, 453 F.3d 473, 479 (D.C. Cir. 2006) ("A reviewing court generally will not consider an argument that was not raised before the agency 'at the time appropriate under its practice.'") (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).

---

[11] Vanda repeatedly quotes—and seeks to introduce into the record—a pro forma email from an FDA official on April 25, 2019 acknowledging receipt of the Humane Society's letter.  See Vanda MSJ Mem. 33.  Vanda omits that this official later informed the Humane Society by letter that FDA "won't be able to comment on your request."  Harlow Decl., Ex. 1.

**2.   While reevaluating Vanda's submissions, FDA permissibly exercised its discretion to gather additional evidence.**

Vanda complains that FDA amassed additional evidence during the remand, *see* Vanda MSJ Mem. 31, 36, but "on remand, 'the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed,'" *Bean Dredging*, 773 F. Supp. 2d at 78 (quoting *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006)); *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (allowing agency on remand to undertake "additional investigation or explanation").   Here, FDA "acknowledge[d] that the record may not adequately reflect FDA's analysis of and response to Vanda's scientific submissions" and would "provide a full written explanation of the agency's analysis and ultimate position."   FDA Remand Mem. 6.   While responding to Vanda's arguments, FDA consulted additional scientific literature and its files about the aborted development of casopitant, another drug in tradipitant's class.   The agency permissibly developed this evidence and included it within the record.

**3.   Vanda is not entitled to more than the existing legal pathways, which it has failed to use, to submit additional evidence to FDA.**

Vanda's last procedural objection also is its most curious.   Vanda claims that the partial clinical hold is arbitrary and capricious because "Vanda has had no opportunity to contest those assertions [in the remand response] before the agency."   Vanda MSJ Mem. 36.   FDA was not required, on remand, to provide Vanda with advance notice about the agency's evidence or an opportunity to rebut it before issuing its decision.   *See Pension Benefit Guar. Corp.*, 496 U.S. at 653, 655 (rejecting, for lack of support in the APA, organic statute or Supreme Court precedent, attempt to require agency to "apprise[] . . . of the material on which it was to base its decision" or provide "an adequate opportunity to offer contrary evidence").

Yet both the FDCA and FDA's implementing regulations actually provide a means for Vanda to submit rebuttal evidence and argument.   A sponsor whose investigation is subject to a

clinical hold may submit a written request to remove the hold, containing "sufficient information

to support the removal," and to which FDA must respond in writing.  21 U.S.C. § 355(i)(3)(C);

*see* 21 C.F.R. § 312.42(e)-(f), 312.48 (discussing process under regulations).  Vanda did *not*

avail itself of these means after the December 2018 initial hold or the April 2019 remand

response; rather, it proceeded to forfeit those opportunities and chose to litigate.  Vanda cannot

now claim that FDA's action is arbitrary and capricious for not providing procedures that it has

chosen not to use.

### III.    FDA's partial clinical hold decision did not treat the Nonclinical Study Guidance as a binding rule.

Finally, we end where Vanda begins—the Nonclinical Study Guidance.  Vanda's full-

fledged assault on the Guidance falls upon a strawman.  The Guidance is a policy statement—not

a legislative rule—and is not the legal basis for FDA's decision.

"An agency action that merely explains how the agency will enforce a statute or

regulation—in other words, how it will exercise its broad enforcement discretion or permitting

discretion under some extant statute or rule—is a general statement of policy."  *Nat'l Mining*

*Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).  In contrast, a legislative rule "purports

to impose legally binding obligations or prohibitions on regulated parties—and that would be the

basis for an enforcement action for violations of those obligations or requirements."  *Id.* at 251.

Courts consider several factors when distinguishing between the two types of agency action.  *See*

*id.* at 252-53 (discussing factors).  All of these factors support FDA's position that the

Nonclinical Study Guidance is a policy statement, not a legislative rule.

### A.  The Nonclinical Study Guidance's context and text show it is a policy statement.

The Nonclinical Study Guidance's context within the overall regulatory scheme

demonstrates that it was not intended to have an "actual legal effect . . . on regulated entities."

**PUBLIC VERSION**

*Nat'l Mining*, 758 F.3d at 252.  FDA's regulation expressly differentiates between the legal

requirement that sponsors provide "[a]dequate information about pharmacological and

toxicological studies of the drug" to support a proposed study, and the guidance documents FDA

makes available "that describe ways in which these requirements *may* be met."  21 C.F.R.

§ 312.23(a)(8) (emphasis added).  Consistent with the regulation, in 2010, FDA announced

availability of the Nonclinical Study Guidance through a *Federal Register* notice.  *See*

Availability of Nonclinical Study Guidance, 75 Fed. Reg. 3471, 3471-72 (Jan. 21, 2010); *see*

*also Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015)

(considering whether document "was published in the Federal Register or the Code of Federal

Regulations" to determine if it was a binding rule).  The agency explained that the Nonclinical

Study Guidance contained FDA's thinking "on the various nonclinical studies *recommended* to

support conduct of clinical trials and marketing."  75 Fed. Reg. at 3472 (emphasis added).

Moreover, the text of the Nonclinical Study Guidance does not read like a "ukase" and

"is devoid of relevant commands."  *Nat'l Mining*, 758 F.3d at 252-53 (quotation omitted).  The

Guidance simply contains FDA's "*Recommended* Minimum Duration of Repeated-Dose

Toxicity Studies to Support Clinical Trials."  AR 10917 (emphasis added); *see* AR 10916

(observing that "[t]he *recommended* duration of the repeated-dose toxicity studies is usually

related to the duration, therapeutic indication, and scope of the proposed clinical trial")

(emphasis added).  Every page repeats the admonishment that it "Contains Nonbinding

Recommendations."  AR 10907-34.  FDA's use of the word "recommendation" is akin to

"language like 'may' or 'should'" that suggests that the provisions to follow are "meant to be

'precatory, not mandatory.'"  *Huerta*, 785 F.3d at 718.

41

**PUBLIC VERSION**

The Guidance admits exceptions to its recommendations.  It acknowledges that parties "can use an alternative approach if the approach satisfies the requirements of the applicable statutes or regulations."  AR 10910.  Also, the recommended study durations may not apply to drugs being studied "[f]or serious or life-threatening indications," or intended only for short-term use, or otherwise "on a case-by-case basis."  *Id.* 10917 n.b, 10918.  "[T]his is not a case in which the guidance document signals that the agency 'will not be open to considering approaches other than those prescribed' therein."  *Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017).

Of course, the Nonclinical Study Guidance "may signal likely future" actions by FDA when sponsors do not provide sufficient animal toxicity data to support human studies; however, in such cases FDA cannot solely rely on the Guidance in defending its action.  *Nat'l Mining*, 758 F.3d at 252; *see Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (policy statements may even use rebuttable presumptions). That is what happened here.

### B.  Through the remand response, FDA has not applied the Guidance at all to Vanda, let alone in a binding fashion.

FDA has not applied the Nonclinical Study Guidance "as if it were binding" on Vanda. *Nat'l Mining*, 758 F.3d at 253.  The Nonclinical Study Guidance "[r]ecommend[s]" that a sponsor conduct a nonrodent toxicity study of at least 9 months to support a proposed clinical study exceeding 6 months in duration.  AR 10917.  Vanda cites a number of instances in which FDA staff reviewing Vanda's IND used language like "per" or "as required per" the Guidance when referring to the necessity of a 9-month nonrodent toxicity study.  *See* Vanda MSJ Mem. 15-16.  But all of Vanda's examples pre-date the remand.  And Vanda ignores the extensive scientific basis for FDA's decision, as set out in the administrative record.

**PUBLIC VERSION**

In seeking remand, FDA forthrightly "acknowledge[d] that the administrative record contains references to a guidance document as the source of some 'requirements.'" FDA Remand Mem. 6. The agency emphasized that the Nonclinical Study Guidance "is, in fact, just that—a non-binding policy statement" and that on remand it would "clarify the regulatory basis for its decision." *Id.*

FDA took to heart the D.C. Circuit's admonishment that "[w]hen the agency applies [a general statement of] policy in a particular situation it must be prepared to support the policy just as if the policy statement had never been issued." *Nat'l Mining*, 758 F.3d at 253 (quotations omitted). The remand response never cites to the Nonclinical Study Guidance. Instead, as discussed extensively above, the agency substantiated its position "just as if the policy statement had never been issued." *Id.* Post remand, FDA has not applied the Nonclinical Study Guidance as a binding requirement.[12]

FDA's application of the legal requirements in 21 C.F.R. §§ 312.23(a)(8) and 312.42 to the specific facts of Vanda's proposed studies distinguishes this case from *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165 (7th Cir. 1996), and *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010), on which Vanda relies. *See* Vanda MSJ Mem. 19. Vanda concedes that neither case held that a policy statement "can *never* have a numerical component." Vanda MSJ

---

[12] By ignoring FDA's remedial efforts on remand, Vanda ignores the purpose of voluntary remand, which is to afford an agency the opportunity "to cure its own potential mistake." *Sierra Club v. Antwerp*, 560 F. Supp. 2d 21, 24-25 (D.D.C. 2008). Under Vanda's view, "once an agency made some error or strayed in some material respect, its action would be irredeemable." *Bean Dredging*, 773 F. Supp. 2d at 79. But "[c]learly, this is not the law." *Id.*; *see id.* ("Courts 'frequently remand matters to agencies while leaving open the possibility that the agencies can reach exactly the same result so long as they rely on the correct view of the law that they previously misinterpreted, or as long as they explain themselves better or develop better evidence for their position.'") (quoting *Nat'l Treasury Employees Union v. Fed. Labor Relations Auth.*, 30 F.3d 1510, 1514 (D.C. Cir. 1994)).

**PUBLIC VERSION**

Mem. 20 n.4 (quoting *Catholic Health Initiatives*, 617 F.3d at 495); *see also Nat'l Mining*, 758

F.3d at 248, 253 (EPA "Final Guidance recommend[ing] that water conductivity levels not

exceed 300-500 iS/cm (microSiemens per centimeter)" was a policy statement); *Am. Min.*

*Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112-13 (D.C. Cir. 1993) (agency's

enforcement policy based on specific x-ray rating scores was not a legislative rule).

Vanda instead claims that "the teaching of those cases is that when an agency substitutes

a bright-line numerical value for an undefined statutory or regulatory standard, it is much more

likely to be making the sort of 'reasonable but arbitrary' *policy judgment that requires public*

*notice and an opportunity for comment.*"  Vanda MSJ Mem. 20 n.4 (emphasis added).  Not so.

Even when a regulation "employ[s] broad and open-ended terms," *Kisor*, 139 S. Ct. at 2448

(Kavanaugh, J., concurring), "[t]he APA does not require that all the specific applications of a

rule evolve by further, more precise rules rather than by adjudication," *Shalala v. Guernsey*

*Mem'l Hosp.*, 514 U.S. 87, 96 (1995); *see Nat'l Small Shipments*, 725 F.2d at 1447 ("It is

hornbook administrative law that the choice of proceeding by individual adjudication or general

rulemaking lies largely within the agency's discretion.").  Nothing in the FDCA or APA required

FDA to apply its policy about the animal toxicity data necessary to support long-term human

studies with tradipitant by regulation rather than an informal clinical-hold adjudication.

*Hoctor* and *Catholic Health Initiatives* also are readily distinguishable because they

involved fundamentally different agency activity than that at issue here.  Both *Hoctor* and

*Catholic Health Initiatives* rebuffed agency attempts to graft specific numerical thresholds,

announced in policy statements, into regulations under the guise of textual interpretation, such

that transgressions of those thresholds were *per se* regulatory violations.  *See Catholic Health*,

617 F.3d at 491 (10% limit on insurance companies' percentage of dividend-paying securities

PUBLIC VERSION

and regulation about costs "appropriate and helpful in developing and maintaining the operation of patient care facilities and activities"); *Hoctor*, 82 F.3d at 167-68 (8-foot fencing requirement and regulation that "the facility [housing the animals] must be constructed of such material and of such strength as appropriate for the animals involved").

FDA here is not claiming to have *interpreted* the text of the IND regulations and found a 9-month nonrodent toxicity study compelled by the regulatory language. Rather, FDA *applied* the regulations to Vanda's particular facts and determined that a 9-month nonrodent study was necessary in this case, a scenario not present in *Hoctor* or *Catholic Health Initiatives*. *See Hoctor*, 82 F.3d at 169 (noting the issue was not presented of "whether the Department might have cited Hoctor for having a perimeter fence that was *in fact*," a regulatory violation in light of the relevant factors). Accordingly, neither *Hoctor* nor *Catholic Health Initiatives* aids Vanda.

## IV.   Even if this Court were to grant Vanda's motion for summary judgment, it should remand the matter to FDA without vacatur.

If this Court were to grant Vanda's motion for summary judgment (which it should not), the Court would again face a choice of remand with or without vacatur. Any remand should be *without* vacatur. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 630 (D.C. Cir. 2016) (per curiam). (setting forth standard for remand without vacatur). Any potential issues are "squarely within the realm" of FDA's expertise to explain. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 282 F. Supp. 3d 91, 98 (D.D.C. 2017). And given the risks to human study subjects, the potential for "unpredictable and irreversible consequences" to those individuals warns against vacatur. *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 46 (D.D.C. 2013).

## CONCLUSION

For the foregoing reasons, this Court should grant FDA's cross-motion for summary judgment, and deny Vanda's motion for summary judgment.

**PUBLIC VERSION**

Respectfully submitted,

Dated:  August 6, 2019

Of Counsel:

ROBERT P. CHARROW
General Counsel
U.S. Department of Health
  and Human Services

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
U.S. Department of Health
  and Human Services

ANNAMARIE KEMPIC
Deputy Chief Counsel, Litigation
Food and Drug Administration

CLAUDIA ZUCKERMAN
Senior Counsel
Office of the General Counsel
Food and Drug Division
10903 New Hampshire Avenue
White Oak 31, Room 4550
Silver Spring, MD 20993-0002
Telephone:  (301) 796-8609
Claudia.Zuckerman@fda.hhs.gov

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

DAVID M. MORRELL
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director

ANDREW E. CLARK
Assistant Director

      /s/ James W. Harlow
JAMES W. HARLOW
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice, Civil Division
P.O. Box 386
Washington, D.C.  20044-0386
Telephone:  (202) 514-6786
Fax:  (202) 514-8742
James.W.Harlow@usdoj.gov

46

PUBLIC VERSION

**CERTIFICATE OF SERVICE**

    I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.


Dated:  August 6, 2019                /s/ James W. Harlow
                                          James W. Harlow