PUBLIC VERSION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| VANDA PHARMACEUTICALS, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:19-CV-00301 (JDB) |
| FOOD AND DRUG ADMINISTRATION, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

PUBLIC VERSION

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................................... **1**

**ARGUMENT**......................................................................................................................... **2**

    I.    NEITHER THE NONCLINICAL STUDY GUIDANCE NOR THE PARTIAL CLINICAL HOLD
        CONSTITUTE LEGISLATIVE RULES. ...................................................................... 2

        A.    The Nonclinical Study Guidance is a policy statement with no actual legal effect........ 3

        B.    The partial clinical hold is an individual adjudication not a rule.................................... 5

    II.    THE PARTIAL CLINICAL HOLD DECISION RESTS UPON A SOUND SCIENTIFIC FOUNDATION. .... 7

        A.    FDA neither ignored certain evidence in the record nor is it contrary to the agency's
            decision.................................................................................................................... 7

        B.    FDA reasonably found that a 9-month nonrodent toxicity study was necessary............ 9

        C.    FDA's tradipitant-specific analyses were not arbitrary and capricious. ....................... 12

    III.    FDA COMPLIED WITH THIS COURT'S ORDER AND THE APA ON REMAND........................... 14

        A.    Vanda's attempted suppression of FDA's remand response is unsupported by the law
            and the record. ......................................................................................................... 15

        B.    FDA considered all relevant information, including Vanda's material, that was
            properly before it. .................................................................................................... 19

    IV.    VANDA'S VACATUR ARGUMENT EPITOMIZES THE FLAWS IN ITS THEORY........................... 22

    **CONCLUSION** ..................................................................................................................... **24**

# TABLE OF AUTHORITIES

**CASES**

*AARP v. U.S. EEOC,*
 292 F. Supp. 3d 238 (D.D.C. 2017) .......................................................................... 23

*Alaska Excursion Cruises, Inc. v. United States,*
 603 F. Supp. 541 (D.D.C. 1984) ............................................................................... 20

*Alpharma, Inc. v. Leavitt,*
 460 F.3d 1 (D.C. Cir. 2006) ............................................................................... 15, 18

*Am. Min. Congress v. Mine Safety & Health Admin.,*
 995 F.2d 1106 (D.C. Cir. 1993) .................................................................................. 4

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
 462 U.S. 87 (1983) ..................................................................................................... 11

*Bean Dredging, LLC v. United States,*
 773 F. Supp. 3d 63 (D.D.C. 2011) ............................................................................ 16

*Ca. Communities Against Toxics v. EPA,*
 ___ F.3d ___, 2019 WL 3917540 (D.C. Cir. Aug. 20, 2019) ............................. 3, 4

*City of Williams v. Dombeck,*
 151 F. Supp. 2d 9 (D.D.C. 2001) .............................................................................. 22

*Clarian Health West, LLC v. Hargan,*
 878 F.3d 346 (D.C. Cir. 2017) ............................................................................... 4, 5

*Comcast Corp. v. FCC,*
 579 F.3d 1 (D.C. Cir. 2009) ...................................................................................... 23

*Cmty. Health Sys., Inc. v. Burwell,*
 113 F. Supp. 3d 197 (D.D.C. 2015) ............................................................................ 5

*Cytori Therapeutics, Inc. v. FDA,*
 715 F.3d 922 (D.C. Cir. 2013) ............................................................................... 7, 9

*Davis v. Pension Ben. Guar. Corp.,*
 815 F. Supp. 2d 283 (D.D.C. 2011) .......................................................................... 22

*Delta Air Lines, Inc. v. Export-Import Bank of the United States,*
 85 F. Supp. 3d 436 (D.D.C. 2015) ...................................................................... 18, 19

*Dep't of Commerce v. New York,*
　　139 S. Ct. 2551 (2019) ........................................................................................ 7

*Earthworks v. U.S. Dep't of the Interior,*
　　279 F.R.D. 180 (D.D.C. 2012) ............................................................................. 20

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
　　423 U.S. 326 (1976) ............................................................................................. 18

*Food Marketing Inst. v. ICC,*
　　587 F.2d 1285 (D.C. Cir. 1978) ...................................................................... 18, 19

*Genuine Parts Co. v. EPA,*
　　890 F.3d 304 (D.C. Cir. 2018) .............................................................................. 19

*Goodman v. FCC,*
　　182 F.3d 987 (D.C. Cir. 1999) ............................................................................... 7

*Izaak Walton League of Am. v. Marsh,*
　　655 F.2d 346 (D.C. Cir. 1981) ................................................................................ 6

*Marsh v. Oregon Nat. Res. Council,*
　　490 U.S. 360 (1989) ............................................................................................. 10

*Muwekma Ohlone Tribe v. Salazar,*
　　708 F.3d 209 (D.C. Cir. 2013) ........................................................................ 16, 18

*NAACP v. Trump,*
　　315 F. Supp. 3d 457 (D.D.C. 2018) ............................................................ 15, 17, 23

*Nat'l Corn Growers Ass'n v. EPA,*
　　613 F.3d 266 (D.C. Cir. 2010) .............................................................................. 21

*Nat'l Mining Ass'n v. McCarthy,*
　　758 F.3d 243 (D.C. Cir. 2014) ............................................................................ 3, 4

*Nat'l Small Shipments Traffic Conference, Inc. v. ICC,*
　　725 F.2d 1442 (D.C. Cir. 1984) .............................................................................. 5

*Neustar, Inc. v. FCC,*
　　857 F.3d 886 (D.C. Cir. 2017) ............................................................................ 6, 7

*North Carolina v. EPA,*
　　550 F.3d 1176 (D.C. Cir. 2008) ............................................................................ 24

*Oceana, Inc. v. Pritzker*,
    126 F. Supp. 3d 110 (D.D.C. 2015) ................................................................. 23

*Safari Club Int'l v. Zinke*,
    878 F.3d 316  (D.C. Cir. 2017) ........................................................................ 6

*Sara Lee Corp. v. Am. Bakers Ass'n*,
    252 F.R.D. 31 (D.D.C. 2008) ................................................................... 20, 21

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ........................................................................................... 5

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engrs.*,
    282 F. Supp. 3d 91 (D.D.C. 2017) ................................................................ 23

*The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
    667 F. Supp. 2d 111 (D.D.C. 2009) ................................................................ 8

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) ...................................................................... 23

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) .................................................................................. 14, 21

*United Steelworkers of Am. v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) .................................................................. 9, 12

*USAir, Inc. v. Dep't of Transp.*,
    969 F.2d 1256 (D.C. Cir. 1992) .................................................................... 22

*Woodford v. Ngo*,
    548 U.S. 81 (2006) ......................................................................................... 19

## STATUTES

5 U.S.C. § 551(4) ...................................................................................................... 6

21 U.S.C. § 355(i)(1)(A) ...................................................................................... 3, 10

21 U.S.C. § 355(i)(2) ................................................................................................. 3

21 U.S.C. § 355(i)(3)(A) ........................................................................................ 3, 6

21 U.S.C. § 355(i)(3)(B) ............................................................................................ 3

21 U.S.C. § 355(i)(3)(C) .......................................................................................... 22

**PUBLIC VERSION**

**RULES**

21 C.F.R. § 312.23 ................................................................................................................... 4

21 C.F.R. § 312.23(a)(8) ................................................................................................... passim

21 C.F.R. § 312.23(a)(8)(ii) ....................................................................................................13

21 C.F.R. § 312.42(a) ............................................................................................................... 6

21 C.F.R. § 312.42(b)(1)(iv) .................................................................................................... 4

21 C.F.R. § 312.42(b)(2)(i) ...................................................................................................... 4

## INTRODUCTION

In the wake of Plaintiffs' (collectively, "Vanda") latest brief, it is important to stress the limits of this case:  a partial clinical hold applying solely to Vanda's proposed long-term studies of tradipitant in humans.  The question for this Court is equally narrow:  whether the Food and Drug Administration's ("FDA") determination that Vanda has not provided sufficient information for FDA to assess the risks to humans of Vanda's proposed studies violates the Administrative Procedure Act ("APA").  The answer lies in the twin principles of science and safety, which grounded FDA's decision.

Tradipitant has never been approved by FDA for any use.  It is currently unknown whether tradipitant can be administered safely to human study subjects for a period of 12 months.  Nonetheless, Vanda insists it should be permitted to conduct long-term human studies of tradipitant, while refusing to submit additional information to assess the risks of toxicities that might emerge from long-term exposure.

Because Vanda has not provided critical toxicity information on long-term tradipitant use, FDA imposed a partial clinical hold on the company's proposed 12-month studies.  This decision was based on a consideration of all relevant factors, fully supported by the evidence, and adequately explained in the remand response.  FDA has met the APA's standard for reasoned decision-making, and this Court should not disturb FDA's scientific judgment.

Vanda's latest brief lays bare why Congress expressly authorized FDA to issue clinical holds and did not leave drugmakers like Vanda the final arbiters of risk and safety. Vanda continues to perpetuate a false dichotomy between safety concerns and the lack of sufficient information even to assess safety.  The latter *is* a safety concern.

**PUBLIC VERSION**

Vanda refuses to undertake any efforts to identify long-term toxicities for tradipitant other than testing the drug in humans.  Rather than preemptively identify toxicities through a 9-month nonrodent study, Vanda seems content to deal with any toxicities that might develop in its human subjects, remove that individual from the study, and carry on.  This is reckless, unacceptable, and not in compliance with the law.

Distracting from the real issues of science and safety, Vanda persists with procedural challenges.  But FDA has not treated a guidance document like a legislative rule nor does the partial clinical hold decision at issue apply to anyone other than Vanda.  Likewise, FDA's procedures during the remand were hardly "extraordinary," "shocking," or "stunning."  FDA did exactly what it told this Court it would do on remand, and considered all properly submitted evidence.

FDA cannot fully assess the risks to humans in long-term studies of tradipitant unless and until Vanda supplies the missing animal toxicity data.  Because human safety cannot be assured, Vanda's proposed long-term studies are impermissible.  FDA's partial clinical hold is necessary to stop the studies until Vanda has conducted an adequate risk assessment and demonstrated that the safety of study subjects is appropriately ensured.

## ARGUMENT

**I.      Neither the Nonclinical Study Guidance nor the partial clinical hold constitute legislative rules.**

We begin by correcting the assertion that FDA's actions here constitute legislative rules. Although Vanda may want to force a public debate about FDA's policies, *see* Vanda MSJ Resp., ECF No. 35, at 2-3, the Nonclinical Study Guidance and partial clinical hold decision are simply not legislative rules.

**A.  The Nonclinical Study Guidance is a policy statement with no actual legal effect.**

Vanda's characterization of the Nonclinical Study Guidance as "binding law," Vanda

MSJ Resp. 6, is unsupported by law or fact.  The legal framework reveals that the Guidance

imposes no "*legally binding* obligations or prohibitions on regulated parties." *Nat'l Mining*

*Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (emphasis added); *Ca. Communities*

*Against Toxics v. EPA*, ___ F.3d ___, 2019 WL 3917540, at *2 (D.C. Cir. Aug. 20, 2019)

(reminding that "to ascertain the nature of an agency action, courts should ground the analysis in

the idiosyncratic regime of statutes and regulations that govern it").

Vanda does not challenge the applicable statutory and regulatory provisions.  The Federal

Food, Drug, and Cosmetic Act ("FDCA") requires that Vanda provide information "necessary to

assess the safety of the drug for use in . . . human studies investigation."  21 U.S.C. § 355(i)(2).

Pursuant to authorization from Congress to condition human testing on reports "of preclinical

tests (including tests on animals) of such drug adequate to justify the proposed clinical testing,"

*id.* § 355(i)(1)(A), FDA requires that Vanda submit "[a]dequate information about

pharmacological and toxicological studies of the drug involving laboratory animals or in vitro,

on the basis of which the sponsor has concluded that it is reasonably safe to conduct the

proposed clinical investigations," 21 C.F.R. § 312.23(a)(8); *see id.* ("The kind, duration, and

scope of animal and other tests required varies with the duration and nature of the proposed

clinical investigations.").

FDA is empowered to stop an investigational study "[a]t any time" by issuing a clinical

hold.  21 U.S.C. § 355(i)(3)(A).  Congress authorized FDA to issue a clinical hold when a drug

"represents an unreasonable risk to the safety of the persons who are the subjects of the clinical

investigation," as well as for other reasons established by regulation.  *Id.* § 355(i)(3)(B).  Among

other reasons, FDA may issue a clinical hold when an "IND does not contain sufficient

3

information required under [21 C.F.R.] § 312.23 to assess the risks to subjects of the proposed

studies." 21 C.F.R. § 312.42(b)(1)(iv); *see id.* § 312.42(b)(2)(i) (extending this rationale to

Phase 2 or 3 studies, which include those at issue here).

The Nonclinical Study Guidance relates to 21 C.F.R. § 312.23(a)(8), which notes that

"[g]uidance documents are available from FDA that describe ways in which these requirements

may be met." The Guidance contains FDA's recommendation on the minimum duration of

repeated-dose, animal toxicity studies to support proposed human studies. *See* AR 10917. But

the Guidance does not "create or amend a substantive legal standard," *Clarian Health West, LLC*

*v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017), simply by "suppl[ying] crisper and more detailed

lines than" the regulation's text, *Am. Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d

1106, 1112 (D.C. Cir. 1993).

The "most important" question is whether the Guidance has "actual legal effect." *Ca.*

*Communities*, 2019 WL 3197540, at *4 (quoting *Nat'l Mining*, 758 F.3d at 252). The answer is

No. The Nonclinical Study Guidance simply "forecasts" FDA's position, *Ca. Communities*,

2019 WL 3917540, at *6, about the nature and kind of animal toxicity studies the agency

believes to be "[a]dequate" to support certain human studies, 21 C.F.R. § 312.23(a)(8), *see, e.g.*,

*Nat'l Mining*, 758 F.3d at 252 (policy statement may "explain[] how the agency will enforce a

statute or regulation").

The agency's own documents reveal that the Guidance "has no independent legal

authority." *Ca. Communities*, 2019 WL 3917540, at *6. At the December 2018 Medical Policy

and Program Review Council ("MPPRC") meeting, for example, the Guidance was described as

reflecting "FDA's current thinking on the topic." AR 10871. The partial clinical hold invokes

21 C.F.R. § 312.42(b)(2)(i)—not the Guidance—as the *legal* basis for action. AR 10185; AR

11106.  Indeed, if the Guidance never existed, FDA could impose a clinical hold for the same

rationale under the same regulation.  *See Clarian Health*, 878 F.3d at 355, 357 (holding agency

action was policy statement in part because agency possessed the "same [legal] authority" with

or without the policy).  Thus, Vanda can "point to no right or duty imposed by the agency's

policy upon [it], other than that already present in" FDA's regulations—all of which were

promulgated through notice-and-comment rulemaking and based upon statutory requirements.

*Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197, 231 (D.D.C. 2015).

Vanda wrongly claims that FDA's position in the remand response was solely supported

by "the . . . Guidance" and the agency "refused to hear new argument" about the validity of its

position.  Vanda MSJ Resp. 8-9 (quotations omitted).  FDA did not support its decision by citing

to the Guidance document; rather, the agency identified and discussed the findings of scientific

studies, which have been "borne out by FDA's . . . experience with clinical investigations."  AR

11120-23.  And far from refusing to hear new argument, FDA specifically responded to Vanda's

argument that a 9-month nonrodent study was unnecessary.  *See* AR 11116-20, 11124-26.

### B.  The partial clinical hold is an individual adjudication not a rule.

Next, Vanda pivots to the partial clinical hold, claiming that it is a "substantive

amendment" of 21 C.F.R. § 312.23(a)(8) because FDA "revised the governing rules to adopt

numeric standards that are not discernible from the regulatory text."  Vanda MSJ Resp. 7-8.

FDA has discretion in enforcing that regulation to proceed "by individual adjudication or general

rulemaking."  FDA MSJ Mem., ECF No. 33-1, at 30 (quoting *Nat'l Small Shipments Traffic

Conference, Inc. v. ICC*, 725 F.2d 1442, 1447 (D.C. Cir. 1984)).  And Vanda does not dispute

that "[t]he APA does not require that all the specific applications of a rule evolve by further,

more precise rules rather than by adjudication."  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87,

96 (1995); *see* FDA MSJ Mem. 44.

Here, FDA exercised its discretion by issuing a partial clinical hold, a type of informal

adjudication.  *See* FDA MSJ Mem. 37; *see also Izaak Walton League of Am. v. Marsh*, 655 F.2d

346, 361 n.37 (D.C. Cir. 1981) (defining informal adjudication).  Vanda argues that the

discussion of the scientific standard in the clinical hold decision constitutes "a binding rule,"

Vanda MSJ Resp. 7; it is incorrect for two reasons.

*First*, FDA adjudicated Vanda's specific situation; it did not establish a "generally

applicable" rule.  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017).  By statute, a

clinical hold relates to a particular sponsor conducting a particular investigation of a drug.  *See*

21 U.S.C. § 355(i)(3)(A); *see also* 21 C.F.R. § 312.42(a) (limiting a clinical hold to

investigations covered by a particular IND); AR 11108.  The partial clinical hold extends no

further than Vanda's proposal to study tradipitant in humans for longer than 3 months.  *See* AR

10184 (imposing initial partial clinical hold for specific studies); AR 11106, 11127 (same).  It

was based on FDA's specific analysis of Vanda's proposed studies of tradipitant.  *See* AR

11115-27.  Thus, the partial clinical hold is an adjudication because it "determined . . . rights and

obligations" under "existing rules and regulations," and within the context of tradipitant.

*Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017).[1]

*Second*, the partial clinical hold immediately bound Vanda by applying the law to the

study proposals it had submitted to FDA.  *Safari Club*, 878 F.3d at 333 ("[R]ules generally have

only 'future effect' while adjudications immediately bind parties by retroactively applying law to

their past actions."); *see* 5 U.S.C. § 551(4) (defining "rule" to mean an "agency statement" that

has "future effect").  Any "tangential impact on other entities" from the partial clinical hold does

---

[1] Contrary to Vanda's claim, FDA has *not* stated that 9-month nonrodent testing data are necessary "in all cases."  Vanda MSJ Resp. 10.  The remand response notes circumstances when the facts justify a different scientific approach.  AR 11123-24.

not "transform an informal adjudication into a rulemaking since 'the nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied . . . to those before the tribunal.'" *Neustar*, 857 F.3d at 895 (quoting *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999)).

## II.     The partial clinical hold decision rests upon a sound scientific foundation.

Vanda's three main challenges to the substance of FDA's decision are no more successful than its contention about a legislative rule.  Essentially, Vanda wants this Court to do what the D.C. Circuit has explicitly cautioned against—"second-guess[ing] an agency's scientific judgments." *Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 923 (D.C. Cir. 2013).  Although Vanda may be willing to accept a great degree of risk in exposing humans to the long-term effects of tradipitant, FDA, committed to protecting the safety of study subjects, has determined that such risk is unacceptable.  The agency's decision is "reasonable and reasonably explained," and should not be upset.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019).

### A.   FDA neither ignored certain evidence in the record nor is it contrary to the agency's decision.

Vanda asserts that FDA "ignored and minimized contrary evidence" in the record.  Vanda MSJ Resp. 19.  But FDA has not ignored the publications that Vanda cites, nor are they contrary to the agency's decision.

Vanda claims that "FDA has simply ignored the Parkinson et al. study," Vanda MSJ Resp. 20, and left unaddressed the "history of how a 9-month nonrodent-study" standard was developed, *id.* 23.  However, FDA explained that Parkinson et al. was one among several early papers that drew various conclusions on the appropriate duration of nonrodent toxicity studies based on analyses of smaller data sets.  AR 11122 n.52.  FDA further explained that the early papers revealed the need for a more robust analysis.  See AR 11122 n.52.  Given FDA's

7

reasonable explanation of the Parkinson paper's role in the development of toxicity-study standards, the paper is not "contrary" to the agency's finding.  *See* Vanda MSJ Resp. 21.  As FDA noted in the remand response, this early analysis has been supplanted by more recent and robust studies.

Much of Vanda's argument about "bureaucratic compromises," Vanda MSJ Resp. 23, consists of extra-record Internet cites, which should not be considered, *see The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009).  Even so, FDA situated its current scientific view of the importance of a 9-month nonrodent toxicity study within the historical context.  FDA traced the science from the early 1990s through the more robust, recent analyses.  *See* AR 11120-11123.  The agency's decision is based on those later, more robust analyses.  *See* AR 11121-23.  Thus, Vanda's claim that the 9-month nonrodent study standard was developed "as a policy-based compromise," Vanda MSJ Resp. 23, is incorrect because FDA reviewed the underlying scientific literature and gave each paper the weight the agency decided it deserved, *see* AR 11121-24.

Vanda also alleges that FDA incompletely analyzed the Broadhead et al. paper, *see* Vanda MSJ Resp. 20, and contends that the scientific literature regarding long-term nonrodent studies is "mixed," Vanda MSJ Resp. 23.  Notably, Vanda does not take issue with FDA's reliance on Broadhead et al. for the proposition that toxicity testing in at least "two mammalian animal species (one rodent and one nonrodent) is necessary to provide adequate assurance of detecting toxicities that may be relevant to humans."  AR 11114.  Instead, Vanda claims that other aspects of the Broadhead study undercut FDA's decision.  But, as Vanda itself points out, *see* Vanda MSJ Resp. 20, the interpretation of scientific studies, and the weight and

consideration given to them, is best left to the agency's scientists,[2] *see United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1263 (D.C. Cir. 1980) ("Where the agency presents scientifically respectable evidence which the petitioner can continually dispute . . . , the court must not second-guess the particular way the agency chooses to weigh the conflicting evidence or resolve the dispute."). FDA's interpretation of these studies is entitled to substantial deference, and should not be overturned. *See, e.g., Cytori Therapeutics, Inc.*, 715 F.3d at 923.

### B. FDA reasonably found that a 9-month nonrodent toxicity study was necessary.

Vanda argues that FDA should have conducted an "analysis of the predictive power of dog studies" before asking Vanda to conduct a 9-month nonrodent toxicity study. Vanda MSJ Resp. 22. The response to that point begins with fundamental, uncontested scientific principles.

Vanda does not dispute that "[t]he duration of exposure to a drug influences the type and severity of injury caused by that drug." AR 11114. Nor does Vanda contest that "[i]ncreasing the duration of toxicity studies has a signal-amplifying function," thereby "increasing the probability that weak or minimal indications of toxicity" could become "clinically meaningful" or "[n]ew or more severe toxicity signals" could be unearthed. AR 11114-15. Given those undisputed principles, FDA reasonably concluded that "it is not possible, at present, to predict long-term systemic toxicity in humans based on subchronic (e.g., 3-month) toxicity studies in animals. Three-month nonrodent toxicity studies are not predictive of findings that may be observed in chronic (9-month) nonrodent toxicity studies and that are relevant to the safety of proposed clinical trials." AR 11120-21; *see* AR 11124 (concluding that "the results from short-term [human] studies cannot be extrapolated to support dosing for longer than 3 months in

---

[2] Indeed, Vanda acknowledges that its opening brief claimed the Broadhead study reached a conclusion that it plainly did not. *Compare* FDA MSJ Mem. 29, *with* Vanda MSJ Resp. 20 n.9.

humans"); *see also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989) ("a classic example of a factual dispute the resolution of which implicates substantial agency expertise").

Vanda seems to believe that information about toxicity from long-term exposure may be obtained by relying on short-term data (which FDA reasonably found to be inadequate) or simply subjecting humans to the drug and assessing the results.  FDA reasonably rejected these choices, in favor of a science-based approach.

There are two components to FDA's decision that Vanda must conduct a 9-month nonrodent toxicity study.  *First*, the law recognizes the use of animal tests, when appropriate, as prerequisites to proposed human studies.  *See* 21 U.S.C. § 355(i)(1)(A) (authorizing regulations that would require sponsors to submit information from "tests on animals . . . *before* any [human] testing of a new drug is undertaken); 21 C.F.R. § 312.23(a)(8) (providing for sponsors to conduct "animal" tests to develop a drug's toxicological profile).  The law reflects the science because "the findings in animal toxicity studies are generally applicable to humans."  AR 11113.

The utility of information obtained from animal toxicity studies goes well beyond positive and negative predictivity.[3]  Toxicity studies "help define appropriate doses for human subjects, and what types of monitoring will be necessary in a clinical trial to detect and avoid any potential toxicities."  AR 11115.  They also are "used to establish a drug's no-observed-adverse-effect-level (NOAEL), the highest level of drug exposure that is not associated with an adverse effect (toxicity) of the drug," which determines a clinical study's "margin of safety," or the "likelihood that humans might experience an adverse effect."  AR 11115.  An adequate margin

---

[3] Vanda's bald assertion that false positive tests in animal toxicity studies cause "abandonment of therapies that would have met unaddressed medical needs" has no support in the record.  Vanda MSJ Resp. 3.

of safety is essential for ensuring that the potential risk to human subjects in proposed clinical studies will be "sufficiently minimized."  AR 11115.

*Second*, FDA's choice of two species (rodent and nonrodent) rather than one (rodent only) was not arbitrary.  The "inconsistent toxicities" in rat species "can be corroborated as relevant to humans if observed" in nonrodents.  AR 11118.  Although FDA has not required a particular species of nonrodent, Vanda acknowledged that the pharmacokinetics of tradipitant share a consistency between dogs and humans.  *See* AR 11118.  FDA agrees.  AR 11118.

FDA stated that "[t]he information that a 9-month toxicity study in nonrodents may provide is currently unknown."  AR 11124.  It might reveal "new or more severe toxicity findings" that would impact proposed human testing or it might not.  AR 11124.  But that does *not* mean Vanda should avoid conducting the test in the first place.  The purpose of such a study is precisely to gather information and resolve uncertainties.  Right now, there is uncertainty about "the risks of long-term tradipitant use in humans."  AR 11119.  FDA reasonably believes a 9-month, nonrodent toxicity test can resolve some of that uncertainty.  *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (agencies receive the "most deferential" review when issues are "at the frontiers of science" and within the agency's "area of special expertise").

Despite its reference to "bad science," Vanda has not proposed an alternative toxicological model.  Vanda did not suggest any alternative study or test aimed at discerning long-term toxicities.  The company's entire plan is to wait until humans develop toxicities and then "the individual will be removed from the trial."  Vanda MSJ Resp. 31.  FDA cannot acquiesce in potential harm to human subjects "while it awaits the Godot of scientific certainty" about the predictive value of animal tests that Vanda demands.  *United Steelworkers*, 647 F.2d at

1266.[4]  FDA's position is all the more reasonable—and critical that it be upheld—given that

Vanda's alternative is to simply expose human subjects to unknown risks.

### C.  FDA's tradipitant-specific analyses were not arbitrary and capricious.

Vanda alleges that FDA's evaluation of the tradipitant-specific toxicity data is arbitrary

and capricious.  *See* Vanda MSJ Resp. 24-28.  None of its reasons have merit.

*First*, FDA's tradipitant-specific concerns are not litigation-driven.  As evident in the

record, those concerns emerged *before* the lawsuit.  *See, e.g.,* AR 10871 (describing weight-

related adverse toxicity findings in the 3-month dog study of tradipitant), AR 10893 (same); *see

also* AR 10884-85 (noting unforeseen risks to study subjects exposed to tradipitant for more than

3 months), AR 10904 (same).  In fact, the toxicity data emanating from Vanda's 3-month dog

study had been noted by FDA in 2016.  *See* AR 11117 n.32 and accompanying text.  The agency

determined that the findings did not prevent shorter-term clinical studies, *see* AR 11110, but they

took on additional significance when Vanda proposed long-term tradipitant use in humans.

There is nothing post-hoc about this analysis.

*Second*, Vanda's complaint about an FDA reviewer's 2005 memorandum has been

addressed.  *See* Vanda MSJ Resp. 27-28.  Although FDA maintains that the 2005 internal

memorandum does not belong in the record, the agency, in full candor, has submitted it to Vanda

---

[4] Indeed, FDA is actively evaluating alternatives to animal toxicity tests, but the science is still evolving.  *See, e.g.,* 84 Fed. Reg. 43144 (Aug. 20, 2019) (announcing public workshop on FDA Toxicology Working Group's Predictive Toxicology Roadmap); Citizen Petition Response, Dkt No. FDA 2015-P-2820, at 6-8 (Dec. 19, 2018) (describing that FDA supported the development of non-animal testing methods but concluded that, to date, the results from animal tests offer the most reliable, informative data for minimizing the risks to clinical study subjects), available at https://www.regulations.gov/document?D=FDA-2015-P-2820-0078.

and the Court.  Among other things, the 2005 memorandum noted that the study being evaluated "cannot be considered to have adequately characterized the toxic potential" of tradipitant. Harlow Decl., Ex. 2, at 7.  However, the deficiency was not seen as a critical flaw because the sponsor had limited its proposal to conduct a short-term (12-week) clinical study, *see id.*, a far cry from Vanda's current 52-week study proposals.

*Third*, FDA's partial clinical hold decision is not standardless.  *See* Vanda MSJ Resp. 25. FDA considered tradipitant's toxicity data in light of 21 C.F.R. § 312.23(a)(8), which requires "[a]dequate information about the pharmacological and toxicological studies of the drug involving laboratory animals or in vitro."  *See id.* § 312.23(a)(8)(ii) (requiring an "integrated summary of the toxicological effects of the drug in animals and in vitro").  FDA found that Vanda's studies of tradipitant revealed important toxicity findings—weight-loss in dogs, liver injury in rats, and an inconsistent pattern of adverse effects within and between animal species. *See* AR 11117-11119.  Against the backdrop of Vanda's proposed 12-month study, these toxicity findings "call[] for a 9-month toxicity study in nonrodents."  AR 111116.

For example, the findings in Vanda's 3-month dog study "indicate general poor health and may reflect development of other underlying toxicities that have yet to manifest in a way we can detect."  AR 11117.  The development of "adverse weight-related findings" in the 3-month dog study that had not been observed in the 1-month study indicates "an increase in drug-related toxicities with increasing duration of exposure to tradipitant."  AR 11117.  The variance in data "from strain to strain in rats, as well as from one mammalian species to another," shows how tradipitant's safety profile is unsettled.  AR 11119.  FDA also discussed how it determined, from scientific literature and agency experience, that a 9-month nonrodent study was necessary.  AR 11120-23; *see* FDA MSJ Mem. 29-32 (discussing scientific standard).  Thus, FDA reasonably

13

evaluated the existing toxicity data and scientific literature in light of the law, 21 C.F.R. §
312.23(a)(8), and rationally determined that Vanda lacked "[a]dequate" toxicology information
upon which to conclude its proposed 12-month studies in humans are reasonably safe to conduct.

*Finally*, Vanda misunderstands the impact of the casopitant information and implies that
it is not relevant to tradipitant.  *See* Vanda MSJ Resp. 28.  FDA's experience with casopitant
belies Vanda's claim that all NK-1 receptor antagonists are "well-tolerated," AR 8661.  As the
record shows, long-term dog studies of casopitant, an NK-1 receptor antagonist like tradipitant,
revealed severe drug-related cardiotoxicity.  AR 11120; AR 11115-18.  And casopitant is but one
example of the basic principle that each drug requires "appropriate and complete toxicology
information" to "assure appropriate decisions can be made regarding clinical development."  AR
11120.

**III.    FDA complied with this Court's order and the APA on remand.**

Having shown the reasonableness of FDA's decision, we address Vanda's contentions
that the decision was based on "extraordinary," "shocking," and "stunning" procedures.  Vanda
MSJ Resp. 4-5.  Vanda is simply wrong.

In Vanda's desire to overturn "the status quo," Vanda MSJ Resp. 3, the company has
extended well beyond the bounds of the APA and "simple fairness to those who are engaged in
the tasks of administration."  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37
(1952).  Unhappy with FDA's remand response, Vanda asks this Court to entirely disregard the
agency's 22-page scientific analysis.  Vanda also complains that FDA impermissibly has
declined to consider the evidence that Vanda (improperly) offered.  These claims do not merit
relief under the APA.

### A. Vanda's attempted suppression of FDA's remand response is unsupported by the law and the record.

Vanda asks this Court to disregard FDA's remand response as a post-hoc rationalization because allegedly "FDA's pre-remand documents were clear that the [Nonclinical Study] Guidance was the *only* basis for the partial clinical hold, not the concerns identified in the Remand Response." Vanda MSJ Resp. 10. That view is not supported by the record.

### 1. FDA's scientific concerns with Vanda's proposed human studies have proved long-standing.

Vanda claims that the remand response should be ignored as post hoc because previously FDA was "indifferent to the science" (allegedly) and issued the clinical hold only because a guidance document "says so, not because of any case-specific analysis." Vanda MSJ Resp. 13. Vanda's position is entirely unsupported by the facts and the law.

As Vanda suggests, we begin with this Court's decision in *NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018). In *NAACP*, the Court recognized that the rule against post hoc rationalizations simply "prevent[s] courts from considering 'rationales offered by anyone other than the proper decisionmakers'" and "is not meant to be 'a time barrier which freezes an agency's exercise of its judgment . . . and bars it from further articulation of its reasoning.'" *NAACP*, 315 F. Supp. 3d at 466 (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006). Indeed, the Court *considered* the agency's reasons offered on remand even though they did not "relate back perfectly" to the original decision and record. *NAACP*, 315 F. Supp. 3d at 467. Here, as discussed below, FDA's pre- and post-remand rationale for its decision is consistent. FDA initially had tradipitant-specific concerns and, on remand, FDA further articulated the bases of those concerns.

By expounding upon its rationale, FDA was doing exactly what this Court requested. Everything in the remand response flowed directly from this Court's order granting FDA's

motion, which in turn explicitly sought permission to "re-evaluate" Vanda's scientific

submissions and "provide a full written explanation of the agency's analysis and ultimate

position."  Remand Order, ECF No. 11, at 5; FDA Remand Mem., ECF No. 6-1, at 6.  And "[i]t

is entirely proper for an agency to provide an explanation if directed to do so on remand."

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 217 (D.C. Cir. 2013); *see Bean Dredging,*

*LLC v. United States*, 773 F. Supp. 3d 63, 78 (D.D.C. 2011) ("[A]n agency's review on remand

must be responsive to the court's mandate.").

 Vanda argues that the remand response's two, "principal rationales . . . do not appear in

the pre-remand record and bear no analytical relation to FDA's original clinical hold."  Vanda

MSJ Resp. 10.  Actually, each rationale is well-documented in the record and directly relates to

the basis for the clinical hold.

*First*, the remand response's discussion of the shortcomings in Vanda's animal studies,

*see* AR 11116-19, and short-term human studies, *see* AR 11124-25, are more in-depth

explanations of FDA's original finding.  As described above, FDA extensively discussed the

safety signals from tradipitant's existing toxicity tests.  *See supra* page 12; *see also* AR 10871,

10875, 10893, 10838-39.  And FDA's concerns about predicting long-term toxicities from

Vanda's short-term human data also are recorded.  *See* AR 10904 (finding that "short-term"

human trial data "may not be predictive of greater than 3 months (or longer-term) safety of this

drug").  Thus, the agency's conclusion that "the risks of long-term tradipitant use in humans

cannot be predicted by the studies conducted to date" is nothing new.  AR 11119.

*Second*, the December 2018 MPPRC meeting reflects FDA's consideration of support for

9-month nonrodent studies in the scientific literature.  *See* AR 10871 (noting that "[a]nalyses by

FDA, other drug regulatory authorities and regulated industry have shown that nonrodent studies

of 9 months duration are needed to identify clinically relevant adverse toxicity findings for human exposures that exceed 3 months"); AR 10872 (FDA staff "noted that their experience has shown that there are potentially important findings in chronic nonrodent toxicity studies of 9-12 months duration that were relevant to human risk, and that these findings were often not observed in the shorter duration toxicity studies (i.e., 3-6 months)").  The initial partial clinical hold letter cited to the foundational scientific publication, which also was discussed in more detail in the remand response.  *Compare* AR 10185 (citing 1999 DeGeorge publication), *with* AR 11121-22 & nn.49-52 (discussing same study).  Any additional scientific literature in the remand response comes pursuant to the Court's permission to "fully set[] out the scientific basis for [the agency's] actions here."  FDA Remand Mem. 6.

Like the challengers in *NAACP*, Vanda "overstate[s] the novelty of the [remand response's] arguments."  *Id.* at 466.  Far from making "clear that the [Nonclinical Study] Guidance was the *only* basis for the partial clinical hold," Vanda MSJ Resp. 10 (emphasis in original), FDA's pre-remand documents demonstrate the agency's long-standing, tradipitant-specific concerns.

## 2.  FDA was not required on remand to consult the MPPRC again.

Vanda argues that the remand response is invalid because the MPPRC purportedly "issued the clinical hold the first time around" and it was not consulted again on remand.  Vanda MSJ Resp. 11.  Vanda's position is unsupported by the facts and the law.

Vanda's characterization of the MPPRC as the body that "*issued* the clinical hold the first time around" is incorrect.  Vanda MSJ Resp. 10 (emphasis added).  No statute or regulation grants the MPPRC legal responsibility for issuing clinical holds; indeed, Vanda does not "suggest that the signatory of the Remand Response lacks statutory or regulatory authority to issue a hold."  Vanda MSJ Resp. 10.  The record shows the MPPRC played a consultative—not a

decisional—role in this matter.  *See* AR 10900 (seeking "input from members of the [MPPRC] on the adequacy of [Vanda's] nonclinical program to support a 52-week clinical trial with tradipitant"); AR 10872 (the MPPRC "supported the recommendation" of the division reviewing Vanda's IND).

The remand response uncontestably was issued by an agency official with authority to do so, *see* Vanda MSJ Resp. 10, and represents the agency's views; that is sufficient.  *See Alpharma*, 460 F.3d at 7 (finding it "perfectly appropriate" to consider an agency's remand explanation if it was issued by a "proper decisionmaker" and "represents the considered views of the agency itself").  FDA's decision not to consult the MPPRC again did not turn the remand into a barren exercise.  Nor did that decision run afoul of the APA.[5]  *See Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (agency discretion to craft its procedures on remand).

Vanda invokes the D.C. Circuit's decision in *Food Marketing Institute v. ICC*, 587 F.2d 1285 (D.C. Cir. 1978), out of context.  *See* Vanda MSJ Resp. 12.  *Food Marketing Institute* "does not mean that an agency cannot explain itself on remand."  *Muwekma*, 708 F.3d at 217 n.8. Rather, "[t]hat decision's warning against '[p]ost-hoc rationalizations by the agency on remand,' occurred after the court already had concluded that the agency's position was 'defective'—not just insufficiently explained . . . –and the court therefore had 'vacated' the decision."  *Delta Air Lines, Inc. v. Export-Import Bank of the United States*, 85 F. Supp. 3d 436, 451 (D.D.C. 2015)

---

[5] FDA's choice not to re-consult the MPPRC does *not* indicate that the agency was locked into its initial decision.  If upon re-evaluation of Vanda's scientific submissions, FDA determined that a clinical hold was not supported by the evidence, nothing prevented the agency from modifying its initial decision or returning to the MPPRC for guidance.  However, FDA is not required to seek the MPPRC's views, nor is the MPPRC the final arbiter for issuing a clinical hold.

(quoting *Food Marketing Inst.*, 587 F.2d at 1288-90).  The case thus "addresses the potential

problem of closed-mindedness when an agency is required to make a new decision on remand."

*Delta Air Lines*, 85 F. Supp. 3d at 451.

Unlike *Food Marketing Institute*, the Court here did not vacate the initial clinical hold,

and FDA was not "required to make a new decision on remand."  *Delta Air Lines*, 85 F. Supp. 3d

at 451; *see* Remand Order 5.  And in any event, the record reflects that FDA was not close-

minded on remand as it thoroughly analyzed and discussed the evidence.

> **B.  FDA considered all relevant information, including Vanda's material, that was properly before it.**

Vanda argues that FDA violated by the APA by "disregarding material that Vanda

submitted."  Vanda MSJ Resp. 16-17.  FDA did not, in fact, skew the record when it included

Vanda's materials that had been properly submitted (which were "before the agency") but

omitted materials that had not been properly submitted (which were *not* "before the agency").

Three points are clear.  *First*, the record contains information submitted by Vanda in

support of its position.  *Second*, Vanda chose not to participate in FDA's clinical-hold

adjudicatory process after December 2018.  *Third*, had Vanda continued to participate in the

administrative process, FDA *would have considered* any properly submitted materials.

FDA was entitled to "impos[e] some orderly structure on the course of its proceedings"

so they "can function effectively."  *Woodford v. Ngo*, 548 U.S. 81, 91 (2006).  The APA does

not support Vanda's attempt to subvert orderly adjudication.

> **1.  FDA did not skew the evidentiary record.**

Under the APA, "an agency cannot ignore evidence that undercuts its judgment."

*Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).  But that evidence must properly

reside in the record, *i.e.*, have been "before the actual decisionmakers involved in the

determination." *Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C. 2008); *see*

*Alaska Excursion Cruises, Inc. v. United States*, 603 F. Supp. 541, 550 (D.D.C. 1984) ("[T]he

court cannot conclude that an agency's decision was improper because it failed to consider

evidence that was not before it . . . ."). In claiming that its February 2019 complaint and a

Humane Society letter, dated April 24, 2019, were "before the agency," Vanda treats the phrase

as a colloquialism rather than a legal requirement. *See Earthworks v. U.S. Dep't of the Interior*,

279 F.R.D. 180, 184 (D.D.C. 2012) ("A broad application of the phrase 'before the agency'

would undermine the value of judicial review[.]").

    *First*, the record *contains* information submitted by Vanda to support its position.

Specifically, Vanda's pre-December 2018 objections to a 9-month nonrodent toxicity study were

before the agency. *See* AR 08647-9130 (August 2018 Formal Dispute Resolution Request and

September 2018 Study 2302 Protocol). FDA asked for permission to re-evaluate those

submissions on remand, *see* FDA Remand Mem. 6, which it did, *see* AR 11111 & n.18

(identifying Vanda's submissions). The record contains nothing from Vanda after December

2018 because the company declined to submit further evidence as "pointless." Vanda MSJ Resp.

19.

    *Second*, addressing any scientific information contained in the complaint that had never

before been presented to FDA was *not* "the entire point of the remand." Vanda MSJ Resp. 17.

Vanda acknowledges that FDA agreed "to address certain *procedural* issues Vanda noted in its

Complaint," Vanda MSJ Resp. 17 (quoting FDA Remand Mem. 2) (emphasis added), which

involved responding to Vanda's pre-existing "scientific submissions," FDA Remand Mem. 6.

The complaint itself was *not* "before the actual decisionmakers involved in the determination,"

*Sara Lee*, 252 F.R.D. at 34, only Vanda's pre-existing submissions were. And Vanda does not

cite a single case in which a court held that a party could properly place evidence "before the agency" through allegations in a litigation pleading.

*Third*, neither Vanda nor the non-party Humane Society properly placed the Humane Society's letter before FDA in a timely way. *See Sara Lee*, 252 F.R.D. at 34. Vanda refuses even to agree that an agency can decline to consider information submitted by a third-party a mere *36 hours* before the court-ordered remand was due. *See* Vanda MSJ Resp. 18. That position is unreasonable and is not compelled by the APA. *See Nat'l Corn Growers Ass'n v. EPA*, 613 F.3d 266, 273 (D.C. Cir. 2010) (declining to "consider an argument that the agency was not given a *fair* opportunity to consider" previously) (emphasis added).

## 2. Vanda's refusal to participate in FDA's clinical-hold process cannot cause the agency's action to be invalid under the APA.

As FDA has repeatedly pointed out, processes exist under the FDCA and FDA's regulations for Vanda to submit additional information regarding a clinical hold. *See, e.g.*, FDA MSJ Mem. 12-13, 38. Vanda eschewed these pathways after December 2018. Although Vanda shrugs that it would have been "pointless," Vanda MSJ Resp. 19, the point of submitting information to an agency is to afford the agency a chance to reexamine earlier conclusions and create a robust record setting out the agency's evaluation of the issues. That is why "[s]imple fairness to those who are engaged in the tasks of administration . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

Vanda cannot reasonably claim that FDA would have "refused to entertain Vanda's substantive arguments." Vanda MSJ Resp. 19. The agency explicitly, and in good faith, re-evaluated and responded to Vanda's submissions. If Vanda had wanted FDA to consider

additional information, Vanda could have presented the information to the agency under either the statutory or regulatory appeal process and FDA *would have considered* it.  Indeed, under the statutory process, Vanda would have received a written response "within 30 days."  21 U.S.C. § 355(i)(3)(C).

The Court should not supplement the record when Vanda acted "in bad faith or with dilatory intent."  *Davis v. Pension Ben. Guar. Corp.*, 815 F. Supp. 2d 283, 291 (D.D.C. 2011). Parties like Vanda "must not be encouraged to 'sandbag' agencies" by withholding evidence from the agency's consideration.  *USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1260 (D.C. Cir. 1992).  The partial clinical hold decision should not be vacated based on the tactical choice of Vanda and the Humane Society to wait until *36 hours* before the remand deadline to send an email to FDA with additional material.  The seminal scientific issue has remained the same throughout this proceeding, and none of the materials Vanda seeks to include in the record are newly published.  Nor should the Court vacate the clinical hold based on other studies the company admittedly never presented to FDA.  *See* Vanda AR Reply, ECF No. 34, at 9 ("Vanda is not asserting that the agency did or should have considered these particular studies . . . .).

That Vanda chose "to withhold evidence at the agency level" does not mean FDA skewed the record and "does not provide a basis to allow the introduction of extra-record evidence during judicial review."  *Davis*, 815 F. Supp. 3d at 292.  Vanda's own "absolutist position deprived [it] of the opportunity" to properly present its evidence to FDA.  *City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 27 (D.D.C. 2001).  Thus, Vanda is "not entitled to a judicial declaration" that FDA's procedures on remand were "somehow inadequate."  *Id.*

## IV.     Vanda's vacatur argument epitomizes the flaws in its theory.

Finally, Vanda contends that the Court should vacate FDA's decision.  If the Court does not grant FDA's summary-judgment motion, FDA requests an opportunity to further brief the

question of remedy because "agency vacatur determinations are unusually well-suited to post-judgment briefing." *AARP v. U.S. EEOC*, 292 F. Supp. 3d 238, 242 (D.D.C. 2017). Nonetheless, FDA addresses Vanda's arguments because they highlight the company's continued recklessness about safety.

Remand without vacatur is appropriate "where there is a likelihood of . . . cure on remand." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 630 (D.C. Cir. 2016). Vanda does not deny that the scientific issues presented in this case are "squarely within the realm of those 'factual disputes' committed to agency expertise." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engrs.*, 282 F. Supp. 3d 91, 99 (D.D.C. 2017). Nor does Vanda deny that FDA's actions have not been held unlawful. Thus, the cases cited by Vanda denying an agency a second remand without vacatur, *see* Vanda MSJ Resp. 29, are clearly inapposite, *see Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) (denying second remand without vacatur because agency failed to comply with court's instruction during first remand); *NAACP*, 315 F. Supp. 3d at 473 (failing to correct legal improprieties identified by court during first remand). Accordingly, the Court should not acquiesce to Vanda's refusal to hear FDA's views about the evidence, particularly if any remand results from consideration of extra-record evidence. *See Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 111-13 (D.D.C. 2015) (remanding without vacatur a second time for agency to consider new, extra-record evidence).

Remand without vacatur also is appropriate when "a substantial disruptive effect . . . would result from vacatur." *U.S. Sugar*, 830 F.3d at 630. This Court already has found that "risks to patient safety from a clinical trial could be 'unpredictable and irreversible,'" which "further supports remand without vacatur." Remand Order 4. Those risks are only heightened by Vanda's plan to allow individuals participating in long-term studies to suffer toxicities that

could have been identified and prevented based on a 9-month, nonrodent toxicity study, and then simply have "the individual . . . removed from the trial." Vanda Reply 31. FDA does not find this reckless approach tolerable—nor should this Court. The partial clinical hold should remain in place to "temporarily preserve" the value of protecting study subjects. *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008).

## CONCLUSION

This Court should grant FDA's cross-motion for summary judgment.

Respectfully submitted,

Dated:  September 10, 2019

Of Counsel:

ROBERT P. CHARROW
General Counsel
U.S. Department of Health
  and Human Services

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
U.S. Department of Health
  and Human Services

ANNAMARIE KEMPIC
Deputy Chief Counsel, Litigation
Food and Drug Administration

CLAUDIA ZUCKERMAN
Senior Counsel
Office of the General Counsel
Food and Drug Division
10903 New Hampshire Avenue
White Oak 31, Room 4550
Silver Spring, MD 20993-0002

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

DAVID M. MORRELL
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director

ANDREW E. CLARK
Assistant Director

____/s/ James W. Harlow____
JAMES W. HARLOW
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice, Civil Division
P.O. Box 386
Washington, D.C.  20044-0386
Telephone:  (202) 514-6786
Fax:  (202) 514-8742
James.W.Harlow@usdoj.gov

Telephone:  (301) 796-8609
Claudia.Zuckerman@fda.hhs.gov

PUBLIC VERSION

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.

Dated:  September 10, 2019                     /s/ James W. Harlow
                                               James W. Harlow